ROBERT S. BREWER, JR.
United States Attorney
AARON P. ARNZEN (CA Bar No. 218272)
ANDREW J. GALVIN (CA Bar No. 261925)
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 546-8384 / 9721
Email: Aaron.Arnzen@usdoj.gov / Andrew.Galvin@usdoj.gov

Attorneys for the United States

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>GANNON GIGUIERE (1),<br>OLIVER LINDSAY (2),<br><br>　　　　Defendants. | Case No.: 18CR3071-WQH<br><br>**MOTION FOR INQUIRY REGARDING CONFLICT OF INTEREST**<br><br>Date:　　　TBD<br>Time:　　　TBD<br>Courtroom:　14-B<br><br>**HON. WILLIAM Q. HAYES** |

　　　The UNITED STATES OF AMERICA, by and through its counsel Robert S. Brewer, Jr., United States Attorney, and Aaron P. Arnzen and Andrew J. Galvin, Assistant U.S. Attorneys, files this notice of motion and motion for an inquiry regarding a serious potential conflict of interest surrounding Defendant Gannon Giguiere's counsel from the law firm of Greenberg Traurig, LLP ("Greenberg").[1]

---

[1] Prior to filing this motion the United States raised this issue with Greenberg, and invited the firm to provide facts sufficient to eliminate the potential for a conflict. As described below, Greenberg responded by maintaining that no serious potential of a conflict of interest existed, and that appropriate waivers are in place.

## I.
## INTRODUCTION

Defendant Giguiere is charged with engaging in fraudulent schemes to manipulate the public markets for two stocks – Kelvin Medical Corp. (ticker: KVMD) and Eco Science Solutions, Inc. (ticker: ESSI). While the schemes were ongoing, Giguiere reported that he sought legal advice and counsel from Mark Lee, an attorney with Greenberg. Giguiere told cooperating witness Michael Forster and co-defendant Oliver Lindsay that Attorney Lee had analyzed "all aspects of our business," spotted "no material issues," and concluded that Giguiere was "not doing anything wrong." At the same time, Giguiere made recorded statements to Forster indicating that Giguiere had concealed highly incriminating aspects of the schemes from Attorney Lee. The Government is considering calling Attorney Lee in its case-in-chief, and Giguiere may wish to do so in his defense case in order to pursue an advice of counsel defense centered on his communications with Attorney Lee. Attorney Lee is not representing Giguiere in this case, but other lawyers from Greenberg will be his trial counsel if the *status quo* holds.

At a minimum, it is likely that Attorney Lee will be a trial witness whose testimony would be important to establish Giguiere's state of mind and consciousness of guilt. Greenberg's strong interest in protecting its reputation may influence its decision about whether and how to cross-examine Attorney Lee if the Government calls him. The same interest may influence the firm's decision about whether to call Attorney Lee, and how to examine him, in a defense case. For example, Greenberg may well be motivated by its own interests, *i.e.*, to establish that the firm gave good advice, and did not know about some of the more egregious aspects of the conspirators' conduct. This, in turn, could support a possible Government argument regarding Giguiere's state of mind (an element required to establish securities fraud, as alleged in Counts 2 and 4 of the superseding indictment) when Giguiere chose what to disclose, and what not to disclose, to Attorney Lee. Separately, in deciding whether to pursue an advice of counsel defense, Greenberg's own interest in

maintaining the firm's reputation and keeping Attorney Lee out of harm's way may conflict with Giguiere's interest in advancing this potential defense.

Separately, Greenberg simultaneously represents ESSI (one of the companies whose stock was manipulated, as alleged in the superseding indictment), ESSI's officers and directors, and Giguiere in numerous civil suits filed against them. Allegations in those civil suits show substantial overlap with the criminal charges pressed here. Because ESSI's officers and directors are potential trial witnesses, Giguiere's interests may diverge from the interests of Greenberg's other clients (*i.e.*, ESSI and/or its officers and directors), leading to a further potential conflict between the Giguiere and his present counsel.

For these reasons, the United States is requesting that the Court perform an inquiry to determine the extent of any conflict, whether a waiver is in place, and whether such a waiver would be sufficient to ensure Giguiere's Sixth Amendment right to conflict-free counsel.

## II.
## STATEMENT OF RELEVANT FACTS

**A.  The Fraudulent Schemes Alleged in the Indictment**

On June 29, 2018, a grand jury impaneled in the Southern District of California handed down an indictment charging Defendants Gannon Giguiere and Oliver Lindsay for two securities fraud schemes. ECF No. 1. Those schemes involved manipulating the market for the stock of KVMD and ESSI.

The superseding indictment, handed down on January 25, 2019, alleges that Giguiere and Lindsay engaged in a pump-and-dump scheme in KVMD stock by:

- Controlling the stock and important operations of KVMD. ECF No. 79 at ¶ 23a, c, d.
- Concealing their control. *Id.* at ¶ 23b.
- Engaging in pre-arranged, coordinated trades to artificially increase the price and volume of KVMD stock. *Id.* at ¶ 23e-f.

- Hiring call-room operators to call securities brokers and convince the brokers to purchase KVMD stock in their clients' accounts. *Id.* at ¶ 23g.
- Fabricating KVMD's purported strategy and products. Prior to the conspirators' involvement, the company offered a hot/cold pack; afterwards, it purportedly had "evolved into an early stage telehealth wearable technology company," and "intend[ed] to leverage artificial intelligence and machine learning combined with the latest advancements in monitoring and therapeutic delivery technologies." *Id.* at ¶ 23h.
- Promoting KVMD and its stock on TheMoneyStreet.com, a website controlled by Giguiere. *Id.* at ¶ 23i.
- Selling KVMD stock to unsuspecting investors in the rising market for the stock. *Id.* at ¶ 23k.

**B.    The SEC's KVMD Trading Halt**

The Federal Bureau of Investigation ("FBI") and the U.S. Securities and Exchange Commission ("SEC") were conducting investigations surrounding KVMD, with assistance from Forster, while the scheme was ongoing. It eventually became apparent to the SEC that the conspirators were successfully manipulating KVMD's stock price. As a result, the SEC halted trading in KVMD on March 19, 2018 "due to concerns about the accuracy and adequacy of information in the marketplace and potentially manipulative transactions in KVMD's common stock." Declaration of Aaron Arnzen ("Arnzen Decl.", filed herewith), Ex. 1. This halt prompted a series of discussions among Giguiere, co-defendant Lindsay, and Forster. Forster recorded the conversations in which he participated. During these discussions, Giguiere relayed advice he received, and information he apparently concealed, from Attorney Lee.

**C.     Giguiere's Disclosure of Advice, and Concealment of Information, from Greenberg Attorney Mark Lee**

**March 20, 2018, Call No. 1** – The day after the SEC trading halt, Giguiere and Forster speculated about the reason for the trading halt, and focused on the huge increase in KVMD's stock price in the absence of factors that normally affect the market, *e.g.*, news releases published by the company.

> *Giguiere: "I think that's right, though, you know, I mean you've [KVMD] got 2 cents to a $1.60. No product. No real employees. No business. No financing. You know. You've got a registration statement then it gets pulled. And you've got a 13G that gets filed. Right? You just add all that up and they're like 'there is not a company here.'"*

Arnzen Decl., Ex. 2[2], Call 421 at 1:40 – 2:45.

**March 20, 2018, Call No. 2** – The same day, Giguiere and Forster plugged co-defendant Lindsay into the conversation. After some discussion, Lindsay advised "you need a good lawyer for this stuff." Mr. Giguiere responded, "Yeah, we do. We've got, uh, Mark Lee, of, because I am in a situation with ESSI, so have good counsel." Ex. 2, Call 422 at 5:30 – 6:40.

**March 21, 2018** – Giguiere shared with Lindsay and Forster some of the advice he received from Attorney Lee about the trading halt.

> *Giguiere: "**I called Mark Lee, of Greenberg**, who is my personal counsel, he's represented me on EVTI and ESSI and Kelvin Medical and you know, **he looked at it top to bottom, and he goes, 'I got no clue why this one got hit.'** He goes, 'you're gonna have to have company counsel talk to the SEC and really understand what the rationale was, because it doesn't make any sense to me. There's nothing nefarious, there's no promotion, there's one 8-K and it's the execution framework.' He goes, 'I see a little bit of volume but it's not like its traded 60 million shares for God's sake, right, it's traded a few million*

---

[2] Exhibit 2 is a CD containing the audio recording referenced herein. A copy of the CD is being submitted to the Court's chambers along with a hardcopy of this brief and other exhibits. Giguiere's counsel has confirmed that they are able to locate specific recordings in discovery, and have no objection to the United States' submission of the CD to chambers.

*shares.' He goes, 'the stock price is high from a valuation perspective, but you know, someone could say the Tesla stock valuation is high from a valuation perspective.' He goes, 'that doesn't warrant a company getting shot.'"*

Ex. 2, Call 434 at 10:35 – 11:30.

**April 25, 2018, Call No. 1** - Giguiere disclosed to Lindsay and Forster further communications he had with Greenberg regarding, among other things:

- The conspirators' business model.

    *<u>Giguiere</u>: "**So, walked them through all aspects of our business.** … They know the featured company aspect, the incubation aspect with registered offerings, credit lines, or equity lines and the for -- the paid aspect of the business."*

    Ex. 2, Call 512 at 10:14 – 10:55.

- Greenberg's intent to review disclosures related to the business model and the firm's initial legal analysis, based on information supplied by Mr. Giguiere.

    *<u>Giguiere</u>: "They are reviewing all the disclosures now. On the surface, they felt like there were no material issues, by any stretch. Uh, some refinements that they would see. … All in all it was a positive call."*

    Ex. 2, Call 512 at 10:55 – 12:23.

- The Kelvin Medical trading halt.

    *<u>Giguiere</u>: "**I talked to him about Kelvin**. He said, listen, I've been doing this a long, long, long time, more often than not there's no rhyme or reason for some of these halts. You know, it could be as simple as, you know, too fast too far. It could be as simple as the registration statement for the equity line. It could be as simple as somebody in the reverse merger got burned or snubbed, or pissed off, and raised a fit with examiners or the compliance group [UI] said lets pick up the pieces later. He goes, 'I've seen everything come out of these small cap microcap stocks.'"*

    Ex. 2, Call 512 at 12:23 – 13:12.

- Giguiere's false representation to Attorney Lee that he was not working with Lindsay and Forster.

> *Giguiere:* "And they said you're not doing anything wrong. You know, you're not, you know, you're not malicious, you're not a pumper that's offshore trying to hide. …"
>
> *Lindsay:* "**You didn't tell them about me, did you?** [Laughter]
>
> *Giguiere:* "No, no, no. **I'm a one-man band. Just so you're clear, Ollie.**"
>
> *Lindsay:* "I'm just kidding because you said offshore pumper."
>
> *Giguiere:* "No. He used that language actually. But, uh, just so you're clear, … . **I tell everybody I'm a one-man band. OK. It's just me in Newport Beach doing my little thing**."
>
> *Lindsay:* "You know, Gannon, I'd love to speak to these guys, because, you know, I just want to do shit properly, too, you know, that's uh --"
>
> *Giguiere:* "Any time you want me to make an introduction, I'm more than happy to, alright. You just tell me. …"

Ex. 2, Call 512 at 31:12 – 32:40 (emphasis added).

**April 25, 2018, Call No. 2** - Giguiere and Forster participated in a subsequent call during which Giguiere confirmed a number of incriminating facts that apparently were not disclosed to Attorney Lee.

> *Giguiere:* On the SEC front, my speculation is, after talking with the Greenberg Traurig guys, is, listen, you're not out coordinating the market and inducting all these insider trading situations. You're just doing your thing and you're advertising.
>
> *Forster:* OK. And that's -- that's kind of my segue. Okay. I am nervous about kicking the dog, okay. **I am nervous about KV[MD]. And its not because of what Greenberg and Sharon know, it's about what they don't know.**
>
> *Giguiere:* Yeah.
>
> *Forster:* **It's about the shit we have really done. You know, the coordinated trading.** You just mentioned it.
>
> *Giguiere:* Yeah.
>
> *Forster:* It about being all of the sales. It's about being, lets even take the two entrepreneurs. I sat up last night hoping an investigation actually didn't ensue because I would hate for them to answer -- because I believe that they would answer truthfully -- I would hate for them to start answering uncomfortable questions like, how was Gannon involved, what has he done for you. How did TheMoneyStreet article get written, how did you change

*your marketing plan, how did you change your plan from a hot cold pack, LED, or electropack to a full AI, fully blown, you know, fleshed out deal. I would hate, for within four questions, for the SEC, to sit there and go, huh, you sold a million and a half of the stock, there's this MoneyStreet thing, he helped you craft your new direction and your story, and we need to look at this more.  And that's just one tip of one iceberg.  Do you know what I'm trying to say?*

<u>Giguiere:</u> *Yeah.*

<u>Forster:</u> **It's not about what Sharon does know.  And it's not about what Greenberg Traurig does know.** *Let's set aside the fact the featured company stuff –*

<u>Giguiere:</u> *They know the featured company thing …*

<u>Forster:</u> *Let's just talk about KV.  I was hoping we didn't send the letter only 'cuz I'm scared of an any kind of investigation.* **And it's the shit we've talked about.  It's the stuff under the rocks.** *You know what I'm talking about.*

<u>Giguiere:</u>  *Yeah.*

<u>Forster:</u>  **If some of that surfaced, we'd be in deep shit.** *We'd be lawyering up and trying to figure out how somebody's not going to say the wrong thing. You know what I mean?*

<u>Giguiere:</u> *Yeah.*

<u>Forster:</u>  *I mean, do you disagree?*

<u>Giguiere:</u> *Well, let's just talk that through.  Okay.  Right.  So, we bought stock, we provided an equity line, and as part of it, we are investors that are trying to assist the company.  You know, making introductions.  So we make the introduction of Bob Smith.  We make the introduction of Toan Boi.  To help them develop their business plan and their strategy.  We make the introduction of Michael Hogue.  Okay.  I don't know how any of that's wrong. I'm just asking a question.  That's more of a question.  You know, can I not make strategy guy introductions, Bob Smith and Toan Boui.*

<u>Forster:</u>  *I think that the sticky wicket comes with the triad, and then ultimately global disclosure.  So the triad is, let's just take the 1.5 million shares to begin with.  Being the sole seller or a million and a half shares.  At the same time, crafting, being involved in crafting the story. And at the same time, going and paying for the marketing, that ultimately led to additional liquidity.  And actually not having disclosed every ugly little detail what we – we supported the market, we sold a million and a half shares, we're selling another million and a half shares, we're coaching and counseling the*

*company, we've formed their story, they can barely explain it on their own. **Those are not disclosures we've given anybody***.

<u>Giguiere:</u>  *That is correct.  That is correct.*

<u>Forster:</u> *And so that's what makes me nervous, and you know that.  And that's just a fine from the SEC, that's measuring me for an orange jump suit.  You know what I mean?*

<u>Giguiere:</u>  *Yep.*

Ex. 2, Call 514 at 11:54 – 16:55 (emphasis added).

### D. Greenberg's Representation of ESSI and its Officers and Directors in Civil Litigation Surrounding the ESSI Scheme

ESSI and its officers and directors, along with Giguiere, have been named as defendants in private securities litigation in several suits around the country.  These cases overlap substantially with the present criminal case.  For example, an amended complaint filed in the Federal District Court for the District of Nevada makes the following allegation against Giguiere, ESSI's officers and directors, and ESSI as a nominal defendant:

> At the heart of this wrongdoing is a "pump and dump" stock promotion scheme (the "Pump and Dump Scheme"), masterminded by Defendant Gannon Giguiere ("Giguiere"), in which the Individual Defendants entered a conspiracy to artificially inflate the price of the Company's shares that they substantially controlled through sham transactions and misrepresentations to the investing public, with the aim to enrich the Individual Defendants at the expense of the Company and its investors.

*Menos v. Taylor, et al.*, D. Nev. Case no. 17CV00662-LRH-CBC, Dkt no. 49 (Arnzen Decl., Ex. 3).  Similarly, a class action amended complaint filed in the Federal District Court for the District of New Jersey alleges that ESSI, its Chief Executive Officer, and its Chief Financial Officer, committed securities fraud by making false and misleading statements that allegedly were uncovered and led the SEC to suspend trading in ESSI stock on May 19, 2017.  *In re Eco Science Solutions, Inc. Securities Litigation*, D. N.J. Case no. 17CV3707-RMB-KMW, Dkt no. 32 (Arnzen Decl., Ex. 4).  These corporate statements are expected to be a significant area of focus at trial in the present case.

### E. Efforts to Meet and Confer with Counsel regarding the Conflict Issue

On July 5, 2018, within hours of defendants' arrests, the United States was contacted by attorneys from Greenberg on behalf of Giguiere. The attorneys included one of the Greenberg partners who has noticed her appearance in this case. The United States disclosed the broad outlines of the actual or potential conflict, and asked the Greenberg attorneys to consider the issue carefully. Greenberg did not make an appearance in this case at that time; Giguiere was represented instead by Steven Cook, an attorney with Brown Rudnick LLP, between July 2018 through the end of November 2018. (ECF No. 71.) In November, attorneys from Greenberg made their appearances for purposes of this case, and Steven Cook withdrew from the case. (ECF Nos. 64, 68, 69.) Because nothing had changed about the potential conflict, the United States initiated another discussion regarding the actual or potential conflict with Greenberg, cited specific instances in which Attorney Lee had given advice about KVMD (including the April 25, 2018 calls referenced above), and engaged in a telephone call to discuss the issue on December 3, 2018. The United States also sent letters in an effort to address the issue on February 12 and March 19, 2019. In each of these instances, the Greenberg trial attorneys responded that they have analyzed the actual or potential conflict(s), and have decided to remain on the case.

Specifically, Greenberg has taken, *inter alia*, the following positions:

- Giguiere sought advice from Attorney Lee about how to structure his business, and Attorney Lee was not engaged by Giguiere during the illegal activity.

- Attorney Lee would not be a proper trial witness because his communications were privileged under the "joint client" or "common interest" doctrine; Attorney Lee's advice is irrelevant because it surrounded the structure of Giguiere's business structure and does not reflect on Giguiere's scienter; and the testimony should be excluded under FRE 403.

- If Attorney Lee does testify at trial, Greenberg would engage "conflict counsel" to examine him.
- Giguiere, ESSI, and ESSI's officers and directors have entered into knowing and valid waivers.

*See* Arnzen Decl., Exs. 5, 6, February 22 and March 21, 2019 Letters from Greenberg re: Conflicts.

The United States has concerns about each of these positions. The privilege appears to have belonged to Giguiere, but he waived it during discussions with Forster and Lindsay.³ Forster never asked Giguiere to get any legal advice, or to describe it. Although they were working together on the KVMD scheme, there was never an oral or written partnership agreement among Giguiere, Forster, and Lindsay. Instead, the evidence shows that Giguiere decided to obtain and pay for legal advice on his own, and did not consult with Forster or (as far as we know) Lindsay about when to get such advice, what the advice should cover, and what information to give or withhold from the lawyers. And, as set forth above, Giguiere stated that Attorney Lee was "<u>my</u> personal counsel, he's represented <u>me</u> on EVTI and ESSI and Kelvin Medical." (Emphasis added.) Perhaps most importantly, if Attorney Lee really provided legal advice to a group that included Forster and/or Lindsay, this would greatly exacerbate (and not quell) concerns about Greenberg's conflicts.

The United States also disagrees that Attorney Lee's advice was unrelated to the subject of the allegations against Giguiere. Indeed, the calls quoted above make clear that Giguiere was seeking advice on (and withholding information regarding) the reason for the

---

³ The Ninth Circuit has repeatedly held that "voluntary disclosure of the content of a privileged attorney communication constitutes waiver of the privilege as to all other such communications on the same subject." *Weil v. Inv./Indicators, Research & Mgmt.*, 647 F.2d 18, 24 (9th Cir.1981); *see also Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010); <u>United States v. Depue</u>, 595 F. App'x 732, 733 (9th Cir. 2015) ("When an individual 'disclos[es] the content of a privileged communication which is relevant and material to an issue in the case,' he waives attorney-client privilege with respect to that communication.") (quoting *Weil*); *In re Icenhower*, 755 F.3d 1130, 1141 (9th Cir. 2014) (same).

KVMD trading halt, which is at the heart of the charges concerning KVMD alleged in Counts 1 and 2 of the superseding indictment. Moreover, Giguiere's argument that FRE 403 effects the analysis cannot be right – the Court and the parties have to know whether Greenberg has a preclusive conflict long before the Court decides an *in limine* motion, shortly before trial, about whether Attorney Lee will testify.

## III

## LEGAL DISCUSSION

**A.    The Constitution Guarantees Criminal Defendants Conflict-Free Counsel**

The Sixth Amendment guarantees every criminal defendant the right to counsel in all felony cases. U.S. Const. amend. VI*; see also Gideon v. Wainwright*, 372 U.S. 335, 342 (1963); *Baldasar v. Ill.*, 446 U.S. 222, 224-25 (1980), *overruled on other grounds by Nichols v. United States,* 511 U.S. 738 (1994). This right generally entitles an individual "[t]o choose who will represent him." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 144 (2006); *see also Powell v. Ala.*, 287 U.S. 45, 52 (1932). Indeed, a presumption exists that individuals may be represented by counsel of their choice. *Wheat v. United States*, 486 U.S. 153, 164 (1988).

Nonetheless, the right to counsel of choice is not absolute. It is "[c]ircumscribed in a number of important respects" and must be balanced against other important interests in the judicial system such as the Sixth Amendment right to conflict-free counsel. *Wood v. Georgia.*, 450 U.S. 261, 271 (1981); *United States v. Morrison*, 449 U.S. 361, 365 (1981); *United States v. Moore*, 159 F.3d 1154, 1157 (9th Cir. 1998).[4] The presumption in favor of granting a defendant his desired counsel is overcome in the presence of an actual conflict of interest created by counsel. *Id.* at 164-64; *see also*

---

[4] *See also Wheat*, 486 U.S. at 153 (the "essential aim of the [Sixth] Amendment is to guarantee an effective advocate," not the attorney preferred by defendant). A court is entitled to balance a defendant's right to retain counsel of his or her choice against the interests of judicial integrity and efficiency. *Id.* at 162 (court could deny defendant's choice of attorney to maintain integrity of judicial system when defendant selected an attorney with a conflict of interest).

*United States v. Miskinis*, 966 F.2d 1263, 1268 (9th Cir. 1992) ("Although a defendant who raises an ineffective assistance of counsel claim is ordinarily required to show prejudice, prejudice is presumed if the alleged violation is based on an actual conflict of interest.").[5]

It is important that courts be vigilant in addressing conflicts, as their existence may result in an attorney's assistance being deemed ineffective. *See Strickland v. Washington*, 466 U.S. 668, 692 (1984). As a result, a trial court has an independent duty to ensure that criminal defendants receive a trial that is free from conflicts of interest that would contravene the Sixth Amendment. *See, e.g.,* W*heat,* 486 U.S. at 161, and *Holloway v. Arkansas*, 435 U.S. 475, 484-85 (1978); *see also* Fed. R. Crim. P. 44(c) (discussing the court's duty to inquire into conflicts involving joint representation). "Moreover, in resolving this question, any doubt is resolved in favor of disqualification." *United States v. Tocco*, 575 F. Supp. 100, 102 (N.D. Ill. 1983).

**B.    The Applicable Rules of Professional Conduct**

Two California Rules of Professional Conduct (which are authoritative pursuant to this district's Civil Local Rule 83.4(b)) may have application here. First, under Rule 3.7, "a lawyer shall not act as an advocate in a trial in which the lawyer is likely to be a witness unless the lawyer's testimony relates to an uncontested issue or matter," and the client has signed a waiver. CRPC 3.7(a). "A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by rule 1.7 or rule 1.9." *Id.*

---

[5] The Supreme Court and Ninth Circuit have gone so far as to find that the mere potential for a conflict of interest is sufficient to require disqualification. *See Wheat*, 486 U.S. at 163-64 (because "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict," the presumption may be overcome by a showing of a serious potential for such a conflict); *United States v. Kenney*, 911 F.2d 315, 321 (9th Cir. 1990) (unless a defendant is attacking a conviction on appeal or in a habeas proceeding, the potential for a conflict of interest is sufficient to justify disqualification).

Rule 1.7, in turn, directly addresses conflicts of interest. Under Rule 1.7, a "lawyer shall not, without informed written consent from each affected client …, represent a client if there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with … a third person, or by the lawyer's own interests." CRCP 1.7(c). This rule's commentary makes clear that a conflict arises "if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities, interests, or relationships, whether legal, business, financial, professional, or personal." *Id.* at Comment 4. Further, a lawyer's relationship with a witness "who may be affected substantially by the resolution of the matter" may represent a conflict. *Id.*[6]

### C.   Knowing and Intelligent Waiver

As set forth above, there are circumstances in which a court may decide that the attorney's personal interest is so heightened, or the conflict is so severe, that no waiver is possible. *See United States v. Kliti*, 156 F.3d 150, 153 (2d Cir. 1998) ("If the conflict is so severe that no rational defendant would waive it, the court must disqualify the attorney.") If, on the other hand, the Court believes a waiver may be appropriate, the following guidance may facilitate the Court's inquiry. To begin with, a defendant may waive his right to the assistance of an attorney who is unhindered by conflicts, *Holloway, supra,* 435 U.S. at 483 n. 5, provided that the waiver is given knowingly and intelligently. *Edwards v. Arizona,* 451 U.S. 477, 482 (1981). But courts "indulge every reasonable presumption against the waiver of fundamental rights." *United States v. Allen*, 831 F. 2d 1487, 1498 (9th Cir. 1987), *citing Glasser, supra,* 315 U.S. at 70, and

---

[6] For conflict purposes, a firm suffers from disqualification when one of its attorneys is disqualified. "When a conflict of interest requires an attorney's disqualification from a matter, the disqualification normally extends vicariously to the attorney's entire law firm." State Compensation Fund v. Drobot, 193 F.Supp.3d 1080, 1087 (C.D. Cal. 2016) (quoting *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys., Inc.*, 20 Cal.4th 1135, 1139 (1999)).

the government bears the burden of proving a valid waiver. *Barker v. Wingo,* 407 U.S. 514, 529 (1972). Demonstrating a knowing and intelligent conflict waiver may be especially challenging in a case involving conflicts, since, as the Supreme Court has acknowledged:

> The likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict, even for those thoroughly familiar with criminal trials. It is a rare attorney who will be fortunate enough to learn the entire truth from his own client, much less be fully apprised before trial of what each of the Government's witnesses will say on the stand. A few bits of unforeseen testimony or a single previously unknown or unnoticed document may significantly shift the relationship between multiple defendants. These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by way of explanation to a criminal defendant untutored in the niceties of legal ethics.

*Wheat*, 486 U.S. at 163.

Given these challenges, it is unsurprising that reviewing courts grant substantial latitude to trial courts to determine whether there is a conflict and whether to accept a waiver. *See Wheat*, 486 U.S. at 164; *United States v. Frega*, 179 F.3d 793, 800 (9th Cir. 1999) ("District judges have 'substantial latitude' in deciding whether counsel must be disqualified."); *United States v. Stites*, 56 F.3d 1020, 1024 (9th Cir. 1995) ("Substantial latitude is necessary to avoid the district court being whipsawed – damned if it does and damned if it doesn't.").

If a waiver is possible, the Court should, at a minimum, conduct a colloquy with the defendant tailored to the risks rising from the specific conflict. For example, in a waiver upheld in *United States v. Powell*, 708 F.2d 455, 456 (9th Cir. 1983), *reversed on other grounds,* 105 S. Ct. 471 (1984), the Court informed appellant of her right to independent representation, advised her that, if she insisted on retaining her attorney despite the conflict, it might affect the attorney's ability to cross-examine witnesses on her behalf, warned her repeatedly of the risks, and gave her opportunities to obtain other counsel.

The Second Circuit has instructed that the trial court should: (i) advise the defendant of the dangers arising from the particular conflict; (ii) determine through questions that are likely to be answered in narrative form whether the defendant understands those risks and freely chooses to run them; and (iii) give the defendant time to digest and contemplate the risks after encouraging him or her to seek advice from independent counsel. *Iorizzo*, 786 F.2d at 59, *citing United States v. Curcio,* 680 F.2d 881, 888-90 (2d Cir. 1982). *Cf.* Fed. R. Crim. P. 44 (in cases of joint representation, court must "promptly inquire" and must advise each defendant of the right to the effective assistance of counsel, including separate representation, and "must take appropriate measures to protect each defendant's right to counsel.").

### D. The Potential Conflicts

In this case, the Court may wish to inquire whether the Greenberg attorneys appearing in this case have interests that are in conflict with Giguiere's interests. These actual or potential conflicts may manifest in one of several ways.

For example, in order to prove a securities fraud violation, the Government is required to establish that Giguiere acted willfully, *i.e.*, "for the wrongful purpose of defrauding or deceiving someone." Ninth Circuit Model Criminal Jury Instruction 9.9 (2010 Edition). Part of the Government's evidence regarding Giguiere's state of mind may consist of presenting evidence that he sought advice from Attorney Lee, but in doing so, he (1) presented the legally ambiguous aspects of the scheme (*e.g.*, the promotional efforts and "featured company thing" on TheMoneyStreet.com), but concealed from Attorney Lee the egregious parts of his scheme. In the terms used by Giguiere and Forster, the egregious aspects included "the triad, and then ultimately global disclosure," which refers to controlling the market for KVMD stock, manipulative trading in KVMD, and promoting the company and its stock, without disclosing all of these aspects to the unsuspecting victims who bought the stock when the conspirators were selling it. If, indeed, Giguiere withheld information from Attorney Lee, this would be evidence the United States may

well seek to present at trial and argue inferences therefrom regarding Giguiere's consciousness of guilt. With this in mind, even if "conflict counsel" examines Attorney Lee, Greenberg would have to decide whether and how to incorporate Lee's testimony into the rest of its trial presentation, including opening statement and closing argument. In short, will the Greenberg trial attorneys be able to pursue Gigueire's interests without being hampered by a potentially inconsistent goal of protecting Attorney Lee's reputation and practice if he were called to the stand?

As another example, Giguiere may wish to pursue an advice of counsel defense. To present the defense at trial, he must first meet several threshold criteria, including showing that he made a full disclosure to counsel. *United States v. Munoz*, 233 F.3d 1117, 1132 (9th Cir.2000). Giguiere may therefore wish to portray a situation in which he made all important disclosures to Greenberg to meet the threshold criteria, that any non-disclosures were unimportant, and then proceed with the defense. The firm, on the other hand, may have an interest in establishing that (1) Attorney Lee only concluded that "there are no material issues" and Giguiere was not "doing anything wrong" because Attorney Lee was not aware of the conspirators' manipulative trading or other nefarious conduct, and (2) that the non-disclosures concerned important information that would have affected Attorney Lee's analysis. This would preserve the firm's, and Attorney Lee's reputation, but it would run counter to any interest Giguiere has in pursuing the defense. An inquiry by the Court, therefore, would seek to determine if Greenberg's interests are sufficiently strong to give rise to a conflict, and if so, whether the conflict is subject to a valid waiver.

There is also the issue of Greenberg's simultaneous representation of Giguiere, ESSI, and ESSI's officers and directors in civil suits. ESSI's officers and directors may well be witnesses at the criminal trial in this case. The Court's inquiry may consist of determining the extent to which Greenberg can represent ESSI and its officers and directors, and present facts and arguments to their benefit, without undermining Giguiere's position in this case. How would Greenberg cross examine its own clients if they become

trial witnesses who testify in a way helpful to the United States? Greenberg's duties to ESSI and its officers and directors, as clients, may be in tension with Giguiere's interest in undermining the credibility of these witnesses and their testimony.

With these potential conflicts in mind, the topics about which to inquire may include the following:

- Whether other attorneys at Greenberg, in addition to Attorney Lee, have worked on Giguiere-related matters.

- Whether Giguiere's descriptions of discussions with Attorney Lee in the recorded calls referenced above are accurate. (The United States understands that some of these questions may be best posed *in camera* and outside the presence of prosecutors.)

- Whether Attorney Lee understood his discussions with Giguiere to concern only "future business dealings" (as suggested in Ex. 5), or if they concerned the suspected reasons for KVMD's trading suspension and how to handle the regulators in response to the suspension.

- The extent to which Attorney Lee knew, between March and April 2018, of the conduct alleged in the superseding indictment.

- Whether Attorney Lee understood his clients to include Lindsay and Forster (as suggested in Ex. 5).

- Whether Greenberg has advised Giguiere about the viability of an advice of counsel defense.

- How Greenberg would address testimony by Attorney Lee that is favorable to the prosecution. For example, if Attorney Lee testifies that Giguiere did not tell Attorney Lee about pre-arranged, manipulative trading, how would Greenberg incorporate that testimony into Giguiere's opening statement, closing argument, and overall trial strategy?

- To the extent that the United States calls ESSI's officer and directors (who are Greenberg clients in civil litigation focused on the same or similar conduct) as trial witnesses, how will Greenberg simultaneously represent the interests of those clients and Giguiere? Testimony that could favor the ESSI clients, of course, could hurt Giguiere, and *vice versa*.
- The nature and scope of waivers signed by other Greenberg clients – *i.e.*, the ESSI officers and directors – whose interests may diverge from Giguiere's interests.

With respect to an inquiry regarding the extent of Giguiere's waiver, the Court may wish to confirm that Giguiere understands that:

- Statements he made about advice received by Attorney Lee are likely to be offered in evidence by the prosecution at trial.
- He may be in a position in which he wants to testify about his communications with Attorney Lee.
- He may be in a position in which he wants to call Attorney Lee as a witness to their communications.
- The prosecution may seek to call Attorney Lee as a witness to their communications.
- Attorney Lee and Greenberg have an interest in protecting their own reputation.
- Greenberg also represents ESSI, and ESSI's officers and directors, in civil litigation, and one of more of these individuals may also be called as witnesses at trial.
- In light of the foregoing, the need for Greenberg to advise Giguiere on trial strategy may give rise to a conflict between Giguiere's interests and Greenberg's interests.

- He has the opportunity to seek advice from independent counsel about whether there is a conflict and whether he should continue to retain Greenberg.
- He will have the opportunity at a subsequent hearing to state on the record whether he is making a knowing and intelligent waiver of any conflicts relating to Greenberg or Attorney Lee.

## IV
## CONCLUSION

Giguiere should be confident that his attorney is watching out solely for Giguiere's interests, and not impaired or motivated by any other considerations. In the interests of protecting Giguiere's Sixth Amendment right to conflict-free counsel and precluding any future claim by Giguiere that an undisclosed conflict rendered his counsel ineffective, the United States respectfully requests that the Court conduct an inquiry to determine whether the Greenberg trial attorneys can continue to represent Giguiere, and, if so, secure Giguiere's waiver on the record.

DATED:   March 25, 2019.

Respectfully submitted,

ROBERT S. BREWER, JR.
United States Attorney

*/s/ Aaron P. Arnzen*
AARON P. ARNZEN
ANDREW J. GALVIN
Assistant U.S. Attorneys