# Exhibit 1

## U.S. SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C.

SECURITIES EXCHANGE ACT OF 1934
Release No. 82903 / March 19, 2018

The U.S. Securities and Exchange Commission ("Commission") announced the temporary suspension of trading in the securities of Kelvin Medical, Inc. ("KVMD"), commencing at 9:30 a.m. EDT on March 20, 2018 and terminating at 11:59 p.m. EDT on April 3, 2018.

The Commission temporarily suspended trading in KVMD's securities due to concerns about the accuracy and adequacy of information in the marketplace and potentially manipulative transactions in KVMD's common stock.  This order was entered pursuant to Section 12(k) of the Securities Exchange Act of 1934 (Exchange Act).

The Commission cautions brokers, dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by KVMD.

Brokers and dealers should be alert to the fact that, pursuant to Exchange Act Rule 15c2-11, at the termination of the trading suspensions, no quotation may be entered relating to KVMD's securities unless and until the broker or dealer has strictly complied with all of the provisions of the rule.  If any broker or dealer is uncertain as to what is required by the rule, it should refrain from entering quotations relating to KVMD's securities until such time as it has familiarized itself with the rule and is certain that all of its provisions have been met.  Any broker or dealer with questions regarding the rule should contact the staff of the Securities and Exchange Commission in Washington, DC at (202) 551-5720.  If any broker or dealer enters any quotation which is in violation of the rule, the Commission will consider the need for prompt enforcement action.

If any broker, dealer, or other person has any information which may relate to this matter, they should immediately contact Judith Weinstock, Esq., at weinstockj@sec.gov or (212) 336-9078.

# Exhibit 2



# Exhibit 3

Patrick R. Leverty, Esq.
**LEVERTY & ASSOCIATES LAW CHTD.**
Reno Gould House
832 Willow Street
Reno, NV 89502
Telephone: (775) 322-6636
Facsimile: (775) 322-3953
Email: pat@levertylaw.com

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| HANS MENOS, derivatively on behalf of ECO SCIENCE SOLUTIONS, INC., | |
| Plaintiff, | Case No. 3:17-cv-00662-LRH-CBC |
| vs. | |
| JEFFERY L. TAYLOR, DON L. TAYLOR, L. JOHN LEWIS, S. RANDALL OVESON, and GANNON GIGUIERE, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| and | |
| ECO SCIENCE SOLUTIONS, INC., | |
| Nominal Defendant. | |

### VERIFIED FIRST AMENDED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Hans Menos ("Plaintiff"), by his undersigned attorneys, derivatively on behalf of Nominal Defendant Eco Science Solutions, Inc. ("Eco Science" or the "Company"), files this Verified First Amended Shareholder Derivative Complaint against Defendants Jeffery L. Taylor, Don L. Taylor, L. John Lewis, S. Randall Oveson, and Gannon Giguiere (collectively, the "Individual Defendants") and alleges claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement. As for his verified first amended complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief

as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants,[1] United States Securities and Exchange Commission ("SEC") filings, including filings in the civil action commenced by the SEC captioned *SEC v. Giguiere, et al.*, Case No. 18-cv-1530 (S.D. Cal.) (the "SEC Action")[2], a criminal action brought by the United States Attorney's Office captioned *U.S.A. v. Giguiere, et al.*, Case No. 18-CR-3071 WQH (S.D. Cal.) (the "Criminal Action")[3], wire and press releases published by and regarding Eco Science, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy blatant and intentional misconduct committed by Eco Science's directors, officers, and controlling person.

2. At the heart of this wrongdoing is a "pump and dump" stock promotion scheme (the "Pump and Dump Scheme"), masterminded by Defendant Gannon Giguiere ("Giguiere"), in which the Individual Defendants entered a conspiracy to artificially inflate the price of the Company's shares that they substantially controlled through sham transactions and misrepresentations to the investing public, with the aim to enrich the Individual Defendants at the expense of the Company and its investors.

---

[1] "Defendants" refers to, collectively, Jeffery L. Taylor, Don L. Taylor, L. John Lewis, S. Randall Oveson, Gannon Giguiere, and the Company.

[2] A copy of the complaint filed in the SEC Action is attached hereto as Exhibit A and incorporated herein by reference.

[3] A copy of the indictment filed in the Criminal Action is attached hereto as Exhibit B and incorporated herein by reference.

3.     The Pump and Dump Scheme began in (at latest) December 2015, when Eco Science announced that the Company's then-majority shareholder had sold his Eco Science stock to two brothers – Defendants Jeffery Taylor ("J. Taylor") and Don L. Taylor ("D. Taylor") (together, the "Taylor brothers") – and that the Taylor brothers had been appointed to run the Company.  In truth, Defendant Giguiere had paid for the Taylor brothers' acquisition of the majority of the shares. Thereafter, Defendant Giguiere acted as an undisclosed control person of Eco Science who personally installed J Taylor as Eco Science's Chief Executive Officer ("CEO") and D. Taylor as the Company's Chief Financial Officer ("CFO"), and proceeded to run its affairs.

4.     Those affairs amounted to a fraudulent conspiracy.  From the moment that they were appointed, the Taylor brothers utilized their nominal control over the Company to help Defendant Giguiere execute the Pump and Dump Scheme.  The Pump and Dump Scheme constituted a series of bogus transactions between the Company and Giguiere-controlled entities and, later, a purported "bank" managed by Defendants Jon Lewis ("Lewis") and S. Randall Oveson ("Oveson"), designed to make the Company and its shares look much more valuable than they truly were.

5.     Within a month of the Taylor brothers nominally, and Giguiere in actuality, taking control of the Company, these Individual Defendants caused the Company to enter an agreement with Separation Degrees – One, Inc. ("Separation Degrees") – a purported "marketing and e-commerce solutions" enterprise also controlled and managed by Giguiere – to (according to the agreement) "pursue mutual beneficial opportunities that result in the development, licensing/acquisition of, and management of on-going technology solutions and marketing campaigns for Eco Science's initiatives."  In truth, the only "marketing" service provided was an illegal stock promotion campaign carried out by Giguiere through a purported "independent financial commentary" website that he secretly controlled called TheMoneyStreet.com ("The Money Street").  Throughout 2016, Defendant Giguiere – with the full knowledge of the Taylor brothers – pumped up the Company on The Money

Verified First Amended Shareholder Derivative Complaint

Street as the next big thing, calling it the next "Amazon" of the cannabis industry, and recommending purchase of its stock. In truth, both Giguiere and the other Individual Defendants knew that the Company had zero assets and tens of millions of dollars in debt.

6. The Taylor brothers remunerated Separation Degrees for its "marketing services" by granting Giguiere, through fraudulent Form S-8 registration statements, millions of dollars' worth of Company stock in lieu of cash. Defendant Giguiere profited handsomely from this scheme. Between April 2016 and January 2017, he sold more than 6 million shares of the Company stock granted to him though Separation Degrees – which had inflated in value some *1,947%* over the course of 2016 as a result of the Individual Defendants' sham transactions and false representations – for illicit proceeds of more than $8.5 million. From those proceeds, Giguiere wired monies to a third party, who then wired the money to Eco Science's bank account, from which the Taylor brothers then *paid themselves* $5,000 per month as their "salaries" for serving as the nominal managers of Eco Science at the behest of Giguiere.

7. In early 2017, Giguiere and the Taylor brothers caused the Company to enter another bogus transaction to further the Pump and Dump Scheme, this time involving Phenix Ventures, LLC ("Phenix"), which Giguiere also owned and controlled. Under that supposed "financing transaction," Eco Science agreed to sell ten million shares of the Company's stock to Phenix at a steep discount, thus allowing Giguiere to dump yet more shares that were inflated in the Pump and Dump Scheme, and at a handsome profit.

8. As the Company's share price began to decline in the spring of 2017, the Individual Defendants engaged in yet another sham transaction to keep the Pump and Dump Scheme alive. On May 5, 2017, the Company announced it had entered a Letter of Intent with Ga Du Bank, Inc. a/k/a Ga Du Corporation ("Ga Du Bank" or "Ga Du") to acquire Ga Du Bank for stock and cash, allegedly providing the Company a gateway into the lucrative cannabis banking business. The Individual

Defendants claimed that the Central Bank of the Southern Cherokee Nation Red Fire People ("SCNRFP") purportedly issued a license for Ga Du Bank to operate. In reality, however, the Individual Defendants concealed the fact that Ga Du Bank had been in existence of only a few weeks, that the SCNRFP had never issued a license to Ga Du Bank, and that SCNRFP was not even recognized by the Bureau of Indian Affairs as a sovereign tribe. But the Individual Defendants caused the Company to acquire Ga Du Bank anyway, continually touting its supposed virtues in a last-ditch bid to keep the Pump and Dump Scheme viable. Ga Du Bank was managed by Defendants Lewis and Oveson, who each joined Eco Science's Board of Directors (the "Board") once the acquisition occurred and, as detailed below, profited handsomely from the sham transaction.

9. The Ga Du Bank affair proved to be the last salvo in the Individual Defendants' Pump and Dump Scheme. On May 19, 2017, before the Ga Du acquisition was consummated, the SEC began to catch on, and suspended trading of Eco Science's stock over concerns about the accuracy of the Company's public statements concerning Ga Du Bank. The order issued by the SEC stated that "it appears to the [SEC] that there is a lack of current and accurate information concerning the securities" of Eco Science "because of concerns regarding the adequacy and accuracy of information in a company press release dated May 5, 2017 relating to the company's proposed acquisition of Ga Du Bank, Inc." By the time trading of the Company's shares resumed, on June 6, 2017, the stock closed at $0.65 per share, down *72%* from the closing price of $2.37 per share on May 19, 2017.

10. By the summer of 2018, the scheme had completely crumbled. On June 29, 2018, a federal grand jury in the United States Court for the Southern District of California issued a criminal indictment against Defendant Giguiere (among others) in the Criminal Action for conspiracy to commit securities fraud and securities fraud. The indictment charged Giguiere with stock manipulation and conducting a pump and dump scheme involving two public companies, one of which was the Pump and Dump Scheme at Eco Science. *See* Exhibit B.

11. Meanwhile, on July 6, 2018, the SEC filed the SEC Action against Defendant Giguiere (among others) also pertaining to the Pump and Dump Scheme on the Company. For his role in the scheme, the complaint charged Defendant Giguiere with violating Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rules 10b-5(a) and (c) promulgated thereunder. *See* Exhibit A.

12. The Company has been decimated by the Individual Defendants' knowing breaches of fiduciary duty and other misconduct. Eco Science has all but collapsed in the fall-out from the Individual Defendants' criminal enterprise and breaches of fiduciary duty, as detailed in both the SEC Action and Criminal Action. Its stock value has nose-dived from a high of $4.58 per share on January 20, 2017 to around $0.03 per share as of December 2018, losing *over 99%* of its value.

13. Through the course of the Pump and Dump Scheme, and as detailed further below, the Individual Defendants also willfully or recklessly made and/or caused the Company to make false and/or misleading statements and fail to disclose that: (1) the Individual Defendants engaged in and caused the Company to engage in the Pump and Dump Scheme; (2) the Company's leadership by the Taylor brothers was nominal only, the Taylor brothers had been installed by Defendant Giguiere and their controlling block of Company shares had been financed by him, and in truth the Company was controlled by Defendant Giguiere; (3) the software platform and other purported benefits obtained by the Company in the Separation Degrees transaction were essentially worthless, and in exchange the Company had given away millions of dollars of stock to allow the Individual Defendants to engage in and cause the Company to engage in the Pump and Dump Scheme; (4) the Company's strategic acquisitions plan lacked veracity; (5) the Company was registering ten million of its shares for a purported "equity incentive plan" when in fact they were being awarded to Defendant Giguiere as compensation for, and to further, the Pump and Dump Scheme; (6) Ga Du Bank was just weeks old when the Company announced its acquisition and was purportedly regulated by a Native American

Verified First Amended Shareholder Derivative Complaint

tribe; (7) Ga Du Bank's charter and ability to engage in some desired commercial operations was not sufficiently developed, and thus not viable; (8) Ga Du Bank had never obtained a valid banking license and would not soon have a solution for engaging in banking; (9) the Company's statements concerning Ga Du Bank was in truth a last-ditch effort to keep the Pump and Dump Scheme viable; and (10) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading at the time they were made. The Individual Defendants also failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

14. These false and misleading statements have subjected the Company and Defendants J. Taylor, D. Taylor, and Giguiere to three federal securities fraud class action lawsuits pending in the United States District Court for the District of New Jersey that have since been consolidated (the "Securities Class Actions"), and has left the Company with the cost of defending and resolving these actions.

15. The Individual Defendants' misconduct has further subjected the Company to the need to undertake internal investigations (including in connection with investigations leading to the Criminal Action and SEC Action), losses from the waste of corporate assets from the sham transaction constituting the Pump and Dump Scheme, and losses due to the unjust enrichment of Individual Defendants who were improperly over-compensated by the Company, including in patent acts of self-dealing. The fall-out from this conspiracy will likely continue to cost the Company millions of dollars going forward.

16. Moreover, the Individual Defendants (including the Taylor brothers) have been unjustly enriched at the expense of the Company by obtaining compensation and other unjustified prerequisites from the Company while breaching their fiduciary duties and committing unlawful acts.

Further, Defendant Giguiere has been unjustly enriched at the expense of the Company through obtaining millions of share of inflated Eco Science stock in the sham transactions detailed herein without any lawful or rationale consideration. So, too, have Defendants Lewis and Oveson been unjustly enriched as a result of the worthless Ga Du Bank transaction. For that same reason, the Taylor brothers committed corporate waste at the expense of the Company by causing it to enter sham transactions (including the Separation Degrees, Phenix, and Ga Du Bank transactions) to further the Pump and Dump Scheme and without any rational or lawful consideration.

17. Finally, as a direct and proximate result of the Individual Defendants' conduct, Eco Science has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the misconduct alleged herein.

18. In light of the breaches of fiduciary duty and/or aiding and abetting thereof, unjust enrichment, and corporate waste engaged in by the Individual Defendants, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of certain of them in the Criminal Action, the SEC Action, and the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

19. Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

20. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the claims made in the Criminal Action, the

SEC Action, and Securities Class Actions, each of which are based on violations of the Exchange Act.

21.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of Nevada or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

22.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

23.     Plaintiff is a current shareholder of Eco Science.  Plaintiff has continuously held Eco Science common stock at all relevant times.  Plaintiff is a citizen of New Jersey.

### Nominal Defendant Eco Science

24.     Eco Science is a Nevada corporation, and its registered agent is National Registered Agents, Inc. of NV, which is located at 701 S. Carson St., Suite 200, Carson City, Nevada 89701.  Eco Science's principal executive offices at 1135 Makawao Avenue, Suite 103-188, Makawao, Hawaii 96768.  Eco Science's shares trade on the OTCQB Venture Market ("OTC") under the ticker symbol "ESSI."

25.     Eco Science is a technology-focused company that targets the health and wellness industry.  It develops technical solutions ranging from enterprise software solutions to consumer apps for daily use.  The Company's core services span business location, localized communications

between consumers and business operators, social networking, educational content, e-commerce, and delivery.

26.    The Company, per its website, "develops technical solutions that empower enthusiasts in their pursuit and enjoyment of building eco-friendly businesses and living healthy lifestyles" through products including consumer apps for daily use and enterprise software solutions.

**Defendant J. Taylor**

27.    Defendant J. Taylor has served as the Company's CEO and President since December 2015. He has also served as the Company's Secretary and as a Company director since January 2016. According to the Company's Form 10-K filed with the SEC on May 1, 2017 (the "2016 10-K"), as of March 31, 2017, Defendant J. Taylor beneficially owned 13,047,019[4] shares of the Company's common stock, which represented approximately 28.76% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $3.39, J. Taylor owned over $44.2 million worth of Eco Science stock.

28.    For the fiscal year ended January 31, 2017, Defendant J. Taylor received $8,305,000 as compensation from the Company, which included $115,000 as base salary and $8,190,000 in stock awards.

29.    The Company's 2016 10-K stated the following about Defendant J. Taylor:

> Mr. Jeffery Taylor
>
> As CEO, Mr. Jeffrey Taylor will oversee the company's strategy, technology roadmap, and consumer community content development programs; Mr. Taylor is a recipient of the Army Commendation Medal from the United States Army during service of operation Uphold Democracy; he served in the United States Army for 10 Years and focused on supply chain management technologies with an emphasis on logistics and distribution of specialty materials. Mr. Taylor was discharged with a Medical Discharge; Mr. Taylor has been a real estate entrepreneur and holds a

---

[4] According to the Company's Form 8-K filed with the SEC on October 6, 2017, Defendant J. Taylor agreed to return 8,000,000 personal shares of Eco Science common stock to the Company for cancellation, effective September 22, 2017.

real estate license in the State of Hawaii from 2005 to present. In 2003, Mr. Taylor received his Microsoft technology certification from the Veterans Association during rehabilitation process from being injured in the military. As part of his passion for open water scuba and snorkeling, he launched Liquid Marlin LLC, and works with the Make A Wish Foundation on Maui as one of its designated snorkel instructors.

30. Defendant J. Taylor is the brother of Defendant D. Taylor.

31. Defendant J. Taylor was named a defendant in the Securities Class Actions for violating and/or causing the Company to violate the Exchange Act, and is referenced in the SEC Action as a co-conspirator in the Pump and Dump Scheme with defendants Giguiere and D. Taylor. Defendant J. Taylor also knowingly and/or recklessly (a) participated in and caused and/or permitted the Company to participate in the Pump and Dump Scheme, and (b) made and caused the Company to make false and misleading statements and material omissions of fact in the Company's public filings and press releases about the Pump and Dump Scheme and other matters, as alleged further herein.

32. Upon information and belief, Defendant J. Taylor is a citizen of Hawaii.

**Defendant D. Taylor**

33. Defendant D. Taylor has served as the Company's CFO since December 2015. He has also served as the Company's Treasurer and as a Company director since January 2016. According to the Company's 2016 10-K, as of March 31, 2017, Defendant D. Taylor beneficially owned 13,047,019[5] shares of the Company's common stock, which represented approximately 28.76% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on March 31, 2017 was $3.39, D. Taylor owned over $44.2 million worth of Eco Science stock.

---

[5] According to the Company's Form 8-K filed with the SEC on October 6, 2017, Defendant D. Taylor agreed to return 8,000,000 personal shares of Eco Science common stock to the Company for cancellation, effective September 22, 2017.

34.     For the fiscal year ended January 31, 2017, Defendant D. Taylor received $8,295,000 as compensation from the Company, which included $105,000 as base salary and $8,190,000 in stock awards.

35.     The Company's 2016 10-K stated the following about Defendant D. Taylor:

Mr. Don Lee Taylor

As CFO, Don Taylor will oversee the company's financial governance; business community content development program, and business partnerships. Mr. Taylor holds a real estate license in the State of Hawaii from 2001 to Present; and has been active in the Hawaii real estate and real estate financing community.  Mr. Taylor currently holds the title of Broker in Charge of Maui Realty Co., Inc. Mr. Taylor holds a BS in Finance with an emphasis in Financial Management from the California State University in Long Beach.

36.     Defendant D. Taylor is the brother of Defendant J. Taylor.

37.     Defendant D. Taylor was named a defendant in the Securities Class Actions for violating and/or causing the Company to violate the Exchange Act, and is referenced in the SEC Action as a co-conspirator in the Pump and Dump Scheme with defendants Giguiere and J. Taylor. Defendant D. Taylor also knowingly and/or recklessly (a) participated in and caused and/or permitted the Company to participate in the Pump and Dump Scheme, and (b) made and caused the Company to make false and misleading statements and material omissions of fact in the Company's public filings and press releases about the Pump and Dump Scheme and other matters, as alleged further herein.

38.     Defendant D. Taylor is a citizen of Hawaii.

**Defendant Giguiere**

39.     Defendant Giguiere was the Managing Member of Phenix and is the CEO of Separation Degrees.  Defendant Giguiere founded Separation Degrees in December 2014.  Defendant Giguiere was also the Managing Member of Phenix from at least January 2017 to at least December 2017.  Giguiere worked at all relevant times as a stock promoter in Southern California, and controlled

Verified First Amended Shareholder Derivative Complaint

the stock promotion website "TheMoneyStreet.com." Eco Science entered into a technology licensing and marketing support agreement with Separation Degrees and an equity purchase agreement with Phenix.

40. As alleged in the SEC Action, Defendant Giguiere was the undisclosed control person at Eco Science at all relevant times alleged herein because he financed the Taylor brothers' controlling block of Eco Science shares, installed the Taylor brothers as the Company's officers, and dictated the Company's affairs and management.[6]

41. Defendant Giguiere was named a defendant in one of the Securities Class Action complaints for violating and/or causing the Company to violate the Exchange Act, and is referenced in the SEC Action as a co-conspirator with the Taylor brothers in the Pump and Dump Scheme. Defendant Giguiere also knowingly and/or recklessly breached his fiduciary duty and aided the other Individual Defendants' breaches of fiduciary duty by (a) participating in and causing and/or permitting the Company to participate in the Pump and Dump Scheme, and (b) making and causing the Company to make false and misleading statements and material omissions of fact in the Company's public filings and press releases about the Pump and Dump Scheme and other matters, as alleged further herein.

42. Defendant Giguiere is a citizen of California.

**Defendant Lewis**

43. Defendant L. John Lewis ("Lewis") has served as a Company director since June 21, 2017. Per his employment agreement with the Company, Lewis is entitled to an annual salary of $120,000 per year and options to purchase 2,500,000 shares of Eco Science stock.

---

[6] *See* SEC Action ¶ 18.

44.     The Company's Form 8-K filed with the SEC on June 26, 2017 stated the following about Defendant Lewis:

L. John Lewis

Mr. Lewis graduated Magna Summa Cum Laude from the University of Utah in 1976, with a Bachelor of Science degree in political science, and an international relations certificate. He received a Juris Doctor degree from Stanford Law School in 1979, and was managing director of the Stanford Law Journal. Following law school, Mr. Lewis served as a law clerk on both the United States District Court for the Southern District of California and on the United States Tenth Circuit Court of Appeals.

As a lawyer, Mr. Lewis has represented American Dairies, China Sky One, the Metropolitan Insurance Group, Skaggs-Alpha Beta, and numerous other companies in connection with private and public offerings, and/or mergers with public entities now trading on the New York Stock Exchange.

Mr. Lewis departed from the practice of law to become involved in assisting private companies with significant growth trajectories. He has been active in assisting such companies with capital formation, structure and the private equity and business management for approximately the last twenty years as a consultant, legal advisor and/or manger, and has been the General Manager of a household products manufacturing company, the CEO of a nutraceutical company, and the Managing Director of a Swiss based asset management firm, as well as managing a large legal and contracting group for a multi-national NGO. His management duties have run the gamut from managing a small business development group of several individuals to responsibility for hundreds of employees.

Mr. Lewis has served as an instructor of "International Legal and Treaty Conventions", "International Commercial Conflicts" for the United States Army, and was a part time Professor of Business Law at LDS Business College, as well as Visiting Instructor of Business Communications and Entrepreneurship" at the University of Utah.

Mr. Lewis has received the following honorary distinctions: (i) Owl and Key; (ii) Pi Sigma Alpha; and (iii) Who's Who in American Law.

45.     Defendant Lewis served as President of Ga Du Bank, and signed the May 2, 2017 Letter of Intent between Ga Du Bank and Eco Science in such capacity. On June 21, 2017, per the Stock Purchase Agreement, Lewis was appointed CEO of Ga Du.

46.     Defendant Lewis breached his fiduciary duties by approving and participating in the Ga Du Bank venture that was designed to keep the Eco Science's stock artificially inflated to promote

14

the Pump and Dump Scheme, and aided and abetted the other Individual Defendants' breaches of fiduciary duty as alleged herein.

47.     Upon information and belief, Defendant Lewis is a citizen of Utah.

**Defendant Oveson**

48.     Defendant S. Randall Oveson ("Oveson") has served as a Company director since June 21, 2017.  Per his employment agreement with the Company, Oveson is entitled to an annual salary of $120,000 per year and options to purchase 1,500,000 shares of Eco Science Stock.

49.     The Company's Form 8-K filed with the SEC on June 26, 2017 stated the following about Defendant Oveson:

S Randall Oveson

BS MBA • Management, Finance, and Accounting

Mr. Oveson started his career as a Financial Analyst with Suite Thinking, Inc., a boutique hospitality consulting firm in Newport Beach, CA. There Mr. Oveson developed systems and processes used to analyze dozens of hotels part of a $500 million+ portfolio in various financial and operational categories still in use in the hospitality industry today.

Upon completion of his MBA at Pepperdine University Mr. Oveson has taken CEO, COO, CFO, and CIO roles in hospitality, the aerospace, manufacturing, brokerage, action sports, telecommunications, and the banking and healthcare technology industries. His range of experience includes all aspects of management for start-up and mid-tier companies both public and private entities. He has led dozens of full financial audits and reviews and has also led numerous PCI audits and MasterCard RAMP reviews. He has been instrumental in projects as diverse as the first and largest prepaid CLEC in the State of California to building out and growing the first financial data center on the island of Antigua.

Mr. Oveson is currently involved in financial processing projects in Europe, Canada, and the US as well as assisting with the development of Ga Du Corporation's enterprise solutions and operations.

50.     On June 21, 2017, per the Stock Purchase Agreement, Oveson was appointed Chief Operating Officer of Ga Du.

51. Defendant Oveson breached his fiduciary duties by approving and participating in the Ga Du Bank venture that was designed to keep the Eco Science's stock artificially inflated to promote the Pump and Dump Scheme, and aided and abetted the other Individual Defendants' breaches of fiduciary duty as alleged herein.

52. Defendant Oveson is a citizen of Utah.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

53. By reason of their positions as officers, directors and/or controlling persons of Eco Science and because of their ability to control the business and corporate affairs of Eco Science, the Individual Defendants owed Eco Science and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Eco Science in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Eco Science and its shareholders so as to benefit all shareholders equally.

54. Each director and officer of the Company owes to Eco Science and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

55. The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controlling persons of Eco Science, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

56. To discharge their duties, the officers, directors, and/or controlling persons of Eco Science were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

57. Each Individual Defendant, by virtue of his or her position as a director, officer, and/or controlling person, owed to the Company and to its shareholders the highest fiduciary duties of

loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors, officers, and/or controlling persons of Eco Science, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants has been ratified by those Individual Defendants who collectively comprised Eco Science's board of directors at all relevant times.

58. As senior executive officers, directors and/or controlling persons of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 ("Exchange Act") and traded on the OTC, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to, *inter alia*, the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those events described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

59. To discharge their duties, the officers, directors, and/or controlling persons of Eco Science were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers, directors, and/or controlling persons of Eco Science were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Nevada, the United States, and pursuant to Eco Science's own Code of Ethics;[7]

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Eco Science conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Eco Science and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Eco Science's operations would comply with all laws and Eco Science's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

---

[7] The Company's 2016 10-K notes that the Company has adopted a Code of Ethics, but it is not publicly available.

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

60.     Each of the Individual Defendants further owed to Eco Science and the shareholders the duty of loyalty requiring that each favor Eco Science's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

61.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Eco Science and were at all times acting within the course and scope of such agency.

62.     Because of their advisory, executive, managerial, directorial, and controlling positions with Eco Science, each of the Individual Defendants had access to adverse, non-public information about the Company.

63.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Eco Science.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

64.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

65.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and aiding and abetting thereof; (ii) conceal adverse information concerning the Company's operations, financial condition, competitors, future business prospects and internal controls; (iii) engage in the Pump and Dump Scheme; and (iv) artificially inflate the Company's stock price.

66. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently conceal material facts, fail to correct such misrepresentations, and violate applicable laws. The Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the facts that the Company engaged in the Pump and Dump Scheme, the Company's strategic acquisitions plan lacked veracity, the Company made inadequate and inaccurate public statements concerning, *inter alia*, its potential acquisition of Ga Du Bank, and the Company failed to maintain adequate internal controls. Because the conduct described herein occurred under the authority and approval of the Board, each of the Individual Defendants who is a director of Eco Science was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

67. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

68.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Eco Science, and was at all times acting within the course and scope of such agency.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### The Pump and Dump Scheme

69.     The Pump and Dump Scheme began with Defendant Giguiere's takeover of the Company and its shares, with the assistance of Defendants J. Taylor and D. Taylor.

70.     The Company's Form 8-K filed with the SEC on December 24, 2015 announced that Eco Science's majority shareholder, Domenic Marciano, had sold his shares in a private transaction equally to Defendants J. Taylor and D. Taylor.  The Taylor brothers collectively purchased about 57.5% of the Company's issued and outstanding shares, with a then market value of $61,000.  The filing further announced that Defendant J. Taylor would become the Company's CEO and Defendant D. Taylor would be become the Company's CFO, and would be designated the sole directors of the Company.

71.     The information on the Form 8-K was false and misleading, however, because (as now confirmed in the SEC Action) Defendant Giguiere, as an undisclosed control person of the Company, secretly arranged to pay Marciano the controlling block of the Company's shares, and then clandestinely installed the Taylor brothers as the Company's purported officers.[8]

72.     Defendant Giguiere, with the assistance of the remaining Individual Defendants, then caused the Company to enter a series of bogus transactions to consummate the Pump and Dump Scheme.

### A.  The Separation Degrees Transactions

---

[8] *See* SEC Action ¶¶ 109-110.

73.     First, on January 12, 2016, the Company filed a Form 8-K with the SEC announcing that on January 1, 2016, the Company entered into a "technology licensing and marketing support" letter agreement with Separation Degrees, an alleged technology company in which Giguiere was founder, Chairman, CEO, Secretary, and President[9], "that will result in the development, licensing and management of on-going technology solutions and marketing campaigns for ESSI's initiatives."

74.     As consideration for Giguiere's promotion of Eco Science stock, pursuant to the letter agreement, the Company agreed to pay Separation Degrees $35,000 worth of Eco Science common stock per month, to be issued pursuant to a Form S-8 registration statement.  The letter agreement called for the stock to be issued at the greater of $0.01 per share or a 30% discount to the volume average weighted price of Company stock on the date of payment.[10]

75.     The parties then amended the letter agreement on June 1, 2016, whereby Eco Science agreed to purchase from Separation Degrees a supposed "proprietary messaging and consumer relationship management software platform" in exchange for consideration of another 500,000 shares of Company common stock.  And, in a subsequent amendment dated October 1, 2016, the parties agreed to increase Separation Degrees' monthly payments under the letter agreement to $42,000 worth of Company common stock, also to be issued pursuant to a Form S-8 registration statement.[11]

76.     Indeed, the Company's subsequent SEC filings revealed several instances of shares being issued to Separation Degrees.  This included an additional 1.2 million shares as part of the

---

[9] Defendant Giguiere created Separation Degrees and appointed himself as CEO, and used Separation Degrees to award himself millions of shares in exchange for selling to Separation Degrees a vague "software platform" consisting of "millions of lines of code" that never amounted to anything significant or noteworthy.  The IPO for Separation Degrees that would register Defendant Giguiere's shares never occurred, despite the registration statement for it being declared effective after considerable back-and-forth with the SEC.

[10] *See* SEC Action ¶ 113.

[11] *See* SEC Action ¶¶ 115-16.

Asset Purchase Agreement (as noted in the Company's Form 10-K filed with the SEC on May 17, 2016), 1.3 million shares as part of its consulting agreement with Separation Degrees (as noted in the Company's Form 10-Q filed with the SEC on June 20, 2016), and 7.5 million shares allocated for advertising services (as noted in the Company's Form 10-Q filed with the SEC on September 19, 2016).

77.     The Company's and Separation Degrees' supposed "software platform" collaboration resulted in two apps, titled "Fitrix" and "Herbo," respectively, being brought to market in 2016. The Company's Form 10-K filed with the SEC on May 17, 2016 described Fitrix as "a powerful and flexible companion which helps users keep track of your day to day fitness routines, dietary habits and alternative medicine intake," and Herbo as an app "with a database of over 14,000 alternative medicine locations and delivery services, doctors who provide evaluations, and local shops that sell relevant product." Defendant Giguiere also caused Eco Science to issue statements via press releases that touted the "software platform" purportedly provided by Separation Degrees.[12] In truth, Fitrix and Herbo were essentially worthless, as the Individual Defendants knew full well, due to a lack of advertising revenue and functionality. Instead, the collaboration was really designed to effectuate the Pump and Dump Scheme, whereby the Individual Defendants caused the publication of illegal articles pumping up the Company stock. Indeed, the Company's own public filings suggested that the services Separation Degrees provided under the letter agreement were for "advertising and promotion services". For the fiscal year ended January 31, 2017, the Company was invoiced by Separation Degrees for an amount exceeding $2 million, $1.7 million of which was for "advertising and promotion services" of Eco Science's brands, including Fitrix and Herbo.

---

[12] *See* Criminal Action ¶¶ 35(g) and (g).

Verified First Amended Shareholder Derivative Complaint

78.     Through Giguiere's The Money Street, the Individual Defendants caused to be published a series of articles that outlandishly promoted and recommended purchasing the Company's stock – an enterprise that in truth had zero revenue and a $43 million deficit by January 31, 2017 – even noting that Eco Science has the potential to become the next Uber or Amazon of the cannabis industry.[13]  The Money Street published at least two articles.  The first, titled "ESSI and the 2016 Elections", claimed that

> [i]t's typically been true that most industries will not see much movement during an election year... BUT once in a while, there are a few outliers that challenge this thought. AND when they do, they merit a closer look. Eco Science Solutions just may be that outlier to bring the returns you are seeking during this window of time.

79.     The second article claimed that Eco Science could become the next Amazon or Uber of the cannabis industry.  Choice quotes from the article have to be read to be believed:

> Eco Science Solutions, Inc. (OTC: ESSI) has an interesting business model. It's approaching the industry as a technology company that is building and delivering e-commerce infrastructure services that connect consumers with cannabis businesses (B2C), and cannabis businesses with other cannabis businesses (B2B).
>
> Their timing to the market couldn't be better, and if they can execute, they stand to make a big splash.
>
> * * *
>
> It's eerily similar to how Amazon started out. It initially launched focused on selling books. It wasn't a sexy product line, and one that was probably not too competitive at the time. This allowed Amazon to perfect is e-commerce model while building direct relationships with consumers that eventually led to it owning the coveted "the last mile" because of its delivery of products to the doorsteps of consumers.

---

[13] Notably, The Money Street also promoted the stock of a company that Defendant Giguiere was the CEO of, called Eventure Interactive, Inc ("Eventure Interactive").  Eventure Interactive was a company set up in an identical way to Separation Degrees, whereby Defendant Giguiere awarded himself millions of shares of stock for the sale of a mysterious "software platform" that consisted of "millions of lines of code" that ultimately amounted to nothing of significance.

As Amazon started out just selling books, owning the last mile has allowed them to continue to expand their product offerings, and to grow vertically to further allow them to capture more market share.

If you take a look at Eco Science's business model, one could see the similarities to Amazon's strategy.

Eco Science is developing technology infrastructure to create a marketplace. The marketplace will connect consumers with products that are carried by sellers. The products offered are not considered "sexy" products. This affords for the likelihood of less competition, which allows the company time to optimize its technology and business model while building long-term consumer relationships.

Eco Science will primarily connect consumers with local smoke shops and local businesses. This allows it to provide consumers with multiple options to get their products – from their own branded delivery service (Uber), to in-store pick-up, to quick and convenient mail delivery.

80. Neither of these articles disclosed Defendant Giguiere's control over The Money Street, his control of Eco Science, or that Giguiere was planning on selling his Eco Science stock into the market.

81. From August 2016 to December 2016, the price per share of Eco Science stock rose *1,947%* (emphasis added). Such a meteoric rise is inexplicable given the fact that by December 2016, the Company's business consisted of two YouTube channels with a combined six subscribers, and its Fitrix and Herbo apps only had 100 to 500 downloads each. In fact, the only logical explanation for the increase in the Company's stock price is the Pump and Dump Scheme effectuated by the Individual Defendants.

82. The illicit relationship with Separation Degrees ended within a year of its beginning, resulting in yet more windfalls to the Individual Defendants at the expense of the Company. On January 18, 2017, the Company filed a Form 8-K with the SEC that noted that on January 10, 2017, the Company had entered into a Cancellation and Release Agreement with Separation Degrees concerning the technology licensing and marketing agreement, upon which the Company owed Separation Degrees $1,920,424 in unpaid fees. Pursuant to the Cancellation and Release Agreement,

the Company cancelled the unpaid fees in exchange for 4,000,000 *more* shares of Company common stock.  Since the price per share of Company stock at closing on January 10, 2017 was $2.76, the $1,920,424 in unpaid fees turned into $11,040,000 worth of Eco Science stock for Separation Degrees – meaning for Giguiere.

83.     Throughout 2016, to consummate transfers of the Eco Science shares to his enterprise, Giguiere (with the assistance and signature of the Taylor brothers) caused Eco Science to file two Form S-8 registration statements with the SEC, the first on April 4, 2016 and the second on November 23, 2016, each which purported to register five million shares of Eco Science's common stock pursuant to Eco Science's "2016 Equity Incentive Plan."  Issuers may register securities pursuant to Form S-8 registration statements to be offered under an "employee benefit plan" to their "employees," which term is defined to include "consultants" and "advisors," but only if such consultants or advisors "provide bona fide services to the registrant," the services "are not in connection with the offer or sale of securities in a capital-raising transaction," and the services "do not directly or indirectly promote or maintain a market" for the securities in question.  But because the shares sought to be registered were being offered to compensate Separation Degrees for the illegal promotion of Eco Science stock, not for "bona fide services", the Individual Defendants knew that Eco Science's stock issuances were unlawful, and in contravention of SEC rules limiting the use of Form S-8.

84.     Once the stock was issued and transferred to Giguiere, the SEC Action provides details as to what happened next:

85.     On April 6, 2016, Eco Science issued its first tranche of 1,250,000 shares to Separation Degrees under the April 4, 2016 S-8 as payment for a "portion of the month of January's salary."[14]

---

[14] *See* SEC Action ¶ 120.

Verified First Amended Shareholder Derivative Complaint

86.     On April 18, 2016, defendant Giguiere deposited Separation Degrees' initial tranche of 1,250,000 shares in a brokerage account in Separation Degrees' name.[15]

87.     In the deposit documentation, defendant Giguiere stated that he was not an "affiliate/control person" of Eco Science and that he had not "made arrangement for the solicitation of buy orders in connection with this sale." But Defendant Giguiere was well aware that these statements were materially false and misleading because he, in fact, controlled Eco Science and was arranging for the solicitation of buy orders of Eco Science stock through his promotion of the investment on The Money Street.[16]

88.     On May 23, October 3, and October 19, 2016, defendant Giguiere deposited approximately 3,607,000 additional shares of Eco Science issued pursuant to the April 4, 2016 Form S-8 into the Separation Degrees account, making the same false statements he made in connection with his April 18, 2016 deposit.[17]

89.     For the October 3, 2016 deposit, defendant Giguiere was required to submit a "Non-Affiliate Shareholder's Representations Letter," in which he stated that he was not an affiliate of Eco Science and that he was not aware of any nonpublic material adverse information about Eco Science. These statements were materially false and misleading because defendant Giguiere, in fact, controlled Eco Science and was aware of non-public material information adverse to Eco Science – namely, that the Company was subject to his own fraudulent scheme.[18]

---

[15] *See* SEC Action ¶ 121.

[16] *See* SEC Action ¶ 122.

[17] *See* SEC Action ¶ 123.

[18] *See* SEC Action ¶ 124.

90.     The October 3, 2016 deposit also included a letter signed by Defendants Giguiere and J. Taylor, in which Defendant Giguiere represented that he was not an affiliate of Eco Science and "did not directly or indirectly promote or maintain a market for the Company's securities." These statements were also materially false and misleading because Defendant Giguiere controlled Eco Science and was actively promoting the Company's securities on The Money Street.[19]

91.     On November 18 and 29, 2016, Defendant Giguiere deposited into a second brokerage account in his own name an additional 1.9 million shares of Eco Science stock. These 1.9 million shares were comprised of 1.4 million shares that Defendant Giguiere had purchased from Eco Science's prior chief executive officer for $100,000, and 500,000 shares he had received from Eco Science as payment for Separation Degrees' sale of the purported communications software platform.[20]

92.     In the deposit documentation accompanying these foregoing deposits, Defendant Giguiere made the same false statement that he made in connection with his previous deposits: that he was not an "affiliate/control person" of Eco Science and that he had not "made arrangement for the solicitation of buy orders in connection with this sale." These statements were materially false and misleading because Defendant Giguiere controlled Eco Science and was arranging for the solicitation of buy orders of Eco Science stock through his promotion of the investment on The Money Street.[21]

93.     On December 23, 2016, defendant Giguiere deposited 600,000 shares of Eco Science stock into another brokerage account in his own name that he opened at a second broker-dealer.

---

[19] *See* SEC Action ¶ 125.

[20] *See* SEC Action ¶ 126.

[21] *See* SEC Action ¶ 127.

Defendant Giguiere's deposit documentation states that he obtained 500,000 of the 600,000 shares as payment from Eco Science for Separation Degrees' sale of the purported communications software platform—*i.e.*, a duplicate tranche of 500,000 shares he had already been paid and had deposited in the first brokerage account on November 29, 2016.[22]

94.     In connection with the latter deposit, defendant Giguiere signed a "Stock Promotion Affidavit" dated December 29, 2016, in which the broker-dealer stated that it had "detected promotional activity that is concurrent with the deposit and/or sale of your stock. Attached is a sample of the information currently being circulated." The attachment was comprised of two online articles from September and December 2016 discussing the promotion of Eco Science by The Money Street.[23]

95.     The affidavit asked defendant Giguiere, "Were you aware of the promotional activity in the issue you wish to deposit or are offering for sale?" Defendant Giguiere checked "no" and then stated: "I am not involved in any promotional activity whatsoever. Third parties, of which I cannot control, will/may opine on what they choose to on any security listed, on any exchange." But, as Defendant Giguiere knew full well, these statements were false and misleading because he was promoting Eco Science on The Money Street.[24]

96.     Between April 21, 2016 and January 18, 2017, defendant Giguiere sold more than 6.6 million shares of Eco Science in his brokerage accounts for illicit proceeds of more than $8.5 million.[25]

---

[22] *See* SEC Action ¶ 128.

[23] *See* SEC Action ¶ 129.

[24] *See* SEC Action ¶ 130.

[25] *See* SEC Action ¶ 138.

97.     Beginning in May 2016, defendant Giguiere began wiring a portion of the proceeds of these stock sales to a third party, who in turn wired the money to Eco Science's bank account. Defendants J. Taylor and D. Taylor then paid themselves $5,000 per month out of the Eco Science account.[26]

98.     Because Eco Science earned no revenues, the third party's deposits of the proceeds of Giguiere's sales of Eco Science stock were the Company's primary funding source, and thus the source of the compensation paid to the Taylor brothers.  Put another way, Defendant Giguiere used the proceeds of his sales of Eco Science stock to pay the Taylor brothers to act as nominal officers of the company.  Accordingly, the Taylor Brothers were direct financial beneficiaries of the Pump and Dump Scheme, not just active participants in it.[27]

**B.  The Phenix Transaction**

99.     In the second transaction, on January 26, 2017, the Company filed a Form 8-K with the SEC that noted that on January 15, 2017, the Company had entered into an Equity Purchase Agreement with Phenix, a company also owned by Defendant Giguiere, whereby Phenix agreed to purchase up to 10,000,000 shares of Company common stock upon "put notices" of the Company to Phenix and that the Company would file a Form S-1 Registration Statement with the SEC to register the 10,000,000 shares.

100.    The purchase price for the 10,000,000 shares would be "equal to 83% of the lowest volume weighted price for the ten consecutive trading days immediately following the date on which the applicable Put notice is delivered to Investor."  Notably, this financing deal was an almost

---

[26] *See* SEC Action ¶ 139.

[27] *See* SEC Action ¶ 140-41.

identical replica of a toxic financing deal entered into by Eventure Interactive, for which Defendant Giguiere also was the mastermind, and which led Eventure Interactive's stock to plummet to zero.

101.    Thus, Defendant Giguiere, with already 4,000,000 shares as a result of the cancellation of the agreement with Separation Degrees, was, pending the filing of a registration statement, to receive an additional 10,000,000 shares of company stock at a discounted price, and would be able to sell them for a profit regardless of the fact that the stock was also concurrently being artificially inflated due to the Pump and Dump Scheme. Sales of such large amounts of stock would also make the share price of Eco Science fall, to the detriment of the Company's shareholders.

102.    On May 12, 2017, the SEC declared effective the Company's Form S-1 Registration Statement for the issuance of stock to Phenix (and further issuances to Separation Degrees)—over four months after the Registration Statement was initially filed.

**C. The Ga Du Bank Transaction**

103.    In the third transaction, on January 27, 2017, the Company filed a Registration Statement on Form S-1 with the SEC, which was not declared effective by the SEC until May 12, 2017. During the unusually long period before the Registration Statement was declared effective, the Company's stock price began to fall.

104.    To prevent a further stock slide while waiting on the registration statement to be approved by the SEC, the Individual Defendants caused the Company to announce and ultimately enter into another sham transaction with Ga Du Bank. As described further below, after the SEC grew concerned over Company statements regarding the nature of this transaction, it suspended trading of the Company's shares. Nevertheless, both before and even after the suspension, the Individual Defendants caused Eco Science to make false and misleading statements to promote the prospects of the Ga Du Bank acquisition to inflate the Company's stock price as high as possible.

105.    Among other things, the Individual Defendants caused the Company to represent that, through its acquisition of Ga Du Bank, the Company would be able to enter the lucrative cannabis banking business.  In reality, Ga Du Bank did not have and would likely never obtain the requisite license to enter such banking business; instead, it had been in business for only a few weeks and its affiliation with supposed Native American tribes (the purported gateway to engaging in licensed banking) was dubious at best.  In fact, that tribe – the SCNRFP – was not recognized by the Bureau of Indian Affairs.

106.    Nevertheless, the Individual Defendants pushed the Company to acquire Ga Du Bank anyway, causing the Company to issue false and misleading statements touting the benefits of such acquisition – purportedly by gaining exposure to Ga Du's alleged technology to assist in banking and financial services – in a latch-ditch effort to keep the Company stock afloat and the Pump and Dump Scheme viable.

107.    By June 21, 2017, the Company had acquired Ga Du Bank as a subsidiary, and Ga Du Bank's President (Defendant Lewis) and CFO (Defendant Oveson) were appointed directors of Eco Science.  They were each provided $120,000 each for that role, despite the Company being essentially worthless.  In fact, Defendant Lewis was also given the option to purchase 2.5 million of common stock at the discounted price of $2 per share, to vest in twenty-four months.  Defendant Oveson was similarly given the option to purchase 1.5 million of common stock at the same option price, to vest in twenty-four months.  In addition, according to a Form 10-Q filed with the SEC on November 3, 2017, Eco Science issued 16,000,000 shares of restricted Company stock to the founders of Ga Du, which included Defendant Lewis.

108.    By that time, however, following the SEC's trading suspension, the Company's stock had eroded to just $0.28 per share on June 12, 2017.  The Company's stock has never recovered and further plummeted to near zero value.

**False and Misleading Statements**

109.　From at least December 2015 through October 2017, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and fail to disclose that: (1) the Individual Defendants engaged in and caused the Company to engage in the Pump and Dump Scheme; (2) the Company's leadership by the Taylor brothers was nominal only, the Taylor brothers had been installed by Defendant Giguiere and their controlling block of Company shares had been financed by him, and in truth the Company was controlled by Defendant Giguiere; (3) the software platform and other purported benefits obtained by the Company in the Separation Degrees transaction were essentially worthless, and in exchange the Company had given away millions of dollars of stock to allow the Individual Defendants to engage in and cause the Company to engage in the Pump and Dump Scheme; (4) the Company's strategic acquisitions plan lacked veracity; (5) the Company was registering ten million of its shares for a purported "equity incentive plan" when in fact they were being awarded to Defendant Giguiere as compensation for, and to further, the Pump and Dump Scheme; (6) Ga Du Bank was just weeks old when the Company announced its acquisition and was purportedly regulated by a Native American tribe; (7) Ga Du Bank's charter and ability to engage in some desired commercial operations was not sufficiently developed, and thus not viable; (8) Ga Du Bank had never obtained a valid banking license and would not soon have a solution for engaging in banking; (9) the Company's statements concerning Ga Du Bank was in truth a last-ditch effort to keep the Pump and Dump Scheme viable; and (10) the Company failed to maintain adequate internal controls.  As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading at the time they were made.

110.　Highlights from these false and misleading public filings follow:

***December 24, 2015 Form 8-K***

111.    On December 24, 2015, Defendants Giguiere, J. Taylor, and D Taylor caused the Company to file a Form 8-K with the SEC (the "December 24, 2015 Form 8-K") announcing that Eco Science's majority shareholder, Domenic Marciano, had sold his shares in a private transaction equally to Defendants J. Taylor and D. Taylor, and that the Taylor brothers were now the Company's controlling shareholders.  The December 24, 2015 8-K misrepresented and failed to disclose the highly material fact that, in actuality, the Taylor brothers had been installed as mere puppets by Defendant Giguiere, who was assuming actual control over the Company and its shares.[28]

### *January 12, 2016 Form 8-K*

112.    On January 12, 2016, Defendants Giguiere, J. Taylor, and D Taylor caused the Company to issue a Form 8-K (the "January 12, 2016 Form 8-K") announcing that Eco Science had obtained a "proprietary messaging and customer relationship management software platform" from Separation Degrees as part of an "Asset Purchase Agreement."  In truth, this software platform (along with its supposedly resulting Fitrix and Herbo apps) were essentially worthless, and a front to facilitate the Pump and Dump Scheme.  The January 12, 2016 Form 8-K also claimed that Separation Degrees was providing "market support" services to the Company, but failed to disclose that those "services" were really the illicit promotion of the Company in The Money Street as part of the Pump and Dump Scheme.

### *January 21, 2016 and March 30, 2016 Press Releases*

113.    On January 21, 2016 and March 30, 2016, Defendants Giguiere, J. Taylor, and D Taylor caused the Company to issue press releases extoling the "software platform" that purportedly had been provided by Separation Degrees.  For example, in a January 21, 2016 press release titled "Eco Science Solutions, Inc. Launches Core Mobile and E-Commerce Platforms to Stake Claim in

---

[28] *See* SEC Action ¶¶ 109-10

the Multi-Billion Dollar Cannabis Industry," Defendant Giguiere – with the approval of Defendant J. Taylor who is quoted in the release – caused the Company to announce the launch of the Herbo app: "We are thrilled in how our team is executing to our product road map and this launch memorializes our core strategy. Today is a key milestone for our business as we initiate our e-commerce and delivery programs, and thus, begin to stake our claim in the multi-billion dollar cannabis industry." Similarly, in the March 30, 2016, press release titled "Eco Science Solutions, Inc. Launches the Fitrix Health and Wellness Companion," defendant Giguiere (again with the approval of the Taylor brothers) caused Eco Science to announce the launch of "Fitrix," allegedly "a powerful and flexible companion which helps you keep track of your day to day fitness routines, dietary habits and alternative medicine intake." Defendant J. Taylor was also quoted in this press release: "At Eco Science, we are committed in the development of eco-centric technologies that empower health-conscious enthusiasts to achieve success in managing their diet, supplementation and alternative medicines."

114. These press releases failed to disclose that "Fitrix" and "Herbo" were effectively worthless, and the collaboration was really designed to effectuate the Pump and Dump Scheme.

***2015 Form 10-K***

115. On May 17, 2016, the Company's Form 10-K was filed with the SEC, signed by Defendants J. Taylor and D. Taylor (the "2015 Form 10-K"). The 2015 10-K described Fitrix as "a powerful and flexible companion which helps users keep track of your day to day fitness routines, dietary habits and alternative medicine intake," and Herbo as an app "with a database of over 14,000 alternative medicine locations and delivery services, doctors who provide evaluations, and local shops that sell relevant product." The launch of these products, the 2015 Form 10-K claimed, was part of the Company's "monetization strategy," which supposedly would "generate revenue through paid

Verified First Amended Shareholder Derivative Complaint

advertisements" and "sales of consumer packaged goods targeting general health and wellness and alternative medicines."

116.    The statements made in the 2015 Form 10-K were false and misleading because, in truth, "Fitrix" and "Herbo" were effectively worthless, as the Individual Defendants knew full well, and they were really fronts designed to effectuate the clandestine and illicit Pump and Dump Scheme.

117.    Attached to the 2015 Form 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants J. Taylor and D. Taylor attesting to the accuracy of the 2015 Form 10-K.

***Violations of Section 17(b) of the Securities Act***

118.    The Individual Defendants' failure to disclose Eco Science's paid relationships with stock promoters in the foregoing filings also ran afoul of Section 17(b) of the Securities Act of 1933.

119.    Section 17(b) – commonly known as the "anti-touting" provision – provides, in pertinent part, that anyone who advertises a stock, even if he does not purport to offer the security for sale, must disclose the "consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, the receipt, whether past or prospective, of such consideration and the amount thereof."  15 U.S.C. §77q(b).

120.    This anti-touting provision was enacted, in part, to "meet the evils of the 'tipster sheet' as well as articles in newspapers or periodicals that purport to give an unbiased opinion but which opinions in reality are bought and paid for."[29]

121.    In an investor bulletin published by the SEC titled "Microcap Stock: A Guide for Investors," the SEC provides information about investment in microcap stocks and specifically warns of potential fraud, explaining as follows:

---

[29] *SEC v. Wall St. Pub. Inst., Inc.*, 851 F.2d 365, 376 (D.C. Cir. 1988) (quoting House Committee Report, H.R. Rep. No. 85, 73d Cong., 1st Sess. 6 (1933)).

> Paid Promoters: Some microcap companies pay stock promoters to recommend or "tout" the microcap stock in supposedly independent and unbiased investment newsletters, research reports, or radio and television shows . . . . The federal securities laws require the publications to disclose who paid them for the promotion, the amount, and the type of payment. ***But many fraudsters fail to do so and mislead investors into believing they are receiving independent advice.***

This SEC investor bulletin may be found at http://www.sec.gov/investor/pubs/microcapstock.htm. (Emphasis added.)

122.    Moreover, an issuer of securities is also required to disclose the details of its relationship with a stock promoter in its regulatory filings.  Here, the Individual Defendants' failure to disclose the stock promoters' receipt of compensation directly or indirectly from the Company for making material statements concerning Eco Science is a material omission and thus a violation of the Exchange Act.

**Form S-8 Registration Statements**

123.    To consummate the issuance and transfer of the Eco Science shares to defendant Giguiere to effectuate the Pump and Dump Scheme, Defendants Giguiere, J. Taylor, and D Taylor caused Eco Science to file two Form S-8 registration statements with the SEC, the first on April 4, 2016 and the second on November 23, 2016, each which purported to register five million shares of Eco Science's common stock pursuant to Eco Science's "2016 Equity Incentive Plan."  But the issuance of these shares was in contravention of SEC rules regarding the use of Form S-8 because the shares were being offered to compensate Separation Degrees/Giguiere for the illegal Pump and Dump Scheme, not for legitimate and bona fide services.[30]

**June 20, 2016 Form 10-Q**

---

[30] *See* SEC Action ¶ 119.

Verified First Amended Shareholder Derivative Complaint

124.     On June 20, 2016, Defendants Giguiere, J. Taylor, and D Taylor caused the Company to file a Form 10-Q with the SEC (the "June 20, 2016 10-Q"), signed by Defendant J. Taylor.  The June 20, 2016 10-Q continued to extol the virtues and benefits to the Company from its collaboration with Separation Degrees, failing to disclose it was merely a front to engage in the illicit Pump and Dump Scheme.  For example, the Form 10-Q stated:

> **Current business overview**
>
> Eco Science Solutions, Inc. is a technology-focused Company targeting the multi-billion-dollar health and wellness industry.
>
> From enterprise software solutions, entertaining and useful content generation for mass distribution to consumer apps for daily use, the Company develops technical solutions that empower enthusiasts in their pursuit and enjoyment of building eco-friendly businesses and living healthy lifestyles. Eco Science's core services span business location, localized communications between consumers and business operators, social networking, educational content, e-commerce, and delivery.
>
> The Company's licensed e-commerce platform enables health-and wellness enthusiasts to easily locate, access, and connect with health and- wellness businesses and like-minded enthusiasts, and to facilitate the research of and purchasing of eco-friendly products … anytime, anywhere.

125.     Attached to the June 20, 2016 Form 10-Q were certifications pursuant to SOX signed by Defendants J. Taylor and D. Taylor attesting to the accuracy of the June 20, 2016 Form 10-Q.

**September 19, 2016 Form 10-Q**

126.     On September 19, 2016, Defendants Giguiere, J. Taylor, and D Taylor caused the Company to file a Form 10-Q with the SEC (the "September 19, 2016 Form 10-Q"), signed by Defendant J. Taylor.  The September 29, 2016 Form 10-Q reiterated the virtues and benefits to the Company in collaborating with Separation Degrees, and again failed to disclose the fundamental truths concerning that arrangement and its purpose in facilitating the Pump and Dump Scheme.

127.     Attached to the September 19, 2016 Form 10-Q were certifications pursuant to SOX signed by Defendants J. Taylor and D. Taylor attesting to the accuracy of the September 29, 2016 Form 10-Q.

*December 2, 2016 Form 10-Q*

128.    On December 2, 2016, Defendants Giguiere, J. Taylor, and D Taylor caused the Company to file a Form 10-Q with the SEC for the fiscal quarter ended October 31, 2016 (the "December 2, 2016 Form 10-Q"), which was signed by Defendant J. Taylor.  The December 2, 2016 Form 10-Q commented on the invoices the Company received from Separation Degrees for advertising services, stating, in relevant part:

> During the nine months ended October 31, 2016 the Company received invoices for advertising services from Separation Degrees totaling $1,271,274 and further received invoices for monthly project and planned technical development/maintenance, production and staging server administration, ongoing marketing services and monthly advertising management services totaling a cumulative $322,000.  The Company determined the value of the shares issuable to settle the total amounts invoiced ($1,593,274) at a 30% discount to fair market value on the settlement date and recorded a loss of $684,748 in relation to the shares issuable. During the nine months ended October 31, 2016 a total of 4,807,953 shares of common stock valued between $0.01 to 0.474 per share in relation to the aforementioned agreements with  Separation Degrees were issued. A total of $2,044,448 was recorded on the Company's balance sheets as liability for issuance of common shares (2016 - $108,510). The allocated shares had not yet been issued as at October 31, 2016.

129.    The statements made in the December 2, 2016 Form 10-Q were materially false and misleading because they failed to disclose and misrepresented that the remuneration to Separation Degrees was to advance the illicit Pump and Dump Scheme.

130.    Attached to the December 2, 2016 Form 10-Q were certifications pursuant to SOX signed by Defendants J. Taylor and D. Taylor attesting to the accuracy of the December 2, 2016 Form 10-Q.

*2016 Form 10-K*

131.    On May 1, 2017, Defendants Giguiere, J. Taylor, and D Taylor caused the Company to file a Form 10-K with the SEC (the "2016 Form 10-K"), which was signed by Defendants J. Taylor and D. Taylor, and which presented a strategic acquisitions plan for Eco Science (the "2016 Form

10-K").  The 2016 Form 10-K touted the Company's prospects in relation to potential strategic

acquisitions and stated, in relevant part:

> The following is to provide a road-map for how the Company intends to prepare for and generate revenues, along with the costs associated to do so. Eco Science Solutions' core Initiatives are centered on five main areas: 1) continued consumer and enterprise technology investment, 2) continued product development through Scientific Research and Development; 3) inventory build for distribution, and *4) strategic acquisitions that provide an accelerated time-frame to secure market share*; 5) development of Sales, Customer and Finance personnel depth to support accelerated revenue growth.
>
> * * *
>
> *Strategic acquisitions – Due to various hyper-growth trends in segments of the holistic health and wellness category, Eco Science Solutions believes that it will be presented with unique investment and acquisition opportunities that are both synergistic and accretive to the Company. The Management Team has already identified several candidates. The Company has not budgeted an exact dollar amount for investment purposes in Strategic acquisitions over the next 12-month period.*

(Emphasis added).

132.    The 2016 Form 10-K, like the previous filings detailed herein, went on to hype the

value of the Fitrix and Herbo apps, along with a "UseHerbo" ecommerce platform that allegedly was

finding market share.  In truth, none of those apps and platform had any market value, and were

bringing in no revenue to the Company.  Instead, they were mere conduits to further the Pump and

Dump Scheme.

133.    Attached to the 2016 Form 10-K were SOX certifications signed by Defendants J.

Taylor and D. Taylor attesting to the accuracy of the 2016 Form 10-K.

*May 5, 2017 Press Release*

134.    On May 5, 2017, the Individual Defendants (including on information and belief with

the support and/or knowledge of Defendants Lewis and Overson, who managed Ga Du) caused the

Company to issue a press release titled, "Eco Science Solutions, Inc. Signs Letter of Intent to Acquire

Specialty Banking Operation," announcing the proposed acquisition of Ga Du Bank.  The press

release provided vague information regarding a potential acquisition of Ga Du Bank and misleadingly

presented that the potential acquisition would allow the Company to "own and operate a financial banking division providing payment processing, cash management and financial services to its customers in the cannabis industry." It stated, in relevant part:

> MAUI, HI--(Marketwired - May 5, 2017) - Eco Science Solutions, Inc. (OTCQB : ESSI ), an eco-technology Company providing solutions to the multi-billion-dollar health, wellness and alternative medicine industry, today announced that it has signed a Letter of Intent with Ga Du Bank, Inc. for the purpose of acquiring full ownership of the Bank in a stock and cash transaction.
>
> Upon the closing of the transaction, ESSI will operate the Bank as a wholly-owned subsidiary of Eco Science Solutions, Inc. ESSI will own and operate a financial banking division providing payment processing, cash management and financial services to its customers in the cannabis industry.
>
> Additionally, the Bank's principals have engaged with prospects in the marketplace whom have made expressions of interest, along with preliminary commitments to deposit sums between Three-Hundred and Six-Hundred Million Dollars ($300,000,000 and $600,000,000). These amounts are currently being projected to be deposited within the first sixty to one-hundred-eighty days following the acquisition of the Bank by ESSI.
>
> "All parties involved are enthusiastic about the Bank's potential to financially serve the cannabis marketplace. Current business owners working in medical marijuana are doing a tremendous job, but are truly in need of formal banking services so they can soundly manage their business finances," stated John Lewis, who is both the current president of the Bank and a Governor of the Central Bank of SCNRFP. Mr. Lewis continued with, "By combining Ga Du Bank with Eco Science Solutions, we see how our synergies will create an important financial institution to serve a category that is in need of a fully integrated vertical product suite."
>
> "Our entire team is thrilled by the prospect of the acquisition of the Ga Du Bank by ESSI," said Andy Tucker, Senior Advisor to of Ga Du Bank. Mr. Tucker continued, "We believe that in joining forces with the ESSI team, we can deliver a comprehensive suite of financial products that addresses the current needs of currently what is a cash-driven industry, allowing ESSI to become a break-out leader for the sector."

135. In the press release, Defendant J. Taylor touted how the acquisition would be a "game-changer" and put Eco Science "years ahead" of its goal," despite the fact that Ga Du Bank was not capable of performing the various financial banking services noted in the press release. He stated:

> It has been our vision from day one that, in order to fully service the cannabis industry and execute on our business plan, we needed to be creative in securing and offering a banking platform that further differentiates us from everyone in our category [. . . .]

41

The deal with Ga Du Bank is a game-changer for not only ESSI, but everyone in the cannabis industry. This new division of our Company will put us years ahead of our goal to create a full-service marketplace among growers, suppliers, distributors, retailers and consumers.

**May 24, 2017 Form 8-K**

136.     On May 24, 2017, the Individual Defendants (including with the support of Defendants Lewis and Overson, who managed Ga Du) caused the Company to file a Form 8-K (the "May 24, 2017 Form 8-K"), which revealed pertinent information regarding the Company's proposed acquisition of Ga Du Bank and the inadequate and inaccurate statements made in the May 5, 2017 press release, as referenced by the SEC in the Order. The May 24, 2017 Form 8-K specifically stated that the Company did not make clear in its May 5, 2017 press release that: (1) Ga Du Bank was operated through the SCNRFP Central Bank; (2) the Chief of the SCNRFP had purportedly given approval for the acquisition; and (3) Eco Science was in the process of performing due diligence for the potential acquisition of Ga Du Bank. The May 24, 2017 Form 8-K stated, in relevant part:

On May 2, 2017, the Company entered into a Letter of Intent, with Ga Du Bank, which operates through the Southern Cherokee Nation Red Fire People Central Bank (SCNRFP CB), operated by a Governing Board and Banking Oversight Secure Committee, of the Southern Cherokee Nation Red Fire People, to acquire the Ga Du Bank. The Letter of Intent is the framework for the Company and the Ga Du bank to formalize the acquisition of the Ga Du Bank following completion of the Company's due diligence. The Company has hired Attorney's Mark Skaist and Ben Frydman with the law firm of Stradling Yocca Carlson & Rauth, PC, specializing in corporate law and familiar with the banking industry.

A press release announcing the letter of intent was issued on May 5, 2017, **and it was not clear in the press release that the Ga Du Bank is operated through the SCNRFP Central Bank; approval by the Chief of the SCNRFP for the acquisition of Ga Du Bank has been given to the Company and the Company is now working through the due diligence process. Once the due diligence is complete, and approved by the Company, the Company will take further steps to close the transaction. In the event the due diligence is not favorable, the Company will not move forward with the transaction.** Both the Ga Du bank and the Company are working diligently to complete this transaction and once finalized, those documents will be filed.

(Emphasis added.)

137. The May 24, 2017 Form 8-K, however, failed to disclose that the Ga Du Bank entity was nowhere close to being able to engage in actual banking services, that SCNRFP had not given approval for Ga Du to engage in any banking activity, and that the SCNRFP, through which Ga Du Bank could obtain its banking license, was not among tribes recognized by the Bureau of Indian Affairs.

**June 14, 2017 Form 10-Q**

138. On June 14, 2017, the Individual Defendants (including on information and belief with the knowledge and/or support of Defendants Lewis and Overson, who managed Ga Du) caused the Company to file a Form 10-Q with the SEC presenting the Company's financial results for the fiscal quarter ended April 30, 2017 (the "June 24, 2017 Form 10-Q"), which was signed by Defendant J. Taylor. The June 24, 2017 Form 10-Q generally stated that the Company had entered into a Letter of Intent with Ga Du Bank and it hoped to close the transaction by the end of June 2017. The June 24, 2017 Form 10-Q stated the following with regard to Ga Du Bank:

> On May 2, 2017, the Company entered into a Letter of Intent, with Ga Du Bank, which operates through the Southern Cherokee Nation Red Fire People Central Bank (SCNRFP CB), operated by a Governing Board and Banking Oversight Secure Committee, of the Southern Cherokee Nation Red Fire People, to acquire the Ga Du Bank. The Letter of Intent is the framework for the Company and the Ga Du bank to formalize the acquisition of the Ga Du Bank following completion of the Company's due diligence. The Company has hired Attorney's Mark Skaist and Ben Frydman with the law firm of Stradling Yocca Carlson & Rauth, PC, specializing in corporate law and familiar with the banking industry.

> The Company continues to work with Ga Du Corporation regarding the acquisition of its banking services, and hope to close the transaction by the end of June 2017.

139. Once again, the June 24, 2017 Form 10-Q failed to disclose that the Ga Du Bank entity was nowhere close to being able to engage in actual banking services, that SCNRFP had not given approval for Ga Du to engage in any banking activity, and that the SCNRFP, through which Ga Du Bank could obtain its banking license, was not among tribes recognized by the Bureau of Indian Affairs.

140.    Attached to the June 24, 2017 Form 10-Q were SOX Certifications signed by Defendants J. Taylor and D. Taylor, attesting to the accuracy of the June 24, 2017 Form 10-Q.

***June 26, 2017 Form 8-K***

141.    On June 26, 2017, the Individual Defendants (including Defendants Lewis and Overson, who were by this time on the Board) caused the Company to file a Form 8-K with the SEC (the "June 26, 2017 Form 8-K"), in which its story concerning Ga Du Bank and its purported interactions with SCNRFP continued to change, while continuing the attempt to conceal the fact that Ga Du had never been given approval by SCNRFP to engage in banking activity.  The Company noted that its due diligence revealed that Ga Du Bank's "overall charter and [. . .] ability to engage in some of the desired commercial operations through the SCNRFP was not sufficiently developed by SCNRFP to meet the expectations of [the Company]," and, thus, the Company was not going to proceed with acquiring Ga Du Bank's banking charter.  The June 26, 2017 Form 8-K claimed, in relevant part:

> Previously, on May 2, 2017, ESSI entered into a Letter of Intent with Ga Du Bank, a banking platform with a charter through the Southern Cherokee Nation Red Fire People ("SCNRFP"). After completing its due diligence, ESSI determined that while the banking platform technology was capable and had many advantages, ***the overall charter and the ability to engage in some of the desired commercial operations through the SCNRFP was not sufficiently developed by SCNRFP to meet the expectations of ESSI. In light of this, each of ESSI and Ga Du determined not to proceed with the acquisition of the banking charter.*** Ga Du; however, has continued the refinement of its platform for data capture, financial services, and compliance platform, to develop mobile enterprise applications and to work with existing commercial banks, along with its other enterprise services activities.

(Emphasis added).

142.    The June 26, 2017 Form 8-K revealed "several key representations" made by the Chief of the SCNRFP to Ga Du Bank, including representations that "the SCNRFP had a correspondent relationship with HSBC Bank in London" and that "SNRFP's central bank was authorized by Visa and Master Card to engage in merchant transaction with cannabis merchants and would be acting as

44

its own 'interchange' (payment processing)." The June 26, 2017 Form 8-K noted with regard to the "key representations":

> The Chief indicated that he believed that an opportunity existed to market banking and merchant services to cannabis merchants. As discussions developed, the Chief made several key representations: (i) that SCNRFP had opened a central bank (the "Central Bank"); (ii) that SCNRFP was a sovereign nation recognized by several other nations, and that this sovereignty had been clarified by opinion letter and treaty as to the United States; (iii) that SCNRFP had a correspondent relationship with HSBC Bank in London; (iv) that the Central Bank was authorized by Visa and Master Card to engage in merchant transactions with cannabis merchants and would be acting as its own "interchange" (payment processing); (v) that a charter from the Central Bank would permit Ga Du to engage in offering banking services; (vi) that SCNRFP would deposit up to $300 million in a bank to be organized by Ga Du if Ga Du was prepared to develop an automated security and compliance system, with funds transfer software capability.

143. The Individual Defendants caused the Company to claim that these "key representations" were misleading, particularly with regard to the representations about merchant and correspondent relationships. The June 26, 2017 Form 8-K claimed, in relevant part:

> As Ga Du's relationship with SCNRFP developed, Ga Du continued a due diligence process and became involved in advising and assisting SCNRFP as to their banking proposal. *Ga Du discovered that the correspondent relationship and merchant relationships, despite representation, were not firm, and had not, in fact, been verified.*

(Emphasis added).

144. Additionally, the June 26, 2017 Form 8-K indicated that during the process leading up to the May 2, 2017 Letter of Intent, "Ga Du indicated to [the Company] that it believed that it would soon have a solution for cannabis banking with SCNRFP. While Ga Du had received a license from SCNRFP it had not yet received an opinion letter as to sovereignty."

145. The June 26, 2017 Form 8-K additionally addressed some fallout resulting from the Order, noting that the "SCNRFP terminated its relationship with Ga Du." The June 26, 2017 Form 8-K, however, also noted that despite the issues with Ga Du Bank and the termination of its

relationship with the SCNRFP, the Company had entered a stock purchase agreement to purchase all of the shares of Ga Du, making it a subsidiary of Eco Science:

> On June 21, 2017, Eco Science Solutions, Inc. (ESSI) entered into a Stock Purchase Agreement ("SPA") with the shareholders of Ga Du Corporation, a Nevada corporation ("Ga Du", "Sellers"), wherein, ESSI agreed to purchase, and Sellers agreed to sell 100% of the shares of capital stock of Ga Du to ESSI, in exchange of fifteen million (15,000,000) shares of ESSI Common Stock, that shall be issued to Seller's, pursuant to the SPA.

146.    As reasoning for the purchase, the Company cited the development of Ga Du Bank's technology platform and enterprise solutions business, and how the acquisition would "complete one segment of [the Company's] business plan" and potentially "create additional revenue streams for a combined entity," stating, in relevant part:

> Ga Du, however, has continued the refinement of its platform for data capture, financial services, and compliance platform, to develop mobile enterprise applications and to work with existing commercial banks, along with its other enterprise services activities. Ga Du's management team determined that the direction and vision of ESSI aligned with the interests of Ga Du, and seeing the potential to create additional revenue streams for a combined entity, the Ga Du management team agreed unanimously to become a subsidiary of ESSI and bring to market its other activities under the Eco Sciences brand. With the acquisition of Ga Du Corporation, ESSI has now acquired the Ga Du technology, along with its other activities such as Certified Laboratory Testing and Retail Inventory Control, bringing important enterprise technologies in-house.

> * * *

> Because Ga Du has developed a great many Enterprise Solutions, and in-roads to provide financial services to the Cannabis industry, Management believes there are tremendous complimentary aspects that, when combined, complete one segment of the ESSI business plan; exploration of eco-friendly technology and properties, which align with our health and wellness applications. Alongside of our Herbo Applications, moving forward in the cannabis industry and developing solutions that comport with the cannabis industry, may position ESSI to become a single source provider to consumers, dispensary owners/operators, smoke shops, and supporting professionals in the industry.

147.    In further touting the benefits of acquiring Ga Du, the June 26, 2017 Form 8-K noted the "tremendous ecommerce and enterprise opportunities in front of a combined Eco Science Solutions and Ga Du," stating, in relevant part:

How Ga Du is related to ESSI's operating business

The Cannabis industry that ESSI and Ga Du are working to penetrate, remains fragmented, with rather small owner/operators, all whom are servicing their customer base with limited technologies, unsophisticated business processes and non-existent financial services. While forecasts have the Medical Marijuana industry as quite large, there remains a lack of technologies, business process and financial services that allow for the enterprise and the consumer to transact in an efficient manner. Management believes an analogy can be made that when Amazon.com entered into consumer retail market, the overall categories they targeted presented similar inefficiencies. This premise implies that there are tremendous ecommerce and enterprise opportunities in front of a combined Eco Science Solutions and Ga Du.

ESSI has developed, and offers, a consumer engagement application; e-wallet; location and delivery technologies; e-commerce platform; and a rich educational content platform.

Ga Du has developed, and offers, a security software to capture and retain customer and membership data, to accommodate KYC and compliancy matters for various kinds of financial services; a flexible mobile payment platform to facilitate payment for all kinds of services and products in collaboration with an experienced provider.

When combined, ESSI and Ga Du will have the capability to vertically satisfy the entire transaction flow from consumer to enterprise with a keen focus on the underserved Cannabis industry. The parties believe that this first mover advantage may give the Company a significant competitive advantage on a long-term basis.

148.    The June 26, 2017 Form 8-K also disclosed Defendant Oveson's leading role in combining the two entities, stating, in relevant part:

Concurrently with work previously commenced on a proprietary banking and compliance software, Ga Du commenced to seek a correspondent relationship with various banks and to develop merchant processing relationship(s). During the later period of this process, Ga Du was introduced to Eco Science Solutions Inc. ("ESSI") by Mr. Randal Oveson. Mr. Oveson was aware of Ga Du's work with SCNRFP. Ga Du indicated to ESSI that it believed that it would soon have a solution for cannabis banking with SCNRFP. While Ga Du had received a license from SCNRFP it had not yet received an opinion letter as to sovereignty. Ga Du continued its development work on merchant processing and other payment solutions to assist merchants to avoid the handling of large amounts of cash, and on a depository system for taking cash deposits and digitizing such deposits.

*October 6, 2017 Form 8-K*

149.    On October 6, 2017, the Individual Defendants caused Eco Science to file a Form 8-K with the SEC (the "October 6, 2017 Form 8-K") announcing that Ga Du had entered into an agreement on September 22, 2017 with G&L Enterprises wherein Ga Du was assigned "all of [G&L Enterprises'] rights, interest in, and obligations under a License and Master Marketing Agreement" that G&L Enterprises had entered into with Alliance Financial Network, Inc. ("Alliance"), a company that "provides certain financial and marketing services to businesses and individuals, including the Cannabis industry." The October 6, 2017 Form 8-K elaborated on the business of Alliance and how Alliance would provide the Company with certain benefits, including the use of a marketing and financial services software platform, stating in relevant part:

> Further, on September 22, 2017, Ga Du Corporation entered into an Assignment Agreement with G&L Enterprises, wherein G&L Enterprises assigned, to Ga Du Corporation, all of its rights, interest in, and obligations under a License and Master Marketing Agreement (LMMA) it entered into with Alliance Financial Network, Inc. ("AFN", "Alliance") on September 6, 2017. The basic terms of that Agreement are as follows:

> Alliance provides certain financial and marketing services to businesses and individuals, including the Cannabis Industry, on a programmatic or membership basis (the "Financial Program"), of which Alliance derives fees and income from enrolling companies in the Financial Program and providing a range of services, with respect to which AFN and Ga Du may derive fees and income, for such clients (the "Members") according to the AFN pricing schedule (the "Fees").

> Alliance Financial Network is registered with FinCEN (MSB Registration Number: 31000094744769) as a financial services institution, compliant with the AML/BSA guidelines of FinCEN, and is regulated by the IRS. Operating a mobile application known as eXPO™ electronic eXchange Portal, Alliance provides financial and marketing services to businesses and individuals, which are challenged in the traditional banking systems, and generally are those that require more intensive compliance then banks are willing, or able to perform. One such industry is the cannabis industry; Alliance is configured to establish Membership relationships businesses in this industry following a full compliance audit on the business.

150.    The October 6, 2017 Form 8-K failed to disclose, however, that these supposed virtues and benefits purportedly achieved from Ga Du were really fronts to further the Pump and Dump Scheme and keep the Company's stock inflated.

151.    The October 6, 2017 Form 8-K also noted that Eco Science would issue 200,000 shares of Company stock to Alliance as a result of the transaction.

**The Truth Begins to Emerge**

*December 15, 2016 Seeking Alpha Article*

152.    On December 15, 2016, *Seeking Alpha* published an article titled "Eco Science Solutions: Dangerously Promoted With Nearly 100% Downside," detailing the Company's involvement in the Pump and Dump Scheme.  In summary, the article noted:

**Summary**

- Eco Science Solutions has been the target of promotional articles.

- ESSI has a portfolio of assets that has little to no value.

- The Company generates no sales and has a significant debt load.

Eco Science Solutions (OTC:ESSI) is a pump-and-dump scheme with a 100 percent downside.  It is simply dumbfounding how ESSI has been able to garner an enterprise value of around $77 million with a portfolio of assets that has seemingly little to no value.

153.    The article described the Pump and Dump Scheme in detail, stating:

A financial media company called The Money Street (TMS) published a series of articles on Eco Science (here, here, and here), going so far as saying that ESSI has the potential to become the next Amazon (NASDAQ:AMZN) or Uber (Private:UBER) of the cannabis industry. What was hidden from the view of investors, however, was TMS's disclaimer at the bottom of the page . . . .

As the disclaimer clearly shows, TMS gets compensated between $25,000 and $150,000 to pump up stocks like ESSI… and looking at the stock chart below, ESSI has been pumped to the hilt:



154.    The article also described the Company's lackluster operations, stating, in relevant part:

**So… What Does ESSI Do?**

ESSI is tackling both the health and wellness industry and the cannabis market. By tackle, I mean the following: Developing two YouTube channels, which so far have a COMBINED subscriber base of six people; and managing two mobile apps, both of which have between 100 to 500 downloads on the Android market, and one of which has a five-star review written by some guy who just so happens to share the same name as ESSI's chief financial officer.

The growth story largely comes from ESSI's "Herbo" and "Fitrix" apps. Herbo uses the smartphone's GPS tracker to "help you find MMJ dispensaries, smoke shops, legal doctors, clinics, and delivery services in your area…". According to ESSI, the app has over 14,000 locations that make up the marijuana smoke chain.

The other app, Fitrix, "helps you keep track of your day-to-day fitness habits and routines." This app has features such as a BMI calculator, fitness radio, weight loss calculator, a daily log, and other generic features. According to an angry reviewer on the app store:

"This app has almost useless levels of functionality - for the parts that work. It seems more of a developer's first learning app than anything meant to be used… only plus is it's free so it can't hurt your wallet."

\* \* \*

It is also helpful to note just how easy it is to make mobile apps these days. For instance, a couple years ago, I decided to develop my own app. I knew nothing of

app making, but for just a few hundred dollars, I was able to hire a programming and design team from India to develop an app from scratch. In just two weeks, the app was completed and was ultimately downloaded just a few hundred times, generating close to nothing in revenue. Perhaps, considering how richly valued ESSI is, my app should have also been worth a few million dollars as well!

155.    In conclusion, the article noted a target price for Eco Science stock of $0.0, stating, in relevant part:

**Valuation and Conclusion**

The financial health of ESSI is the nail in the coffin. For starts, ESSI has not been able to generate ANY sales, and as a result, the company has burned through $12.5 million in shareholder capital since inception!

With only $70K in cash and almost $900K in payables on the balance sheet, the company will continue to cling to the capital markets for survival. An annual cash burn rate of +$200K also does not help.

Since it looks like the company will have no hope in successfully generating cash flow to support its significant debt load, my target price for ESSI is $0, or 100 percent down from the stock's current levels.

156.    On this news, the price per share of Eco Science fell $0.13, or almost 5%, closing at $2.55 on December 16, 2016.  By the close of market on December 20, 2016, just three trading days after the December 15, 2016 *Seeking Alpha* article was published, the price per share of Eco Science stock had fallen even further to $1.43.

**May 17, 2017 Seeking Alpha Article**

157.    On May 17, 2017, *Seeking Alpha* published another article concerning Eco Science, titled "Eco Science Solutions: It's All Just A Little Bit Of History Repeating," outlining the Company's engagement in the Pump and Dump Scheme and noting the relevance of the fate of Eventure Interactive, of which Defendant Giguiere was formerly the CEO, whose stock price dropped from $3.50 to $0.0 in 2014 after a series of toxic financing deals identical to the financing Eco Science obtained from Phenix.

158.    In summary, the article stated, in relevant part:

**Summary**

- Thanks to a small float and an ongoing stock promotion, Eco Science Solutions has been up over 700% over the last twelve months.

- Today, however, the size of its float has exploded overnight as a registration statement for 14 million newly issued shares has been declared effective.

- The person indirectly holding those shares has previously been CEO of Eventure, a publicly traded company with an uncanny number of similarities to Eco Science Solutions.

- Eventure's stock price dropped from 3.50 into the triple zeroes in 2014 after a series of toxic financing deals. Eco Science Solutions has now obtained identical toxic financing.

- I believe history will repeat itself and Eco Science Solution's stock will shortly follow Eventure's down the drain.

159. The article provided relevant background into Eventure Interactive, which Giguiere had used to operate a pump-and-dump scheme, stating, in relevant part:

**2012-2015: Eventure Interactive**

This article starts in 2012, years before Eco Science Solutions ever even came to light. That year an entrepreneur named Gannon Giguiere, and a fellow investor, sold a "software platform" to OTC-listed Live Event Media (OTCPK:EVTI), later renamed to Eventure Interactive. Giguiere, who received millions of shares in this transaction, also became Eventure's new CEO.

This mysterious software platform, with hardly any other description other than the fact it supposedly had "millions lines of code," was supposed to be Eventure's backbone in becoming "a social application development company."

However, despite a lot of talk about "vision" and "inspiration" and plenty of (stock) promotions, nothing ever materialized. Millions of investing dollars were wasted.

While Eventure Interactive did at one point manage to put out two barely functioning free apps, which never gained any traction whatsoever, it never generated any revenue. Most of all, it was a toxic printing press of stock. Before Giguiere became CEO in 2012, Eventure had 10.4 *million* shares outstanding. Late 2015, this number had increased to 1.4 *billion* shares.

After peaking at $3.60 late 2013, the Eventure share price plummeted straight to zero in the following months and years.

* * *

This fall in share price was without a doubt caused by the many toxic financing deals Eventure agreed on. In little over a year, Eventure signed approximately ten different equity purchase or convertible note agreements (for example 1 2 3), in which outside financiers were allowed to buy or convert to EVTI stock at significant discounts to the share price, only to then proceed to dump the newly acquired shares in the open market. By far the most remarkable of those deals was with a mysterious entity named N600PG, which agreed to buy ten million worth of stock at a hefty discount to the market price. However, remarkably, Gannon Giguiere was not only the President of Eventure Interactive at that time, but according to corporationwiki.com also a past Managing Member of this toxic financier. As far as I could find, the fact Giguiere might have had conflicting interests was never disclosed to shareholders.

160.    The article also described the fate of Eventure Interactive, stating, in relevant part:

In 2016, Eventure Interactive went "dark" and is now no longer filing with the SEC. While its shares are as of today still theoretically listed, it hardly ever trades anymore. Even though there are millions of shares on offer at $0.0001, there are simply no buyers left.

* * *

At this point, the stock is merely waiting for its registration to be revoked by the SEC. All that's left is a large group of investors owning billions of worthless shares who at one point bought into the promises of Giguiere and his team, but are now left holding the bag having effectively lost all of their money.

161.    The article noted and offered in support the December 15, 2016 *Seeking Alpha* article, stating, in relevant part:

On the 15th of December 2016, author Anthony Thorpe published an article on Seeking Alpha about a company called Eco Science Solutions (OTC:ESSI). He convincingly argued shares are worthless. Anyone who has taken a few minutes to do some basic due diligence on Eco Science will agree with him. The company solely owns two extremely basic apps nobody uses or has even heard of. Nevertheless, Eco Science currently has a $110 million market cap.

* * *

In his article, Thorpe mainly focused on Eco Science itself, and its unlikely management. To really understand what's going on here, and to predict when the ESSI share price will finally dump for the last time before sinking away into oblivion, I suggest we look a bit deeper. In this article, I'll argue the company, as well as its management, are irrelevant and merely part of a vehicle that was set up

to transfer shares to a third party. And in this case, that particular third party has pulled off an almost identical scheme just a few years ago, with that stock now trading at zero.

Finally, I'll explain why I strongly believe the ESSI share price will follow that example, and why it will start its final, definitive descent to zero literally any day now.

162.     Also discussed in the article was the creation of Separation Degrees, which Defendant Giguiere was also the CEO of and was set up in the same way as Eventure Interactive.  The article stated, in relevant part:

**2015: Separation Degrees – One**

In January of 2015, when the share price of Eventure Interactive had already been spiraling down for some time, Giguiere apparently decided it was time to move on. He then filed with the SEC, through an S-1 registration statement, for the IPO of a completely new company called Separation Degrees - One. Giguiere appointed himself CEO, and took a large part of his team from Eventure Interactive with him, including Michael Rountree (Eventure's CFO) and Jason Harvey (Eventure's new CEO).

The setup behind Separation Degrees was basically identical to the setup behind Eventure Interactive in many ways. Again, Giguiere had given himself millions of shares in this new venture in exchange for selling to the company a mysterious "software platform," consisting of (again) "millions of lines of code."

Unfortunately, for Giguiere and Separation Degrees, the SEC wasn't willing to play ball. In an initial response letter to the original filing, the SEC made thirty-nine(!) different comments. Among others, the SEC had a problem with the lack of proper disclosure, the lack of clarity with regards to the amount of customers (if any) the company had, the use of promotional language, and a large number of inconsistencies in the filing. Also, the SEC wanted to know "how the software platform sold by Mr. Giguiere [to Separation Degrees] differs from the platform [sold to Eventure Interactive]," as "we note the identical description of the assets purchased and that they are now owned by Eventure Interactive."

After going back and forth several times, and although Separation Degrees made a number of amendments to its filings, the SEC was still far from satisfied. In September 2015, it concluded:

"[u]ntil a corrective amendment is filed, we will not perform a detailed examination of the registration statement and we will not issue comments because to do so would delay the review of other disclosure documents that do not appear to contain comparable deficiencies."

1    While the S-1 registration statement was eventually declared effective, it's no
2    surprise the IPO of Separation Degrees - One never materialized.

3    163.    The article then dove into the transaction and ensuing relationship between Separation
4    Degrees and Eco Science, stating, in relevant part:

5    *ESSI and Giguiere's Separation Degrees*

6    After the IPO of Separation Degrees - One fell through, Giguiere seems to have
7    changed his plans. He no longer tried to IPO his own company, and instead
8    appeared to change his focus to a company that's already listed. In January of 2016,
9    Separation Degrees signed a "technology licensing and marketing support
10   agreement" with an obscure, illiquid publicly traded entity called Eco Science
     Solutions, trading under the ticker ESSI. A majority stake in this company had (not
     coincidentally) just been bought by two brothers from Hawaii one month before
11   (for more information on the Taylor brothers, see Anthony Thorpe's article). The
     agreement between Eco Science and Separation Degrees entailed, among others,
     for the third time this article, the sale of a mysterious "software platform."
12
13   Over 2016, the collaboration between Eco Science and Separation Degrees resulted
     in (again) two, very basic apps being brought to market, Herbo and Fitrix. Both
14   apps are free, both are extremely basic (I personally tried Fitrix: by far the most
     impressive thing it does is offer an ability to calculate your Body Mass Index) and
15   both are being downloaded or used by virtually nobody.

16   During 2016, Separation Degrees has sent invoices to Eco Science totaling *over $2
     million*. This includes $1.8 million in "advertising services." I have no idea what
17   exactly was advertised. It surely weren't the apps, as even Google doesn't seem to
18   know what, for example, the Fitrix app even is.

19                                     * * *

20   But maybe Separation Degrees didn't advertise the apps on behalf of Eco Science,
     but instead advertised its stock. The website themoneystreet.com has been
21   promoting ESSI stock for months now. Coincidentally (or not), that same website
22   also used to promote EVTI stock.

23                                     * * *

24   I've asked Thermonatrite if they have been compensated for running the ESSI
25   promo, as they offer no clear disclosure. They did not reply.

26   Eco Science and Separation Degrees initially agreed invoices would be paid not in
     cash (which Eco Science doesn't have), but instead would be paid in shares. Later,
27   both parties agreed to settle all outstanding invoices from 2016 by Eco Science
     issuing 4 million shares to Giguiere's Separation Degrees. At the current market
28   price, these shares are worth about $10 million. Not a bad deal at all considering

                                        55

the original invoices amounted to about $2 million. However, it's important to realize these shares cannot legally be resold in the open market without a valid S-1 registration statement being approved by the SEC.

164.    The article then discussed the toxic transaction entered into between Phenix Ventures and Eco Science, stating, in relevant part:

In January of 2017, Eco Science also signed an Equity Purchase Agreement with an entity called Phenix Ventures LLC. By now, anyone reading this article will not be surprised that Phenix Ventures is ALSO in fact owned by Gannon Giguiere.

* * *

The agreement states Eco Science will sell to Phenix ten million shares of the company's stock, at a price "equal to 83% of the lowest volume weighted price for the ten consecutive trading days immediately following the date on which the applicable Put notice is delivered to Investor."

Such an agreement is a fine example of toxic financing. Phenix gets to buy stock at a discount to the market price, sell those shares for a profit, which makes the share price fall, where Phenix is again able to buy at a discount, etcetera. Actually, it's the exact same type of financing that tanked the Eventure Interactive share price to zero.

And that's not where the similarities end. The Equity Purchase Agreement signed by Eco Science with Phenix is almost an exact copy of the Equity Purchase Agreement signed by Eventure Interactive with toxic financier N600PG two years previous . . . .

* * *

Both deals through two separate entities have given Gannon Giguiere pole position in taking full advantage of the inflated Eco Science share price in the short term. He's now sitting on four million shares, plus has the right to acquire another ten million shares at a hefty discount, and sell them in the open market for a big profit. All it still takes is those shares being registered for re-sale.

165.    The article additionally described issues related to the Company's Registration Statement on Form S-1 filed with the SEC on January 27, 2017, and the issues concerning the Company's announced acquisition of Ga Du Bank, stating, in relevant part:

On January 26th, Eco Science filed with the SEC an S-1 registration statement. These registration statements are usually declared effective by the SEC within weeks, but on this occasion, it took close to four months, and two amendments.

As the ESSI share price began to slide during that unexpectedly long waiting period, the company made ever more desperate attempts to keep traders interested. This included a press release saying the company had signed a "Letter of Intent" to buy a bank, with supposedly "commitments" from prospects" "to deposit sums between $300 million and $600 million."

Sounds good? Well, the internet has never heard of this so-called "Ga Du Bank," and it's regulated by (or, in fact, is; it's all a bit confusing to say the least) the newly founded Central Bank of the "Southern Cherokee Nation and The Red Fire People." Claiming to be a sovereign nation based on an 18th century US Supreme Court ruling (and quite possibly the only government in the world you can contact per e-mail through a Gmail-address), it's not on the list of 566 Native American tribes legally recognized by the US.

Apparently, even Eco Science itself wasn't too impressed: while it did send out a PR, it never filed an 8-K with the SEC, which is an obligation to public companies when they have material news to report. I agree with the company the banking business is immaterial (and, besides, of a questionable legality, but I'll leave that to the experts), but is most of all a poor attempt to distract investors from impending doom.

Anyway, I digress. By far, the most important news for ESSI shareholders over these last couple of months is the SEC has today declared the registration statement effective, making it possible for Giguiere to start selling stock legally now. Based on the uncanny number of similarities between Eventure Interactive and Eco Science Solutions, I strongly believe history will repeat itself: Eco Science's extended run will soon be over. With dilution in full swing, I believe Giguiere will run yet another share price straight into the ground.

166.     In conclusion, the article stated that the Company "must be one of the most cynical publicly traded 'companies'" that the author had "ever come across," and the author provided his opinion on the dire prospects of the Company, stating, in relevant part:

**Conclusion**

Eco Science Solutions must be one of the most cynical publicly traded "companies" I've ever come across. While many OTC-listed small caps have very little substance, at least most of them fake doing something. Eco Science Solutions doesn't even bother. After having created two extremely basic apps and now apparently a move into tribal "banking," the company to me seems ready to move on to the real purpose of this operation: printing new stock.

With a small float, lots of volatility and several great "buy the dip" opportunities, ESSI stock has been a day trader's dream in 2016 and 2017. It's fundamentally worthless though, and it doesn't take a genius to see this. But there's no shortage of OTC stocks which are clear "zeroes." And most of them, like ESSI, have

excessive borrow rates, which make shorting tremendously expensive. The most difficult question is not determining the value, but when the bubble will finally pop. If you're right about the value, but completely wrong about the timing, you'll likely lose anyway.

With the SEC now having declared effective the S-1 statement registering an additional 14 million shares in the hands of a person with, shall we say, a "colorful" history and a strong incentive to sell sooner rather than later, I believe the catalyst that will pop this bubble has finally arrived.

167.    On this news, the price per share of Eco Science stock fell $0.23, or 9.5%, from the previous day's closing price to close at $2.17 on May 16, 2017.

***May 19, 2017 SEC Release and Order***

168.    On May 19, 2017, the SEC issued a release announcing the temporary suspension of trading in the Company's securities pursuant to section 12(k) of the Exchange Act due to "concerns regarding the accuracy and adequacy of publicly disseminated information concerning, among other things, ESSI's proposed acquisition of Ga Du Bank, Inc." The SEC release stated, in relevant part:

SECURITIES EXCHANGE ACT OF 1934
Release No. 80737 / May 19, 2017

The Securities and Exchange Commission ("Commission") announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading in the securities of Eco Science Solutions, Inc. ("ESSI"), of Malawea, Hawaii at 9:30 a.m. EDT on May 22, 2017, and terminating at 11:59 p.m. EDT on June 5, 2017.

The Commission temporarily suspended trading in the securities of ESSI because of concerns regarding the accuracy and adequacy of publicly disseminated information concerning, among other things, ESSI's proposed acquisition of Ga Du Bank, Inc. This order was entered pursuant to Section 12(k) of the Securities Exchange Act of 1934 (Exchange Act).

The Commission acknowledges FINRA's assistance in this matter.

The Commission cautions broker-dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the company.

Further, brokers and dealers should be alert to the fact that, pursuant to Rule 15c2-11 under the Exchange Act, at the termination of the trading suspension, no quotation may

Verified First Amended Shareholder Derivative Complaint

be entered unless and until they have strictly complied with all of the provisions of the rule. If any broker or dealer has any questions as to whether or not he has complied with the rule, he should not enter any quotation but immediately contact the staff in the Division of Trading and Markets, Office of Interpretation and Guidance, at (202) 551-5777. If any broker or dealer is uncertain as to what is required by Rule 15c2-11, he should refrain from entering quotations relating to ESSI's securities until such time as he has familiarized himself with the rule and is certain that all of its provisions have been met. If any broker or dealer enters any quotation which is in violation of the rule, the Commission will consider the need for prompt enforcement action.

If any broker-dealer or other person has any information which may relate to this matter, they should immediately contact Gerald Gross, Assistant Regional Director, New York Regional Office at (212) 336-0085 or Michael D. Paley, Assistant Regional Director, New York Regional Office at (212) 336-0145.

169.  On May 19, 2017, the SEC also issued the Order against the Company.  It stated that "there is a lack of current and accurate information concerning the securities of [the Company]" due to "concerns regarding the adequacy and accuracy" of information provided in its May 5, 2017 press release with regard to its potential acquisition of Ga Du Bank.  The Order noted, in relevant part:

It appears to the Securities and Exchange Commission that there is a lack of current and accurate information concerning the securities of Eco Science Solutions, Inc. (CIK No. 0001490873), a Nevada corporation with its principal place of business listed as Makawao, Hawaii with stock quoted on OTC Link, operated by OTC Markets Group Inc., under the ticker symbol ESSI, because of concerns regarding the adequacy and accuracy of information in a company press release dated May 5, 2017 relating to the company's proposed acquisition of Ga Du Bank, Inc.

The Commission is of the opinion that the public interest and the protection of investors require a suspension of trading in the securities of the above-listed company.

**Stock Resumes Trading**

170.  On June 6, 2017, the Company's stock resumed trading, and closed at $0.65 per share on that day, which was decline of about $1.72, or 72.5%, from the closing price of the Company's stock on May 19, 2017, the date trading in the Company's stock was suspended.

171.  On September 14, 2017, Eco Science filed a Form 12b-25 Notification of Late Filing with the SEC, stating that the Company "is unable to file, without unreasonable effort and expense,

its Quarterly Report on Form 10-Q for the quarter ended July 31, 2017 because the Registrant has not

yet been able to compile all the required financial data for the independent auditor to review."

**The Truth Fully Emerges**

172.     On June 29, 2018, a federal grand jury in the United States Court for the Southern

District of California issued a four-count criminal indictment against Defendant Giguiere (among

others) in the Criminal Action for conspiracy to commit securities fraud under 18 U.S.C. § 371, and

securities fraud under 15 U.S.C. §§78j(b), 78ff, and 17 C.F.R. §240.10b-5.  The indictment charged

Giguiere with stock manipulation and conducting a pump and dump scheme involving two public

companies, one of which related to the Pump and Dump Scheme at Eco Science.  On June 29, 2018,

an arrest warrant was issued for Defendant Giguiere.  He was later conditionally released on a $2

million bond, with certain of his assets held in the custody of the U.S. Department of Justice (the

"DOJ") pending further disposition of the forfeiture allegations in the Indictment.  Giguiere is slated

for a jury trial on May 21, 2019.

173.     Meanwhile, on July 6, 2018, following its own parallel investigation, the SEC filed

the SEC Action against Defendant Giguiere (among others) also pertaining to the Pump and Dump

Scheme.  For his role in the scheme, the complaint charged Defendant Giguiere with violating Section

10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.  *See* Exhibit A.  The SEC Action

seeks a final judgment: (a) restraining and permanently enjoining defendant Giguiere from engaging

in the acts, practices, and courses of business alleged against them in the SEC Action; (b) ordering

defendant Giguiere to disgorge any ill-gotten gains and to pay prejudgment interest on those amounts

(c) imposing civil money penalties on defendant Giguiere pursuant to Section 21(d)(3) of the

Exchange Act; (d) imposing penny-stock bar orders against defendant Giguiere under Section

21(d)(6) of the Exchange Act; and (e) imposing permanent officer-and-director bar orders against

defendant Giguiere pursuant to Section 21(d)(2) of the Exchange Act as a result of the violations

alleged in the SEC Action.  The SEC Action is stayed pending resolution of the criminal charges brought in the Criminal Action.

## SUMMARY OF THE INDIVIDUAL DEFENDANTS' BREACHES

174.    In breach of their fiduciary duties owed to Eco Science, the Individual Defendants engaged in and caused the Company to engage in the Pump and Dump Scheme by causing the Company to (among other things) engage in fraudulent and worthless transactions that has effectively ruined the entire enterprise, illegally promote the Company stock through publications, issue Company stock under false SEC filings to finance the Pump and Dump Scheme, and obtain kick-backs to the Individual Defendants by liquidating Company stock that was inflated as a result of the Pump and Dump Scheme.

175.    In further breach of their fiduciary duties owed to Eco Science, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and omissions of material fact described herein.

176.    In further breach of their fiduciary duties to the Company, the Individual Defendants failed to timely correct these false and misleading statements and/or omissions of material fact.

177.    In further breach of their fiduciary duties to the Company, the Individual Defendants further failed to institute effective internal controls at Eco Science.  Instead, they permitted a culture of lawlessness to pervade the enterprise.

178.    Moreover, the Individual Defendants (including the Taylor brothers) have been unjustly enriched at the expense of the Company by obtaining compensation and other unjustified prerequisites at the expense of the Company, all while breaching their fiduciary duties and committing unlawful acts.

179.    In addition, Defendant Giguiere has been unjustly enriched at the expense of the Company through obtaining millions of inflated share of Eco Science stock in the sham transactions

detailed herein without any lawful or rationale consideration. Defendants Lewis and Oveson also have been unjustly enriched as a result of the worthless Ga Du Bank transaction.

180. For that same reason, the Individual Defendants committed corporate waste at the expense of the Company by causing it to enter sham transactions (including the Separation Degrees, Phenix, and Ga Du Bank transactions) to further the Pump and Dump Scheme and without any rational or lawful consideration.

## DAMAGES TO ECO SCIENCE

181. As a direct and proximate result of the Individual Defendants' misconduct, resulting in the Company engaging in the Pump and Dump Scheme and making misrepresentations and omissions of material fact, Eco Science will lose and expend many millions of dollars.

182. Such losses include, but are not limited to, legal fees and payments associated with the Securities Class Actions filed against the Company and Defendants J. Taylor, D. Taylor, and Giguiere, and amounts paid to outside lawyers, accountants, and investigators in connection thereto, and the cost of settling or resolving the actions.

183. Such losses include the SEC's suspension of trading in the Company's securities.

184. Such losses include investigative costs in connection with governmental investigations of the misconduct alleged herein, including in connection to the Criminal Action and SEC Action.

185. Such losses include the overpayment of Company stock for (a) the acquisition of Ga Du Bank and (b) the toxic transactions with Separation Degrees and Phenix.

186. Relatedly, such losses include the corporate assets wasted through the Pump and Dump Scheme, especially through the significant amounts of common stock awarded to Defendant Giguiere's companies for essentially nothing in return.

187.    In addition, such losses include damages from Giguiere's systemic and massive selling of Eco Science stock, leading to a fundamental collapse of the share price and the Company as a going concern, and rendering it unable to attract new investors and obtain requisite financing.

188.    Such losses also include compensation, bonuses, and/or benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, and/or aided and abetted said breach.

189.    Such losses also include lost revenues caused by customers' loss of trust in the Company's business and potential products and losses in potential investments caused by investors loss of trust in the Company's business and products.

190.    Relatedly, such losses include a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future.

## DERIVATIVE ALLEGATIONS

191.    Plaintiff brings this action derivatively and for the benefit of Eco Science to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors, officers, and controlling person of Eco Science and unjust enrichment, as well as the aiding and abetting thereof.

192.    Eco Science is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

193.    Plaintiff is, and has been at all relevant times, an Eco Science shareholder.  Plaintiff will adequately and fairly represent the interests of Eco Science in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

194.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

195.    A pre-suit demand on the Board of Eco Science is futile and, therefore, excused.  At the time of filing both the original and this amended complaint, the Board consists of the following four Individual Defendants: Defendants J. Taylor, D. Taylor, Lewis, and Oveson (collectively, the "Directors").  Plaintiff only needs to allege demand futility as to two of these four Directors.

196.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of, among other things, their (a) participation in and causing the Company to participate in the Pump and Dump Scheme, (b) knowingly or recklessly making and/or causing the Company to make the false and misleading statements and omissions of material facts described herein, (c) failing to implement even bare minimum internal controls, (d) providing themselves excessive compensation while breaching their fiduciary duties and in furtherance of the Pump and Dump Scheme, and (e) causing the Company to waste corporate assets by engaging in sham transactions to further the Pump and Dump Scheme.  In addition, each of the Directors lacks the requisite independence to impartially consider a demand to commence and aggressively prosecute this action because, among other things, their livelihoods are dependent on Defendant Giguiere, the actual controller of the Company who lies at the center of the conspiracy alleged herein.  As a result of the foregoing, each of the Directors faces a substantial likelihood of liability, is not disinterested, and is unable to impartially investigate the charges and decide whether to pursue action against themselves.  Accordingly, demand upon each of them is futile, and thus excused.

197.    Additional reasons that demand on each Director is futile follow:

***Defendant J. Taylor***

198.    Defendant J. Taylor was directly responsible for all of the wrongful conduct described herein, by participating from the very beginning in the Pump and Dump Scheme (including by allowing Giguiere to control the Company as an undisclosed control person, causing the Company to

engage in sham transactions to enrich the Individual Defendants, causing the issuance of stock grants to Giguiere under false pretenses, and causing and/or permitting illegal promotion of the Company on The Money Street), awarding himself compensation from illicit proceeds from the scheme, granting himself lucrative shares from the Company in patently one-sided transactions, and making and causing the Company to make the false and misleading statements and material omissions alleged herein. Indeed, Defendant J. Taylor is a defendant in the Securities Class Actions arising from these false and misleading statements and is alleged to be a co-conspirator of the Pump and Dump Scheme in the SEC Action. As the CEO, President, Secretary, and a Company director, Defendant J. Taylor conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In fact, according to the Company's 2015 Form 10-K and 2016 Form 10-K, the Company did not have effective disclosure controls, "material weaknesses" existed as to those controls, the Company lacked an audit committee or any independent directors, and had insufficient policies governing financial reporting obligations. Thus, Defendant J. Taylor is further liable as a director for utterly failing to implement internal controls necessary to prevent or bring a halt to the Pump and Dump Scheme. Thus, for these reasons, too, Defendant J. Taylor faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

199. In addition, Defendant J. Taylor has served as the Company's President and CEO since December 2015. He has also served as the Company's Secretary and as a Company director since January 2016. As the Company admits in the 2016 10-K, he is a non-independent director. He received lavish compensation, including $8,305,000 for the fiscal year ended January 31, 2017. Defendant J. Taylor's large Company stock holding, worth over $44.2 million on March 31, 2017, reveals his interest in keeping the Company's stock price as high as possible (in addition to subjecting

Verified First Amended Shareholder Derivative Complaint

him to liability for unjust enrichment in receiving these benefits while breaching his fiduciary duties to the Company).  Furthermore, Defendant J. Taylor is the brother of Defendant D. Taylor, who is likely to face liability for the scheme outlined herein.  Even more fundamentally, Defendant J. Taylor is beholden to Defendant Giguiere for his livelihood, as he has received his salary from illicit proceeds from the Pump and Dump Scheme largely orchestrated by Defendant Giguiere and generous grants of Company stock that has been inflated in value as a direct result of that scheme.  He is also controlled by Defendant Giguiere as the Company's undisclosed control person.  In fact, Defendant J. Taylor's controlling block of Company shares was paid for directly by Defendant Giguiere, and J. Taylor's position as CEO of the Company was at the behest of Defendant Giguiere.  Yet Defendant Giguiere is at the center of this Action:  he was and is the mastermind and a primary beneficiary of the Pump and Dump Scheme, directed the Company to make the false and misleading statements alleged herein, has been sued in the Securities Class Actions and the SEC Action for the wrongful conduct at the heart of this Action, and is under indictment in the Criminal Action, with trial to commence next year.  In fact, as alleged herein, Defendant J. Taylor has been consistent in his subservience to Defendant Giguiere in furthering the Pump and Dump Scheme to Defendant Giguiere's benefit.  Thus, for these reasons, too, Defendant J. Taylor is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

***Defendant D. Taylor***

200.    Defendant D. Taylor was directly responsible for all of the wrongful conduct described herein, by participating from the very beginning in the Pump and Dump Scheme as alleged herein (including by allowing Giguiere to control the Company as an undisclosed control person, causing the Company to engage in sham transactions to enrich the Individual Defendants, causing the issuance of stock grants to Giguiere under false pretenses, and causing and/or permitting illegal promotion of the Company on The Money Street), awarding himself compensation from illicit proceeds from the

scheme, granting himself lucrative shares from the Company in patently one-sided transactions, and making and causing the Company to make the false and misleading statements and material omissions alleged herein. Defendant D. Taylor also is a defendant in the Securities Class Actions arising from these false and misleading statements and is alleged to be a co-conspirator of the Pump and Dump Scheme in the SEC Action. As the CFO and a Company director, Defendant J. Taylor conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements and/or omissions of material fact, consciously disregarded his duties to monitor engagement in the scheme, and consciously disregarded his duties to protect corporate assets. In fact, according to the Company's 2015 Form 10-K and 2016 Form 10-K, the Company did not have effective disclosure controls, "material weaknesses" existed as to those controls, the Company lacked an audit committee or any independent directors, and had insufficient policies governing financial reporting obligations. Thus, Defendant D. Taylor is further liable as a director for utterly failing to implement internal controls necessary to prevent or bring a halt to the Pump and Dump Scheme. Thus, for these reasons, too, Defendant D. Taylor faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

201. In addition, Defendant D. Taylor has served as the Company's CFO since December 2015. He has also served as the Company's Treasurer and as a Company director since January 2016. As the Company admits in the 2016 10-K, he is a non-independent director. He received lavish compensation, including $8,295,000 for the fiscal year ended January 31, 2017. Defendant D. Taylor's large Company stock holding, worth over $44.2 million on March 31, 2017, reveals his interest in keeping the Company's stock price as high as possible (in addition to subjecting him to liability for unjust enrichment in receiving these benefits while breaching his fiduciary duties to the Company). Furthermore, Defendant D. Taylor is the brother of Defendant J. Taylor, who is likely to face liability for the scheme outlined herein. Even more fundamentally, Defendant D. Taylor is

beholden to Defendant Giguiere for his livelihood, as he has received his salary from illicit proceeds from the Pump and Dump Scheme largely orchestrated by Defendant Giguiere and generous grants of Company stock that has been inflated in value as a direct result of that scheme. He is also controlled by Defendant Giguiere as the Company's undisclosed control person. In fact, Defendant D. Taylor's controlling block of Company shares was paid for directly by Defendant Giguiere, and D. Taylor's position as CFO of the Company was at the behest of Defendant Giguiere. Yet Defendant Giguiere is at the center of this Action: he was and is the mastermind and a primary beneficiary of the Pump and Dump Scheme, directed the Company to make the false and misleading statements alleged herein, has been sued in the Securities Class Actions and the SEC Action for the wrongful conduct at the heart of this Action, and is under indictment in the Criminal Action, with trial to commence next year. In fact, as alleged herein, Defendant D. Taylor has been consistent in his subservience to Defendant Giguiere in furthering the Pump and Dump Scheme to Defendant Giguiere's benefit. Thus, for these reasons, too, Defendant D. Taylor is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

### *Defendant Lewis*

202.    As a Company director, Defendant Lewis breached his fiduciary duties to the Company and aided and abetted the other Individual Defendants' breaches of fiduciary duty to the Company. Namely, Defendant Lewis, due to his employment with Ga Du Bank, helped effectuate the bogus Ga Du Bank acquisition as part of the Pump and Dump Scheme, and caused and/or permitted the Company to fail to disclose the material adverse facts concerning that acquisition because he knew that Ga Du Bank would not be able to provide the Company with the financial banking services it desired and had represented it would obtain in its public statements. Yet he was aware that the making of such false statements helped effectuate the acquisition of Ga Du Bank, which acquisition he has handsomely benefited from as part of the Pump and Dump Scheme, thereby

wasting valuable corporate assets and being unjustly enriched. Those false statements, in turn, have given rise to the Securities Class Actions alleging violations of the federal securities laws. Thus, for these reasons, too, Defendant Lewis faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

203. In addition, Defendant Lewis has served as a Company director since June 21, 2017. He is entitled to receive lavish compensation, including an annual salary of $120,000. Defendant Lewis is also entitled to exercise options for 2,500,000 shares of the Company's common stock. In addition, Defendant Lewis is entitled to a portion of 16,000,000 shares of restricted Company stock to the founders of Ga Du (which includes Lewis). Moreover, Defendant Lewis is not disinterested due to the positional benefits he received and continues to receive from Eco Science's dealings with Ga Du. Defendant Lewis was appointed to serve as CEO of Ga Du after it was acquired by Eco Science, and served as President of Ga Du before the acquisition, yet Ga Du is at the center of one of the key transactions challenged in this Action. For these same reasons, Defendant Lewis is beholden to Defendants Giguiere, J. Taylor, and D. Taylor, who through the Pump and Dump Scheme installed him in the managerial positions and granted him the lush compensation that he now enjoys. Accordingly, if Defendant Lewis were to take action against them, he would undermine his critical positions and benefits, in addition to implicating himself for his own role in the Ga Du scheme. Thus, for these reasons, too, Defendant Lewis is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

### Defendant Oveson

204. As a Company director, Defendant Oveson breached his fiduciary duties to the Company and aided and abetted the other Individual Defendants' breaches of fiduciary duty to the Company. Namely, Defendant Oveson, due to his employment with Ga Du Bank, helped effectuate the bogus Ga Du Bank acquisition as part of the Pump and Dump Scheme, and caused and/or

permitted the Company to fail to disclose the material adverse facts concerning that acquisition because he knew that Ga Du Bank would not be able to provide the Company with the financial banking services it desired and had represented it would obtain in its public statements. Yet he was aware that the making of such false statements helped effectuate the acquisition of Ga Du Bank, which acquisition he has handsomely benefited from as part of the Pump and Dump Scheme, thereby wasting valuable corporate assets and being unjustly enriched. Those false statements, in turn, have given rise to the Securities Class Actions alleging violations of the federal securities laws. Thus, for these reasons, too, Defendant Oveson faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

205. In addition, Defendant Oveson has served as a Company director since June 21, 2017. He is entitled to receive lavish compensation, including an annual salary of $120,000. Defendant Oveson is also entitled to exercise options for 1,500,000 shares of the Company's common stock. Moreover, Defendant Oveson is not disinterested due to the positional benefits he received and continues to receive from Eco Science's dealings with Ga Du. Defendant Oveson was appointed to serve as Chief Operating Officer of Ga Du after it was acquired by Eco Science, and was responsible for the operations of Ga Du Bank before the acquisition, , yet Ga Du is at the center of one of the key transactions challenged in this Action. For these same reasons, Defendant Oveson is beholden to Defendants Giguiere, J. Taylor, and D. Talyor, who through the Pump and Dump Scheme installed him in the managerial positions and granted him the lush compensation that he now enjoys. Accordingly, if Defendant Lewis were to take action against them, he would undermine his critical positions and benefits, in addition to implicating himself for his own role in the Ga Du scheme. Thus, for these reasons, too, Defendant Oveson is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

206.     Eco Science has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct to attempt to recover for Eco Science any part of the damages Eco Science suffered, and will continue to suffer, thereby.  Thus, any demand on the Directors is futile.

207.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

208.     The acts complained of herein constitute violations of fiduciary duties owed by Eco Science's officers and directors, and these acts are incapable of ratification.

209.     The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Eco Science.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Directors were to sue themselves or certain of the officers of Eco Science, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit.  On the other hand, if the suit is brought

derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

210.    If there is no directors' and officers' liability insurance, then the Directors will not cause Eco Science to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

211.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, at least two of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duty

212.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

213.    As officers, directors, and/or controlling person of Eco Science, the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Eco Science's business and affairs.

214.    The Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

215.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Eco Science.

216.    In breach of their fiduciary duties, the Individual Defendants engaged in and caused the Company to engage in the Pump and Dump Scheme as described herein, including by entering a

conspiracy to install nominal "officers" to run the Company without disclosing that Giguiere was actually in control, engaging in sham transactions by exchanging valuable Company assets for worthless consideration to artificially inflate the value of the Company's stock to enrich the Individual Defendants, causing the Company to issue stock to the Individual Defendants under false pretenses and/or in patent acts of self-dealing, illegally promoting Eco Science shares on The Money Street, and causing the Company to issue Giguiere millions of shares of Eco Science stock who then lied to broker dealers in order to deposit and liquidate those shares and further enrich the Individual Defendants.

217. Also, in breach of their fiduciary duties owed to Eco Science, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact and fail to disclose that: (1) the Individual Defendants engaged in and caused the Company to engage in the Pump and Dump Scheme; (2) the Company's leadership by the Taylor brothers was nominal only, the Taylor brothers had been installed by Defendant Giguiere and their controlling block of Company shares had been financed by him, and in truth the Company was controlled by Defendant Giguiere; (3) the software platform and other purported benefits obtained by the Company in the Separation Degrees transaction were essentially worthless, and in exchange the Company had given away millions of dollars of stock to allow the Individual Defendants to engage in and cause the Company to engage in the Pump and Dump Scheme; (4) the Company's strategic acquisitions plan lacked veracity; (5) the Company was registering ten million of its shares for a purported "equity incentive plan" when in fact they were being awarded to Defendant Giguiere as compensation for, and to further, the Pump and Dump Scheme; (6) Ga Du Bank was just weeks old when the Company announced its acquisition and was purportedly regulated by a Native American tribe; (7) Ga Du Bank's charter and ability to engage in some desired commercial operations was not sufficiently developed, and thus not viable; (8) Ga Du

Bank had never obtained a valid banking license and would not soon have a solution for engaging in banking; (9) the Company's statements concerning Ga Du Bank was in truth a last-ditch effort to keep the Pump and Dump Scheme viable; and (10) the Company failed to maintain adequate internal controls. As a result of the foregoing, the Company's public statements regarding its business, operations, and prospects were materially false and misleading at the time they were made. The Individual Defendants also failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

218. In further breach of their fiduciary duties to the Company, the Individual Defendants failed to institute effective internal controls at Eco Science. According to the Company's 2015 Form 10-K and 2016 Form 10-K, the Company did not have effective disclosure controls, "material weaknesses" existed as to those controls, the Company lacked an audit committee or any independent directors, and had insufficient policies governing financial reporting obligations. The Individual Defendants' knowing and fundamental failure to implement even the bare minimum of controls allowed a culture of lawlessness to prevail at the Company, as described herein.

219. As direct participants in the Pump and Dump Scheme and the other misconduct described herein, the Individual Defendants had actual knowledge that they had caused the Company to improperly engage in the Pump and Dump Scheme, made false and misleading statements and omissions of material fact as described herein, and failed to maintain adequate internal controls.

220. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

221. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Eco Science has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

222.    Plaintiff on behalf of Eco Science has no adequate remedy at law.

## SECOND CLAIM

**Against Defendants Giguiere, Lewis, and Oveson for Aiding and Abetting**
**Breach of Fiduciary Duty**

223.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

224.    To the extent Defendants Giguiere, Lewis, and Oveson did not breach their own fiduciary duty to Eco Science, such Individual Defendants aided and abetted the Individual Defendants who breached their fiduciary duty to Eco Science.

225.    Defendant Giguiere masterminded, was materially involved in, and personally benefitted from the Pump and Dump Scheme, including the Company's sham transactions with Defendant Giguiere's companies that has plundered the Company of assets, and the issuance of false and misleading statements (including in The Money Street) that inflated Defendant Giguiere's considerable Company shares at the expense of Eco Science and its investors.

226.    In addition, by virtue of his role as control person of the Company, Defendant Giguiere aided and abetted (and also caused) the Company's issuance of false and misleading statements and omissions of material fact as alleged herein.

227.    Through the Pump and Dump Scheme, Defendant Giguiere also knowingly assisted the Taylor brothers in maintaining their role and obtaining profits as the nominal managers of the Company while he was also aware that they were breaching their fiduciary duties to the Company.

228.    By virtue of his control status and orchestrator of the Pump and Dump Scheme, Defendant Giguiere also knowingly permitted and encouraged the Taylor brothers to fail to implement any effective controls at the Company, which resulted in a culture of lawlessness to pervade there.

229. Defendants Lewis and Oveson had knowledge of Eco Science's directors' and officers' breaches of fiduciary duty in connection with the sham Ga Du Bank acquisition due to their respective employments and associations with Ga Du.

230. By virtue of that employment and association, Defendants Lewis and Oveson were aware that Ga Du Bank would not be able to provide the financial banking services that Eco Science sought and had presented in its public statements.

231. Thus Defendants Lewis and Oveson were aware that the Company's statements concerning the Ga Du Bank acquisition were materially false and misleading, and yet caused and/or permitted such statements to be disseminated anyway.

232. Defendants Lewis and Oveson also aided and abetted the other Individual Defendants' breach of fiduciary duty by causing the Company to grossly overpay via Company stock for the acquisition of Ga Du Bank in a sham transaction for worthless or near-worthless consideration, which acquisition Defendants Lewis and Oveson benefited from through their nomination as directors of the Company, positions at Ga Du, salaries on account of such positions, and lucrative stock awards that were inflated due to the false and misleading statements alleged herein.

233. Each of Defendants Giguiere, Lewis, and Oveson had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements disseminated by Eco Science, and had the power and/or ability to directly or indirectly control or influence one another.

234. Each of Defendants Giguiere, Lewis, and Oveson is jointly and severally liable to the same extent as any other Individual Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

235. Each of Defendants Giguiere, Lewis, and Oveson is liable to the same extent as any other Individual Defendant is liable for violations of laws set forth herein.

236.    As a direct and proximate result of Defendants Lewis, Giguiere, and Oveson's aiding and abetting of the breaches of fiduciary duty alleged herein, Eco Science has sustained and will continue to sustain substantial damages as detailed herein.

237.    Plaintiff on behalf of Eco Science has no adequate remedy at law.

### THIRD CLAIM

### Against the Individual Defendants for Unjust Enrichment

238.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

239.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Eco Science.

240.    The Individual Defendants either benefitted financially from the improper conduct, and received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Eco Science that was tied to the performance or artificially inflated valuation of Eco Science, and/or received compensation or otherwise received payments that was unjust in light of the Individual Defendants' bad faith conduct.

241.    First, all of the Individual Defendants have been unjustly enriched at the expense of the Company by receiving unjustified compensation in the form of compensation and perquisites while breaching their fiduciary duties and/or aiding and abetting the breach of fiduciary duties, as alleged herein.  In fact, the Taylor brothers' "salaries" from the Company were financed from proceeds from the Pump and Dump Scheme itself and its sham transactions.  Moreover, as reported in the 2016 Form 10-K, the Taylor brothers each provided themselves – in a patent self-dealing transaction – three million shares (worth some $8,190,000 at the time of issuance) the Company's

inflated shares, purportedly as "stock based compensation recorded as management fees" for serving as the Company's officers.

242. Second, Defendant Giguiere has been unjustly enriched at the expense of the Company through obtaining millions of inflated shares of Eco Science stock in the sham transactions detailed herein without any lawful or rationale consideration, and then liquidating those inflated shares for illicit proceeds for more than $8.5 million, all as part of the Pump and Dump Scheme and in breach of his fiduciary duties and/or through aiding and abetting the other Individual Defendants' breaches of fiduciary duty.

243. Third, Defendants Lewis and Oveson have been unjustly enriched as a result of the worthless Ga Du Bank transaction and their breaches of fiduciary duty and their aiding and abetting the other Individual Defendants' breaches of fiduciary duty in helping effectuate and misrepresent the same. They were each appointed "directors" of Eco Science and officers of Ga Du following the Company's acquisition of Ga Du and provided $120,000 each for those roles, despite the Company being essentially worthless. Defendant Lewis was also given the option to purchase 2.5 million of common stock at the discounted price of $2 per share, to vest in twenty-four months. Defendant Oveson was similarly given the option to purchase 1.5 million of common stock at the same option price, to vest in twenty-four months. In addition, Eco Science issued 16,000,000 shares of restricted Company stock to the founders of Ga Du, which included Defendant Lewis.

244. Plaintiff, as a shareholder and a representative of Eco Science, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from benefits and other compensation, and any performance-based or valuation-based compensation obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties and/or their aiding and abetting breach of fiduciary duties.

245. Plaintiff on behalf of Eco Science has no adequate remedy at law.

1

2

## **FOURTH CLAIM**

### **Against The Individual Defendants for Waste of Corporate Assets**

3

4

246.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth

5

above, as though fully set forth herein.

6

247.   As a result of the foregoing, and by failing to properly consider the interests of the

7

Company and its public shareholders, the Individual Defendants have caused Eco Science to waste

8

valuable corporate assets: by engaging in the Pump and Dump Scheme; by paying themselves

9

excessive compensation in patent acts of self-dealing; grossly overpaying with Company stock for

10

the impotent Ga Du "Bank", the sham "collaboration" with Separation Degrees for worthless assets,

11

and the toxic financing transaction with Phenix; by incurring many millions of dollars of legal liability

12

and legal and investigative costs to defend unlawful actions; and by losing valuable assets from

13

investors and customers who no longer trust the Company.

14

15

248.   As a result of the waste of corporate assets, the Individual Defendants are each liable

16

to the Company.

17

249.   Plaintiff on behalf of Eco Science has no adequate remedy at law.

18

## **FIFTH CLAIM**

19

20

### **Against the Individual Defendants for Abuse of Control**

21

250.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth

22

above, as though fully set forth herein.

23

251.   The Individual Defendants' misconduct alleged herein constituted an abuse of their

24

ability to control and influence Eco Science, for which they are legally responsible.

25

252.   As a direct and proximate result of the Individual Defendants' abuse of control, Eco

26

Science has sustained significant damages.   As a direct and proximate result of the Individual

27

Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Eco Science

28

79

has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

253.    Plaintiff on behalf of Eco Science has no adequate remedy at law.

### SIXTH CLAIM

**Against the Individual Defendants for Gross Mismanagement**

254.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

255.    By their actions alleged herein, the Individual Defendants abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Eco Science in a manner consistent with the operations of a publicly-held corporation.

256.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Eco Science has sustained and will continue to sustain significant damages.

257.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

258.    Plaintiff, on behalf of Eco Science, has no adequate remedy at law.

### REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Eco Science, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Eco Science;

(c)    Determining and awarding to Eco Science the damages sustained by it as a

result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

        (d)    Directing Eco Science and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Eco Science and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

        1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

        2. a provision to permit the shareholders of Eco Science to nominate at least two candidates for election to the board; and

        3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

        (e)    Awarding Eco Science restitution from Individual Defendants, and each of them;

        (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

        (g)    Granting such other and further relief as the Court may deem just and proper.

/ / / /

/ / / /

/ / / /

/ / / /

# JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 21, 2018                    Respectfully submitted,

                                             LEVERTY & ASSOCIATES LAW CHTD.


                                             *Patrick Leverty*
                                             _____
                                             Patrick R. Leverty, Esq.
                                             Reno Gould House
                                             832 Willow Street
                                             Reno, NV 89502
                                             Telephone: (775) 322-6636
                                             Facsimile: (775) 322-3953
                                             Email: pat@levertylaw.com

                                             *Liaison Counsel for Plaintiff*

                                             THE ROSEN LAW FIRM, P.A.
                                             Phillip Kim
                                             275 Madison Avenue, 34th Floor
                                             New York, NY 10016
                                             Telephone: (212) 686-1060
                                             Facsimile: (212) 202-3827
                                             Email: pkim@rosenlegal.com

                                             *Counsel for Plaintiff*

# **CERTIFICATE OF SERVICE**

Pursuant to Rule 5(b) of the Federal Rules of Civil Procedure, I hereby certify under penalty of perjury that I am an employee of Leverty & Associates Law Chtd., and that service of the foregoing was made on this date via electronic service through the Court's CM/ECF system to all parties/counsel requesting service.

DATED this _21st_ day of December, 2018.

*Patrick Leverty*

An employee of Leverty & Associates Law Chtd.

DocuSign Envelope ID: CEAFC15E-CC2C-4670-AF91-D54C84813CBD

<u>VERIFICATION</u>

I, Hans Menos am the plaintiff in the within action. I have read the foregoing complaint and know the contents thereof. The allegations of the complaint are true of my personal knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this _th day of December 2018.

12/18/2018

DocuSigned by:

AC16B6900457425

Hans Menos

# Exhibit 4

James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
**CARELLA, BYRNE, CECCHI,**
**OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

*Liaison Counsel for Lead Plaintiff Richard*
*Roschke and the Class*

Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

*Counsel for Lead Plaintiff Richard Roschke*
*and Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE ECO SCIENCE SOLUTIONS, INC. SECURITIES LITIGATION | Case No.  1:17-cv-03707-RMB-KMW <br><br> **AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

Lead Plaintiff Richard Roschke ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Eco Science Solutions, Inc., ("Eco Science" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Eco Science; and (c) review of other publicly available information concerning Eco Science.

## NATURE OF THE ACTION AND OVERVIEW

1.     Plaintiff alleges that Defendants[1] engaged in an illegal "pump and dump" scheme. The United States agrees.  Defendant Gannon Giguiere  has been criminally charged with conspiracy and securities fraud, and has posted a substantial bail pending trial.  Concurrently, the SEC is pursuing securities fraud charges based on the same allegations in civil court.   Not only have Defendants profited by inflating the price of Eco Science's stock, they also sought to maintain the inflated price by falsely representing that the Company was purchasing a bank.  In fact, this purported purchase was a sham.  In sum, this case presents a particularly egregious example of securities fraud.

2.     This is a class action on behalf of persons and entities that acquired Eco Science's securities between December 2, 2016, and May 19, 2017, inclusive (the "Class Period"), against the Defendants, seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

3.     Eco Science is purportedly a bio and software technology-focused company targeting the health and wellness industry.  Eco Science claims its consumer initiatives are centered on education and connecting consumers with various holistic health, wellness and alternative medicine businesses.  The Company also claims that its e-commerce platform enables health-and-wellness enthusiasts to locate, access, and connect with health-and-wellness

---

[1] "Defendants" refers to Eco Science Solutions, Inc., Jeffery Lee Taylor, Don Lee Taylor, and Gannon Giguiere, collectively.

businesses and like-minded enthusiasts, and to facilitate the research of and purchasing of eco-friendly products.

4.      On December 15, 2016, a report was published on *SeekingAlpha.com* alleging that Eco Science was operating a "pump-and-dump scheme" whereby the Company was paying a third party to promote the Company's stock, inflating the market price, while the Company's primary products—two mobile apps—were essentially worthless.

5.      On this news, the Company's stock price fell $0.13 per share, or 4.8%, to close at $2.55 per share on December 16, 2016.  The stock price continued to decline as the market absorbed the news during the next two trading days, falling $0.73 per share, or 28.6%, on December 19, 2016, and $0.39 per share, or 21.4%, on December 20, 2016, on unusually heavy trading volume.

6.      On May 5, 2017, the company announced that it "signed a Letter of Intent with Ga-Du Bank, Inc. for the purpose of acquiring full ownership of the Bank in a stock and cash transaction."  The Company claimed that "the Bank's principals have engaged with prospects in the marketplace whom have made expressions of interest, along with preliminary commitments to deposit sums between Three-Hundred and Six-Hundred Million Dollars ($300,000,000 and $600,000,000)."

7.      On May 15, 2017, another report was published on *SeekingAlpha.com* alleging again that Eco Science was operating a pump-and-dump scheme.  The report elaborated further, alleging that Defendant Gannon Giguiere was using Eco Science for his own personal enrichment—noting that the Company had engaged in multiple transactions with entities controlled by Gannon Giguiere which were highly lucrative for those entities, but which would eventually erode the value of the Company's stock.  The report alleged further that Defendant Giguiere had engaged in similar schemes in the recent past.  The report also claimed that the Company's substantial payments for "advertising services" were likely services related to advertising the stock, rather than the Company's products, and pointed out that "themoneystreet.com has been promoting Eco Science stock for months now."  Moreover, with respect to the Company's purported pending acquisition of Ga-Du Bank, the report alleged that

"the internet has never heard of this so-called 'Ga-Du Bank,'" and that it was regulated by a newly founded central bank of the "Southern Cherokee Nation and The Red Fire People," which claimed to be a sovereign nation, but which could also be contacted by email through a Gmail address, and was "not on the list of 566 Native American tribes legally recognized by the US"— all raising the specter that the acquisition was a sham to keep the Company's stock inflated.

8.    On this news, the Company's stock price fell $0.23 per share, or 9.5%, to close at $2.17 per share on May 16, 2017.

9.    On May 19, 2017, the SEC issued a release announcing that it had "temporarily suspended trading in the securities of Eco Science" due to "concerns regarding the accuracy and adequacy of publicly disseminated information concerning, among other things, Eco Science's proposed acquisition of Ga-Du Bank, Inc." The SEC further stated that the suspension would terminate on June 5, 2017.

10.    On June 6, 2017, when the Company's stock began trading again, it closed at $0.65 per share, which was a decline of approximately $1.72 per share, or 72.5%, from the Company's closing price of approximately $2.37 on May 19, 2017.

11.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company was using advertising funds to promote the Company's stock; (2) that the Company's mobile app products were essentially worthless; (3) that the Company engaged in a series of transactions intended to enriching Defendant Gannon Giguiere at the expense of the investing public; (4) that Ga-Du Bank was operated by the Southern Cherokee Nation and The Red Fire People Central Bank; (5) that the Company disseminated false information concerning, among other things, Eco Science's proposed acquisition of Ga-Du Bank; (6) that, as such, the Company was operating a pump-and-dump scheme; and (7) that, as a result of the foregoing, Defendants' statements about Eco Science's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

12.    As a result of Defendants' wrongful acts and omissions, and the precipitous

decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

13.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

15.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

16.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

17.    Plaintiff Richard Roschke purchased Eco Science securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.    Defendant Eco Science Solutions, Inc. is incorporated in Nevada and its headquarters are in Makawao, Hawaii. Eco Science's common stock trades on the OTCQB under the symbol "Eco Science."

19.    Defendant Jeffery Lee Taylor was the Chief Executive Officer ("CEO") of Eco Science at all relevant times.

20.    Defendant Don Lee Taylor was the Chief Financial Officer ("CFO") of Eco Science at all relevant times.

CLASS ACTION COMPLAINT

21.     Defendant Gannon Giguiere ("Giguiere") was the President of Separation Degrees – One, Inc, ("SDOI") and the Managing Member of Phenix Ventures, LLC—two companies that engaged in transaction with Eco Science designed to enrich Giguiere.

22.     Defendants Jeffery Lee Taylor and Don Lee Taylor, (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of Eco Science's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

23.     Eco Science is purportedly a bio and software technology-focused Company targeting the health and wellness industry. Eco Science claims its consumer initiatives are centered on education and connecting consumers with various holistic health, wellness and alternative medicine businesses. The Company also claims that its e-commerce platform enables health-and-wellness enthusiasts to locate, access, and connect with health-and-wellness businesses and like-minded enthusiasts, and to facilitate the research of and purchasing of eco-friendly products.

### Materially False and Misleading
### Statements Issued During the Class Period

#### 1.     The "Pump and Dump" Scheme

24.     The Class Period begins on December 2, 2016. On that day, the Company filed

its quarterly report with the SEC on Form 10-Q for the period ended October 31, 2016.  Therein, the Company, in relevant part, stated:

> During the nine months ended October 31, 2016 the Company received invoices for advertising services from SDOI totaling $1,271,274 and further received invoices for monthly project and planned technical development/maintenance, production and staging server administration, ongoing marketing services and monthly advertising management services totaling a cumulative $322,000.
>
> …
>
> We have recently changed the focus of our business to operate in the eco-friendly technology sector using social media sites and offering apps to generate advertising revenues and download fees. The Company's need for ongoing capital by way of loans, sale of equity and/or convertible notes is expected to continue during the current fiscal year until we can establish revenues from operations.

25.     The above statements identified in ¶24 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose: (1) that the Company was using advertising funds to promote the Company's stock; (2) that the Company's mobile app products were essentially worthless; (3) that the Company engaged in a series of transactions intended to enriching Defendant Gannon Giguiere at the expense of the investing public; (4) that, as such, the Company was operating a pump-and-dump scheme; and (5) that, as a result of the foregoing, Defendants' statements about Eco Science's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

26.     Specifically, on January 1, 2016, Defendant Giguiere entered into a letter agreement with Separation Degrees Online, Inc. ("SDOI") purportedly to provide development, licensing, and other services for the Company's initiatives.  In fact, the "marketing support" that the SDOI provided consisted of promotion of the Company's stock on TheMoneyStreet.com. The Company paid for SDOI's "services" with common stock.  The Company's own filings demonstrate that SDOI was paid only for pumping up the value of Eco Science stock.  The Company's Form 10-K for the year ending January 31, 2017, filed with the SEC on May 1, 2017, disclosed that $1,720,914 of the $2,061,506 (approximately 83%) worth of stock paid to

SDOI was for advertising and promotion services, while the balance of $340,592 (approximately 17%) was paid for purported "technology, licensing and marketing fees."

27.     Throughout 2016, Defendant Giguiere deposited in brokerage account(s) approximately 8,000,000 shares of the Company's common stock, that he caused to be issued purportedly pursuant to its "2016 Equity Incentive Plan."  In making these deposits, Defendant Giguiere repeatedly falsely represented that not an affiliate of the Company and that he was not aware of any non-public material adverse information about the Company. For instance, in filling out a "Stock Promotion Certificate" on December 29, 2016, Defendant Giguiere, in response to a question ""Were you aware of the promotional activity in the issue you wish to deposit or are offering for sale?," he checked "no" and then falsely stated, "I am not involved in any promotional activity whatsoever." Defendant Giguiere, in fact, knew, or was at least reckless in not knowing, that these statements were materially false and misleading because he knew that he was promoting the Company on TheMoneyStreet.com, a website that he owned and/or controlled.

28.     Throughout 2016, Giguiere recommended Eco Science's stock—a company with zero revenues and an accumulated deficit of more than $43 million by January 31, 2017—on TheMoneyStreet.

29.     TheMoneyStreet published at least two multi-page articles titled "[the Company] and the 2016 Elections" and "Is This the Next Big Stock for 2016[?]" The first article claimed, among other things, that "[i]t's typically been true that most industries will not see much movement during an election year. . . . BUT once in a while, there are a few outliers that challenge this thought. AND when they do, they merit a closer look. Eco Science Solutions just may be that outlier to bring the returns you are seeking during this window of time."

30.     The second article claimed, among other things, that "Eco Science seems to be taking a page out of Amazon.com's playbook" and that "[i]t's eerily similar to how Amazon started. . . . If you take a look at Eco Science's business model, one could see the similarities to Amazon's strategy."

31.     Neither article disclosed that Giguiere owned TheMoneyStreet, that he controlled

Eco Science, or that he was intending to and/or actively liquidating his Eco Science stock into the market.

32.     In fact, as of March 2016, TheMoneyStreet's "Disclaimer" page made no mention of Giguiere and affirmatively misrepresented that "[a]rticles on our website represent independent financial commentary. The content is provided by independent authors via a common carrier platform and do not necessarily represent the opinions of our website." Giguiere knew, or was at least reckless in not knowing, that those statements and omissions were false and misleading because Giguiere controlled TheMoneyStreet and the website's authors were not independent. At no timw did the Disclaimer page disclose that Giguiere controlled all of SDOI, TheMoneyStreet, and Eco Science, and that he was actively selling shares of Eco Science.

33.     Beginning in May 2016, Defendant Giguiere began wiring a portion of the proceeds of his stock sales to a third party, who in turn wired the money to the Company's bank account. The other Individual Defendants then paid themselves $5,000 per month out of the Eco Science account. Because Eco Science earned no revenues, the third party's deposits of the proceeds of Defendant Giguiere's sales of the Company's stock were the Company account's primary funding source, and thus the source of the other Individual Defendants' salaries. In other words, and upon information and belief, Defendant Giguiere used the proceeds of his sales of the Company's stock to pay the other individual defendants to act as nominal officers of the company.

34.     On December 15, 2016, a report was published on *SeekingAlpha.com* alleging that Eco Science was operating a "pump-and-dump scheme" whereby the Company was paying a third party to promote the Company's stock, inflating the market price, while the Company's primary products—two mobile apps—were essentially worthless. The report, in relevant part, stated:

> Eco Science Solutions (OTC:Eco Science) is a pump-and-dump scheme with a 100 percent downside. It is simply dumbfounding how Eco Science has been able to garner an enterprise value of around $77 million with a portfolio of assets that has seemingly little to no value.

**The Pump**

A financial media company called The Money Street (TMS) published a series of articles on Eco Science . . . going so far as saying that Eco Science has the **potential to become the next Amazon (NASDAQ:AMZN) or Uber (Private:UBER) of the cannabis industry**.

. . .

TMS gets compensated between $25,000 and $150,000 to pump up stocks like Eco Science... and looking at the stock chart below, Eco Science has been pumped to the hilt . . . .

**So... What Does Eco Science Do?**

Eco Science is tackling both the health and wellness industry and the cannabis market. By tackle, I mean the following: Developing two YouTube channels, which so far have a **COMBINED** subscriber base of six people; and managing two mobile apps, both of which have between 100 to 500 downloads on the Android market, and one of which has a five-star review written by some guy who just so happens to share the same name as Eco Science's chief financial officer.

The growth story largely comes from Eco Science's "Herbo" and "Fitrix" apps. Herbo uses the smartphone's GPS tracker to "help you find MMJ dispensaries, smoke shops, legal doctors, clinics, and delivery services in your area...". According to Eco Science, the app has over 14,000 locations that make up the marijuana smoke chain.

The other app, Fitrix, "helps you keep track of your day-to-day fitness habits and routines." This app has features such as a BMI calculator, fitness radio, weight loss calculator, a daily log, and other generic features. According to an angry reviewer on the app store:

> "This app has almost useless levels of functionality - for the parts that work. **It seems more of a developer's first learning app than anything meant to be used**... only plus is it's free so it can't hurt your wallet."

. . .

**Valuation and Conclusion**

The financial health of Eco Science is the nail in the coffin. For starts, Eco Science has not been able to generate **ANY** sales, and as a result, the company has burned through $12.5 million in shareholder capital since inception!

With only $70K in cash and almost $900K in payables on the balance sheet, the

company will continue to cling to the capital markets for survival. An annual cash burn rate of +$200K also does not help.

Since it looks like the company will have no hope in successfully generating cash flow to support its significant debt load, my target price for Eco Science is $0, or 100 percent down from the stock's current levels.

35.     On this news, the Company's stock price fell $0.13 per share, or 4.8%, to close at $2.55 per share on December 16, 2016.  The stock price continued to decline as the market absorbed the news during the next two trading days, falling $0.73 per share, or 28.6%, on December 19, 2016, and $0.39 per share, or 21.4%, on December 20, 2016, on unusually heavy trading volume.

36.     On May 15, 2017, another report was published on *SeekingAlpha.com* further alleging that Eco Science was operating a pump-and-dump scheme.   The report elaborated further, stating, in relevant part:

**Summary**

- Thanks to a small float and an ongoing stock promotion, Eco Science Solutions has been up over 700% over the last twelve months.

- Today, however, the size of its float has exploded overnight as a registration statement for 14 million newly issued shares has been declared effective.

- The person indirectly holding those shares has previously been CEO of Eventure, a publicly traded company with an uncanny number of similarities to Eco Science Solutions.

- Eventure's stock price dropped from 3.50 into the triple zeroes in 2014 after a series of toxic financing deals. Eco Science Solutions has now obtained identical toxic financing.

- I believe history will repeat itself and Eco Science Solution's stock will shortly follow Eventure's down the drain.

**Introduction**

. . .

In this article, I'll argue the company, as well as its management, are irrelevant and merely part of a vehicle that was set up to transfer shares to a third party. And in this case, that particular third party has pulled off an almost identical scheme

just a few years ago, with that stock now trading at zero.

. . .

### 2016-2017: Eco Science Solutions

*Eco Science and Giguiere's Separation Degrees*

After the IPO of Separation Degrees - One fell through, Giguiere seems to have changed his plans. He no longer tried to IPO his own company, and instead appeared to change his focus to a company that's already listed. In January of 2016, Separation Degrees signed a "technology licensing and marketing support agreement" with an obscure, illiquid publicly traded entity called Eco Science Solutions, trading under the ticker Eco Science. A majority stake in this company had (not coincidentally) just been bought by two brothers from Hawaii one month before . . . The agreement between Eco Science and Separation Degrees entailed, among others, for the third time this article, the sale of a mysterious "software platform."

Over 2016, the collaboration between Eco Science and Separation Degrees resulted in (again) two, very basic apps being brought to market, Herbo and Fitrix. Both apps are free, both are extremely basic (I personally tried Fitrix: by far the most impressive thing it does is offer an ability to calculate your Body Mass Index) and both are being downloaded or used by virtually nobody.

During 2016, Separation Degrees has send invoices to Eco Science totaling *over $2 million*. This includes $1.8 million in "advertising services." I have no idea what exactly was advertised. It surely weren't the apps, as even Google doesn't seem to know what, for example, the Fitrix app even is.

. . .

But maybe Separation Degrees didn't advertise the apps on behalf of Eco Science, but instead advertised its stock. The website themoneystreet.com has been promoting Eco Science stock for months now. Coincidentally (or not), that same website also used to promote EVTI stock.

. . .

Eco Science and Separation Degrees initially agreed invoices would be paid not in cash (which Eco Science doesn't have), but instead would be paid in shares. Later, both parties agreed to settle all outstanding invoices from 2016 by Eco Science issuing 4 million shares to Giguiere's Separation Degrees. At the current market price, these shares are worth about $10 million. Not a bad deal at all considering the original invoices amounted to about $2 million. However, it's important to realize these shares cannot legally be re-sold in the open market without a valid S-1 registration statement being approved by the SEC.

*Eco Science and Giguiere's Phenix Ventures*

In January of 2017, Eco Science also signed an Equity Purchase Agreement with an entity called Phenix Ventures LLC. By now, anyone reading this article will not be surprised that Phenix Ventures is ALSO in fact owned by Gannon Giguiere.

. . .

The agreement states Eco Science will sell to Phenix ten million shares of the company's stock, at a price "equal to 83% of the lowest volume weighted price for the ten consecutive trading days immediately following the date on which the applicable Put notice is delivered to Investor."

Such an agreement is a fine example of toxic financing. Phenix gets to buy stock at a discount to the market price, sell those shares for a profit, which makes the share price fall, where Phenix is again able to buy at a discount, etcetera. Actually, it's the exact same type of financing that tanked the Eventure Interactive share price to zero.

37.     On this news, the Company's stock price fell $0.23 per share, or 9.5%, to close at $2.17 per share on May 16, 2017.

### 2.     The Sham Ga-Du Bank Transaction

38.     On May 5, 2017, the Company issued a press release entitled "Eco Science Solutions, Inc. Signs Letter of Intent to Acquire Specialty Banking Operation." Therein, the Company, in relevant part, stated:

MAUI, HI--(Marketwired - May 5, 2017) - Eco Science Solutions, Inc. (OTCQB: Eco Science), an eco-technology Company providing solutions to the multi-billion-dollar health, wellness and alternative medicine industry, today announced that it has signed a Letter of Intent with Ga-Du Bank, Inc. for the purpose of acquiring full ownership of the Bank in a stock and cash transaction.

Upon the closing of the transaction, Eco Science will operate the Bank as a wholly-owned subsidiary of Eco Science Solutions, Inc. Eco Science will own and operate a financial banking division providing payment processing, cash management and financial services to its customers in the cannabis industry.

Additionally, the Bank's principals have engaged with prospects in the marketplace whom have made expressions of interest, along with preliminary commitments to deposit sums between Three-Hundred and Six-Hundred Million Dollars ($300,000,000 and $600,000,000). These amounts are currently being projected to be deposited within the first sixty to one-hundred-eighty days following the acquisition of the Bank by Eco Science.

"All parties involved are enthusiastic about the Bank's potential to financially serve the cannabis marketplace. Current business owners working in medical

marijuana are doing a tremendous job, but are truly in need of formal banking services so they can soundly manage their business finances," stated John Lewis, who is both the current president of the Bank and a Governor of the Central Bank of SCNRFP. Mr. Lewis continued with, "By combining Ga-Du Bank with Eco Science Solutions, we see how our synergies will create an important financial institution to serve a category that is in need of a fully integrated vertical product suite."

"Our entire team is thrilled by the prospect of the acquisition of the Ga-Du Bank by Eco Science," said Andy Tucker, Senior Advisor to of Ga-Du Bank. Mr. Tucker continued, "We believe that in joining forces with the Eco Science team, we can deliver a comprehensive suite of financial products that addresses the current needs of currently what is a cash-driven industry, allowing Eco Science to become a break-out leader for the sector."

"It has been our vision from day one that, in order to fully service the cannabis industry and execute on our business plan, we needed to be creative in securing and offering a banking platform that further differentiates us from everyone in our category," stated Jeff Taylor, Chief Executive Officer of Eco Science Solutions, Inc. Mr. Taylor continued, "The deal with Ga-Du Bank is a game-changer for not only Eco Science, but everyone in the cannabis industry. This new division of our Company will put us years ahead of our goal to create a full-service marketplace among growers, suppliers, distributors, retailers and consumers."

39.     The above statements identified in ¶38 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that Ga-Du Bank was operated by the Southern Cherokee Nation and The Red Fire People Central Bank; (2) that the Company disseminated false information concerning, among other things, Eco Science's proposed acquisition of Ga-Du Bank; and (3) that, as a result of the foregoing, Defendants' statements about Eco Science's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis.

40.     On May 15, 2017, seekingalpha.com published a report that stated in relevant part:

On January 26th, Eco Science filed with the SEC an S-1 registration statement. These registration statements are usually declared effective by the SEC within weeks, but on this occasion, it took close to four months, and two amendments.

As the Eco Science share price began to slide during that unexpectedly long waiting period, the company made ever more desperate attempts to keep traders interested. This included a press release saying the company had signed a "Letter

of Intent" to buy a bank, with supposedly "commitments" from prospects" "to deposit sums between $300 million and $600 million."

Sounds good? Well, the internet has never heard of this so-called "Ga-Du Bank," and it's regulated by (or, in fact, is; it's all a bit confusing to say the least) the newly founded Central Bank of the "Southern Cherokee Nation and The Red Fire People." Claiming to be a sovereign nation based on an 18th century US Supreme Court ruling (and quite possibly the only government in the world you can contact per e-mail through a Gmail-address), it's not on the list of 566 Native American tribes legally recognized by the US.

Apparently, even Eco Science itself wasn't too impressed: while it did send out a PR, it never filed an 8-K with the SEC, which is an obligation to public companies when they have material news to report. I agree with the company the banking business is immaterial (and, besides, of a questionable legality, but I'll leave that to the experts), but is most of all a poor attempt to distract investors from impending doom.

### Disclosures at the End of the Class Period

41. On May 19, 2017, the SEC issued a release announcing that it had "temporarily suspended trading in the securities of Eco Science" due to "concerns regarding the accuracy and adequacy of publicly disseminated information concerning, among other things, Eco Science's proposed acquisition of Ga-Du Bank, Inc." In greater part, the SEC stated:

The Securities and Exchange Commission ("Commission") announced the temporary suspension, pursuant to Section 12(k) of the Securities Exchange Act of 1934 (the "Exchange Act"), of trading in the securities of Eco Science Solutions, Inc. ("Eco Science"), of Malawea, Hawaii at 9:30 a.m. EDT on May 22, 2017, and terminating at 11:59 p.m. EDT on June 5, 2017.

The Commission temporarily suspended trading in the securities of Eco Science because of concerns regarding the accuracy and adequacy of publicly disseminated information concerning, among other things, Eco Science's proposed acquisition of Ga-Du Bank, Inc. This order was entered pursuant to Section 12(k) of the Securities Exchange Act of 1934 (Exchange Act).

The Commission acknowledges FINRA's assistance in this matter.

The Commission cautions broker-dealers, shareholders, and prospective purchasers that they should carefully consider the foregoing information along with all other currently available information and any information subsequently issued by the company.

Further, brokers and dealers should be alert to the fact that, pursuant to Rule 15c2-11 under the Exchange Act, at the termination of the trading suspension, no

quotation may be entered unless and until they have strictly complied with all of the provisions of the rule. If any broker or dealer has any questions as to whether or not he has complied with the rule, he should not enter any quotation but immediately contact the staff in the Division of Trading and Markets, Office of Interpretation and Guidance, at (202) 551-5777. If any broker or dealer is uncertain as to what is required by Rule 15c2-11, he should refrain from entering quotations relating to Eco Science's securities until such time as he has familiarized himself with the rule and is certain that all of its provisions have been met. If any broker or dealer enters any quotation which is in violation of the rule, the Commission will consider the need for prompt enforcement action.

42.     On June 6, 2017, when the Company's stock began trading again, it closed at $0.65 per share, which was a decline of approximately $1.72 per share, or 72.5%, from the Company's closing price of approximately $2.37 on May 19, 2017.

## CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired Eco Science's securities between December 2, 2016, and May 19, 2017, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

44.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Eco Science's common stock actively traded on the OTCQB. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Eco Science shares were traded publicly during the Class Period on the OTCQB. As of April 28, 2017, Eco Science had 45,357,572 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Eco Science or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.     Plaintiff's claims are typical of the claims of the members of the Class as all

members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Eco Science; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

49.     The market for Eco Science's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Eco Science's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Eco Science's securities relying upon the integrity of the market price of the Company's securities and market information relating to Eco Science, and have been damaged thereby.

50.     During the Class Period, Defendants materially misled the investing public,

thereby inflating the price of Eco Science's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Eco Science's business, operations, and prospects as alleged herein.

51.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Eco Science's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

52.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

53.     During the Class Period, Plaintiff and the Class purchased Eco Science's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## GOVERNMENT INVESTIGATIONS AND RESULTING CRIMINAL AND CIVIL CHARGES

54.     On June 29, 2018, the Department of Justice charged Individual Defendant Giguiere with four counts of conspiracy and securities fraud (the "Indictment"). In addition to other crimes, Defendant Giguiere was charged with what was effectively a "pump-and-dump" scheme with respect to the Company's stock. The Indictment alleged that Defendant Giguiere "obtain[ed] a material degree of control over [the Company], including by obtaining significant blocks of [the Company's] stock." The Indictment further charges that Defendant Giguiere concealed his substantial control of the Company from the brokerage firms with which he deposited the Company's stock. In fact, he falsely represented to a brokerage firm that he was "not involved in any promotional activity whatsoever."

55.     The Indictment charges that Defendant Giguiere "would promote, or cause the promotion of, [the Company] and its stock on TheMoneyStreet.com in order to artificially avoid the deflation of, maintain, and inflate the share price of [the Company's] stock." The Indictment asserted that on January 21 and March 30, 2016, Defendant Giguiere issues several press releases touting the Company's inventive new products.

56.     The Indictment further alleges that Defendant Giguiere would sell the Company's stock at inflated prices, thereby enriching himself, without ever disclosing his substantial ownership of the Company and/or his covert efforts to promote the stock without disclosing his relationship with the Company. In other words, Defendant Giguiere knowingly and intentionally engaged in a classic fraudulent "pump and dump" scheme that brought him more than $8,500,000 in fraudulently obtained gains.

57.     Defendant Giguiere was arrested on July 5, 2018, and arraigned the following day. On July 11, 2018, Defendant Giguiere was released on $2,000,000.00 bond.

58.     On July 6, 2018, the SEC instituted civil proceedings against Defendant Giguiere for securities fraud consistent with the allegations herein

### SCIENTER ALLEGATIONS

59.     As alleged herein, Defendants acted with scienter since Defendants knew that the

public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Eco Science, their control over, and/or receipt and/or modification of Eco Science's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Eco Science, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

60. The market for Eco Science's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Eco Science's securities traded at artificially inflated prices during the Class Period. On January 20, 2017, the Company's stock price closed at a Class Period high of $4.58 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Eco Science's securities and market information relating to Eco Science, and have been damaged thereby.

61. During the Class Period, the artificial inflation of Eco Science's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Eco Science's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Eco Science and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class

Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

62.     At all relevant times, the market for Eco Science's securities was an efficient market for the following reasons, among others:

(a)     Eco Science stock met the requirements for listing, and was listed and actively traded on the OTCQB, a highly efficient and automated market;

(b)     As a regulated issuer, Eco Science filed periodic public reports with the SEC and/or the OTCQB; and/or

(c)     Eco Science regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

63.     As a result of the foregoing, the market for Eco Science's securities promptly digested current information regarding Eco Science from all publicly available sources and reflected such information in Eco Science's stock price. Under these circumstances, all purchasers of Eco Science's securities during the Class Period suffered similar injury through their purchase of Eco Science's securities at artificially inflated prices and a presumption of reliance applies.

64.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

65.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Eco Science who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

66.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

67.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Eco Science's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

68.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Eco Science's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

69. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Eco Science's financial well-being and prospects, as specified herein.

70. Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Eco Science's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Eco Science and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

71. Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants

was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

72.  Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Eco Science's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

73.  As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Eco Science's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Eco Science's securities during the Class Period at artificially high prices and were damaged thereby.

74.  At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Eco Science was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Eco Science

securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

75. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

76. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Individual Defendants**

77. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

78. Individual Defendants acted as controlling persons of Eco Science within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. Defendant Giguiere was a major stockholder in Eco Science and, upon information and belief, had control and influence over the statements of the other Individual Defendants, including the false and misleading statements alleged herein. Accordingly, Defendant Giguiere is liable under the doctrine of scheme liability.

79. Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular

transactions giving rise to the securities violations as alleged herein, and exercised the same.

80.     As set forth above, Eco Science and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## THIRD CLAIM
### Violation of Section 20(b) of The Exchange Act
### Against Defendant Giguiere

81.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.     By his conduct as alleged above, Defendant Giguiere directly and indirectly acted through and used another person or entity to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

83.     In acting through and using another person or entity to violate Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, Defendant Giguiere acted intentionally, knowingly or with severe recklessness with respect to the truth.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: February 1, 2019

/s/ James E. Cecchi
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**
James E. Cecchi
Lindsey H. Taylor
Donald A. Ecklund
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

-and-

Lesley F. Portnoy (LP-1941)
122 East 42nd Street, Suite 2920
New York, New York 10168
Telephone: (212) 682-5340

*Attorneys for Lead Plaintiff*

# Exhibit 5



John F. Gibbons
Tel 312.476.5017
Fax 312.456.8435
gibbonsj@gtlaw.com

February 22, 2019

Aaron Arnzen
Assistant United States Attorney
880 Front Street, Room 6293
San Diego, CA 92101

> **Re:** **Conflict – U.S. v. Gannon Giguiere, et al.**
> **Case No. 18-CV-3071-WQH**

Dear Aaron,

    This letter responds to your concerns regarding Greenberg Traurig's ability to effectively represent Gannon Giguiere in the above-captioned case. Having reviewed your letter, the tapes referenced therein, and spoken to Mr. Giguiere and Mark Lee, we remain confident that our continued representation comports with all ethical canons and best serves Mr. Giguiere's right to effective counsel under the Sixth Amendment.

    The Sixth Amendment commands that the accused be permitted the defense of counsel he believes to be best. *U.S. v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006). Indeed, the right to select counsel of one's choice is regarded as the root meaning of the Sixth Amendment's constitutional guarantee. *Id.* at 147-48. The right is so fundamental that where it is shown that counsel of choice has been wrongfully denied, no additional showing of prejudice is required to establish a constitutional violation. *Id.* at 148 The violation is complete at the moment of wrongful denial, requiring reversal in the event of a conviction. *Id.* at 150.

    Mr. Giguiere has been fully apprised of the government's concerns, and he maintains his selection of Greenberg Traurig as his counsel of choice. Because your stated concerns impose no actual issue of conflict, denial of Mr. Giguiere's choice would violate the Sixth Amendment.

    Regarding your concern about an advice of counsel defense, we note that the timing of Mr. Lee's retainment forecloses that defense. The SEC suspended trading on KVMD on March 19, 2018. That same day, Mr. Giguiere reached out to Mr. Lee for advice on how to structure his business (including legal advice on the formation of a registered investment advisor) so as to minimize the chances of future disruptions. Because Mr. Lee was not retained during the term of Mr. Giguiere's allegedly inappropriate trading activity, Mr. Lee could not have advised Mr. Giguiere in any way related to the charged conduct. Without advice on which to rely, there can be no advice of counsel defense.

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BERLIN°
BOCA RATON
BOSTON
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MEXICO CITY+
MIAMI
MILAN°
NEW JERSEY
NEW YORK
NORTHERN VIRGINIA
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME°
SACRAMENTO
SAN FRANCISCO
SEOUL°
SHANGHAI
SILICON VALLEY
TALLAHASSEE
TAMPA
TEL AVIV^
TOKYO°
WARSAW°
WASHINGTON, D.C.
WESTCHESTER COUNTY
WEST PALM BEACH

°OPERATES AS GREENBERG
  TRAURIG GERMANY, LLP
*OPERATES AS
 GREENBERG TRAURIG MAHER LLP
+OPERATES AS
 GREENBERG TRAURIG, S.C.
^STRATEGIC ALLIANCE
°OPERATES AS
 GREENBERG TRAURIG LLP
 FOREIGN LEGAL CONSULTANT OFFICE
°A BRANCH OF
 GREENBERG TRAURIG, P.A.,
 FLORIDA, USA
°OPERATES AS
 GT TOKYO HORITSU JIMUSHO
°OPERATES AS GREENBERG
 TRAURIG GRZESIAK SPK

February 22, 2019
Page 2

In addition, because we believe the Court would exclude Mr. Lee as a live witness, defense counsel does not believe your concerns regarding Greenberg Traurig's inability to cross examine one of its own attorneys justifies disqualification. We believe Mr. Lee is unqualified to testify at trial for at least two reasons.

First, the statements that Mr. Giguiere attributed to Mr. Lee in your letter's referenced tapes are inadmissible attorney client privileged conversations. Mr. Giguiere retained Mr. Lee for the purpose of receiving legal counsel regarding future business dealings that involved partners Oliver Lindsay and Michael Forster. Indeed, on the March 20, 2018 phone call with Mr. Lindsay and Mr. Forster, in response to Mr. Lindsay's statement that a good lawyer would be needed, Mr. Giguiere stated, "Yeah, **we** do. **We've** got, uh, Mark Lee[,] so **we've** got good counsel." Mr. Lindsay and Mr. Forster, along with Mr. Giguiere, were all expected to contribute capital towards the creation of a Registered Investment Advisor; they were, in Mr. Giguiere's mind, business partners. On all three phone calls referenced in your letter, Mr. Giguiere was communicating with Mr. Lee for the purpose of obtaining legal advice as the group worked toward the common legal cause of conducting trading business in the future in line with SEC regulations and then communicated that legal guidance to his business partners.

Such communications are protected by the "joint client" or "common interest" doctrine. This exception to a waiver of privilege may be reasonably inferred from consultation among clients and counsel allied in common legal cause. *U.S. v. Gonzalez*, 669 F.3d 974, 979 (9th Cir. 2012). The common interest exception covers material that addresses not only anticipated litigation, but also joint efforts to avoid litigation. *Morvil Tech., LLC v. Ablation Frontiers, Inc.*, 2012 WL 760603, at *2 (S.D. Cal. Mar. 8, 2012). Here, the audio tapes at issue demonstrate that Mr. Giguiere initiated a relationship with Mr. Lee to further the common interest his business collective had in legally conducting trading activities. Mr. Lee's statements to Mr. Giguiere were relayed to Mr. Giguiere's business partners as common interest exceptions to the waiver doctrine. The statements – and any related live testimony from Mr. Lee – are therefore inadmissible at trial.

Second, even if deemed by the Court to have been waived, Mr. Lee's statements to Mr. Giguiere, as well as any statements Mr. Giguiere did or did not make to Mr. Lee, are irrelevant to the events detailed in the Superseding Indictment. As discussed above, Mr. Lee's "advice" to Mr. Giguiere was tailored toward Mr. Giguiere and his business partners' ventures after the SEC halted KVMD trading activity. Such advice is plainly irrelevant to Mr. Giguiere's alleged misconduct, all of which is alleged to have occurred before the SEC's trading freeze.

The only other comments on tape that involve Mr. Lee concern Mr. Giguiere's withholding aspects of his relationship with Mr. Lindsay from Mr. Lee. But scienter for the events in the Superseding Indictment cannot be shown from live testimony from a lawyer about (i) discussions he did not have with his client, (ii) after the client's alleged misconduct had already taken place, (iii) in the context of a conversation about Mr. Giguiere's future business ventures. If anything, Mr. Giguiere's conversations with Mr. Lee demonstrate that he lacked scienter, as he sought forward-looking legal advice as a result of his lack of knowledge and understanding as to why the SEC froze trading in one of his investments. Such counsel also sounds in Rule 407's ban against post-remedial measures, which applies with equal force in civil and criminal cases, as the advice

February 22, 2019
Page 3

was given for the purpose of assuring compliant future behavior. The evidence would not help prove the government's scienter case and it would run afoul of the public policy shielding subsequent remedial measures from admissibility.

Even if such testimony about non-conversations was found relevant, defense counsel believes its presentation via live testimony would be excluded under Rule 403. The tapes speak for themselves, and insofar as the government desires Mr. Lee's testimony to confirm their content (or what was not said), Mr. Giguiere will stipulate that his conversations with Mr. Lee were consistent with their portrayal on the recorded phone calls.[1] To place a lawyer on the stand to condemn his former client for not telling him certain bits of information, in light of the defendant's willingness to offer stipulations on that very topic, would violate Rule 403's ban against unfair prejudice, particularly where such prejudice would include trotting on the Sixth Amendment via disqualification of Mr. Giguiere's counsel of choice.

Mr. Giguiere is aware of both the government's conflict concerns and his counsel's belief that no such conflict exists. Because Mr. Giguiere believes that disqualification would be an improper violation of his Sixth Amendment guarantees, he desires to continue forward with Greenberg Traurig as his counsel of choice. In light of that desire and for the reasons stated above, we believe a motion to disqualify is unwarranted and unsupported by fact and law.

Aaron, please feel free to give us a call if the government would like to further discuss this issue. Thank you for your courtesy in this matter.

Best regards,

John F. Gibbons

---

[1] Should the Court allow Mr. Lee to be called to testify, Greenberg Traurig would retain conflict counsel to cross examine him.

# Exhibit 6



John F. Gibbons
Tel 312.476.5017
Fax 312.456.8435
gibbonsj@gtlaw.com

March 20, 2019

Aaron Arnzen
880 Front Street, Room 6293
San Diego, CA 92101

   **Re:**  *Conflict – U.S. v. Gannon Giguiere, et al.*
     *Case No. 18-CV-3071-WQH*

Dear Aaron,

I write in response to your March 19 letter's concern regarding Greenberg Traurig's representation of Gannon Giguiere in his criminal case and Eco Science Solutions, Inc. ("ESSI"), Mr. Giguiere, and ESSI's officers and directors in several civil cases.

We do not believe that your concern is relevant to this criminal case. As is his Sixth Amendment right, Mr. Giguiere has retained Greenberg Traurig to represent him in his criminal prosecution. Whether different litigants or judges hearing different cases in different fora under civil law might harbor a concern for Greenberg Traurig's ability to effectively represent its civil clients does not bear on our ability to effectively defend our individual client in this criminal prosecution. Therefore, we believe your concern is irrelevant to this case and is better addressed by civil litigants in other courtrooms, which would then not implicate Mr. Giguiere's Sixth Amendment right to his counsel of choice.

Moreover, to sate any concern you might have, we note that Greenberg Traurig was engaged by the parties you have identified under a joint representation agreement with each client knowingly consenting to the joint representation. This agreement remains in place, and should any genuine conflict arise in connection with the civil lawsuits, Greenberg Traurig would explore it with our civil clients at such time.

Aaron, thank you for the courtesy of allowing us to explain our position before you file any motion before Judge Hayes.

        Best regards,

        John F. Gibbons

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BERLIN¬
BOCA RATON
BOSTON
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MEXICO CITY+
MIAMI
MILAN**
NEW JERSEY
NEW YORK
NORTHERN VIRGINIA
ORANGE COUNTY
ORLANDO
PHILADELPHIA
PHOENIX
ROME**
SACRAMENTO
SAN FRANCISCO
SEOUL∞
SHANGHAI
SILICON VALLEY
TALLAHASSEE
TAMPA
TEL AVIV^
TOKYO¤
WARSAW~
WASHINGTON, D.C.
WESTCHESTER COUNTY
WEST PALM BEACH

¬OPERATES AS
 GREENBERG TRAURIG GERMANY, LLP
*  OPERATES AS A
 SEPARATE UK REGISTERED LEGAL ENTITY
+  OPERATES AS
 GREENBERG TRAURIG, S.C.
¯  STRATEGIC ALLIANCE
** OPERATES AS
 GREENBERG TRAURIG LLP
 FOREIGN LEGAL CONSULTANT OFFICE
^  A BRANCH OF
 GREENBERG TRAURIG, P.A.,
 FLORIDA, USA
¤ OPERATES AS
 GT TOKYO HORITSU JIMUSHO
~ OPERATES AS
 GREENBERG TRAURIG GRZESIAK SP.K.

*ACTIVE 42487634v1*

GREENBERG TRAURIG, LLP ■ ATTORNEYS AT LAW ■ WWW.GTLAW.COM
77 West Wacker Drive, Suite 3100, Chicago, Illinois 60601 ■ Tel: 312.456.8400 ■ Fax 312.456.8435