```
 1                    UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3
      UNITED STATES OF AMERICA,        )
 4                                     )
            Plaintiff,                 ) No. 18-CR-3071-WQH
 5                                     )
                 v.                    ) April 22, 2019
 6                                     )
                                       ) 2:27 p.m.
 7    GANNON GIGUIERE,                 )
      OLIVER LINDSAY                   ) San Diego, California
 8                                     )
            Defendants.                )
 9    _____

10
                      TRANSCRIPT OF MOTION HEARING
11            BEFORE THE HONORABLE WILLIAM Q. HAYES
                    UNITED STATES DISTRICT JUDGE
12
      APPEARANCES:
13
      For the Plaintiff:        United States Attorney's Office
14                              By:  AARON ARNZEN, ESQ.
                                     ANDREW GALVIN, ESQ.
15                              880 Front Street, Room 6293
                                San Diego, California 92101
16
      For the Defendants:       Greenberg Traurig LLP
17                              By:  JOHN GIBBONS, ESQ.
                                     MICHAEL CEDILLOS, ESQ.
18                              77 West Wacker Drive, Suite 3100
                                Chicago, Illinois 60601
19
                                Duane Morris LLP
20                              By:  MICHAEL LIPMAN, ESQ.
                                750 B Street, Suite 2900
21                              San Diego, California 92101

22
      Court Reporter:          Melinda S. Setterman, RPR, CRR
23                             333 West Broadway, Suite 420
                               San Diego, California 92101
24                             melinda_setterman@casd.uscourts.gov

25    Reported by Stenotype, Transcribed by Computer
```

|       |    |                                                                    |
|-------|----|--------------------------------------------------------------------|
|       | 1  | SAN DIEGO, CALIFORNIA, APRIL 22, 2019, 2:27 P.M.                   |
|       | 2  | * * * *                                                            |
|       | 3  | (Defendants present.)                                             |
|       | 4  | THE CLERK:  Number 14 on the calendar, 18-CR-3071,                |
| 02:27 | 5  | United States vs Gannon Giguiere and Oliver Lindsay, for motion   |
|       | 6  | hearing.                                                          |
|       | 7  | MR. ARNZEN:  Good afternoon, Your Honor.  Aaron Arnzen            |
|       | 8  | and Andrew Galvin for the United States.                         |
|       | 9  | THE COURT:  Good afternoon.                                      |
| 02:27 | 10 | MR. GIBBONS:  Good afternoon, Your Honor.  John                  |
|       | 11 | Gibbons on behalf of Gannon Giguiere who is present in court.    |
|       | 12 | MS. CEDILLOS:  Michael Cedillos on behalf of                    |
|       | 13 | Mr. Giguiere.                                                    |
|       | 14 | THE COURT:  Good afternoon.                                      |
| 02:27 | 15 | MR. LIPMAN:  Good afternoon.  Michael Lipman on behalf          |
|       | 16 | of Mr. Lindsay who is present in court.                          |
|       | 17 | THE COURT:  Let's rearraign the defendants on the               |
|       | 18 | superseding indictment.  I am going to rearraign them.           |
|       | 19 | MR. GIBBONS:  We were arraigned last time we were               |
| 02:27 | 20 | here, Your Honor.                                                |
|       | 21 | THE COURT:  We were, but I don't know if it was                 |
|       | 22 | complete, so we're going to rearraign them.                     |
|       | 23 | MR. GIBBONS:  Okay.                                              |
|       | 24 | THE COURT:  Thank you.                                           |
| 02:27 | 25 | THE CLERK:  Mr. Giguiere, is Gannon Giguiere your true          |

1    name?

2           THE DEFENDANT GIGUIERE:  Yes.

3           THE CLERK:  You are informed that a superseding

4    indictment has now been filed charging you with conspiracy to

02:28    5    commit security frauds, manipulative trading, securities fraud,

6    and criminal forfeiture.

7           Have you received a copy of the superseding

8    indictment?

9           THE DEFENDANT GIGUIERE:  Yes.

02:28    10          THE CLERK:  You are further informed that you are

11    entitled to a trial by jury to be represented by counsel at all

12    stages of the proceedings before this Court and to have

13    witnesses summoned to testify on your own behalf.

14          How do you plead to the charges in the superseding

02:28    15    indictment, guilty or not guilty?

16          THE DEFENDANT GIGUIERE:  Not guilty.

17          THE CLERK:  Counsel, do you waive reading of the

18    superseding indictment?

19          MR. GIBBONS:  We do.

02:28    20          THE CLERK:  Mr. Lindsay, is Oliver Lindsay your true

21    name?

22          THE DEFENDANT LINDSAY:  Yes.

23          THE CLERK:  You are informed that a superseding

24    indictment has now been filed charging you with conspiracy to

02:28    25    commit security frauds, manipulative trading, securities fraud,

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | and criminal forfeiture.                                     |
|       | 2  | Have you received a copy of the superseding                  |
|       | 3  | indictment?                                                  |
|       | 4  | THE DEFENDANT LINDSAY:  Yes.                                  |
| 02:28 | 5  | THE CLERK:  You are further informed that you are            |
|       | 6  | entitled to a trial by jury, to be represented by counsel at |
|       | 7  | all stages of the proceedings before this Court, and to have |
|       | 8  | witnesses summoned to testify on your own behalf.            |
|       | 9  | How do you plead to the charges in the superseding           |
| 02:29 | 10 | indictment, guilty or not guilty?                            |
|       | 11 | THE DEFENDANT LINDSAY:  Not guilty.                          |
|       | 12 | THE CLERK:  Counsel, do you waive reading of the             |
|       | 13 | superseding indictment?                                      |
|       | 14 | MR. LIPMAN:  Yes.                                            |
| 02:29 | 15 | THE COURT:  All right.  Counsel, there are a couple of       |
|       | 16 | issues on -- one is counsel issue for Mr. Giguiere.          |
|       | 17 | A couple questions, I guess, initially, from the             |
|       | 18 | government, do you know whether or not you would -- whether or|
|       | 19 | not you would call Mr. Lee?                                  |
| 02:29 | 20 | MR. ARNZEN:  We do not know yet, Your Honor.  We think       |
|       | 21 | it is -- we think it is a likelihood that we would.          |
|       | 22 | THE COURT:  Although, as I understand it, is it the          |
|       | 23 | case that the government's theory is that the defendant who  |
|       | 24 | hired Mr. Lee didn't tell him everything, and then they are on|
| 02:29 | 25 | tape discussing that in fact they didn't tell everybody -- they|

1    didn't tell Mr. Lee everything; is that right?

2         MR. ARNZEN:  That is our theory, Your Honor, that

3    there was an effort to conceal information from Mr. Lee.

4         THE COURT:  So even if you did -- whether you call

02:30   5    Mr. Lee or not, in essence, it would be from the defendant's

6    theoretically -- your theory of the case, from the defendant's

7    own words, they told Mr. Lee one thing; they left out some

8    significant facts; and they had some conversation -- two

9    defendants had some conversation; and one defendant purportedly

02:30   10   said to the other, oh, you didn't tell them that and chuckled,

11   purportedly.

12        And your theory is that they intentionally didn't tell

13   Mr. Lee they left out certain facts because they didn't want

14   him to know what the true story was; is that right?

02:30   15        MR. ARNZEN:  That is exactly right.  We would argue

16   the inference that can be drawn from that reflects on

17   Mr. Giguiere's state of mind.

18        THE COURT:  Right.  So even if Mr. Lee was called --

19   so the jury would learn -- I think they would learn in the

02:30   20   recorded call -- or the wire -- they know the name of the firm

21   based on the recording that you wish to play; is that right?

22        MR. ARNZEN:  Yes, sir.

23        THE COURT:  So theoretically if they would learn that,

24   they would know that Mr. Lee was at the same firm of counsel,

02:31   25   trial counsel, but all they would really know is government's

1    theory would be that the lawyer expressed an opinion that

2    everything was okay, but that the defendants -- one of the

3    defendants by his own admission didn't tell Mr. Lee everything

4    and the other defendant asked whether or not that was true.

02:31  5         And how -- at that point, even if Mr. Lee was called,

6    how is that, I guess, a problem at the trial?

7         MR. ARNZEN:  I think it becomes a problem when it

8    comes to the cross-examination of Mr. Lee.

9         THE COURT:  But isn't the cross -- I'm sorry for

02:31 10   interrupting.  Wouldn't the cross be that you -- the cross be,

11   what, that he -- he told you certain things and he didn't tell

12   you other things; right?

13        MR. ARNZEN:  I think so.  I think maybe the

14   cross-examination could explore the extent to which Mr. Lee

02:32 15   asked the right questions.

16        THE COURT:  Although, at some point, though, isn't

17   that potentially attorney/client as to what was asked and what

18   was said?  I understand the waiver argument, but -- I mean -- I

19   don't really understand why you have to go there, because your

02:32 20   whole theory, as I understand it, your theory is that the

21   defendant's didn't tell them the whole story; they only told

22   him the part that they wanted him to hear; and the other part,

23   the part that makes it criminal, he didn't tell; and so the --

24   really the focus is he didn't tell them things, not really what

02:32 25   Mr. Lee asked him; right?

|  |  |
|--|--|
|  | 1 |

          1          MR. ARNZEN:  Yeah.  I think the government would seek

          2   to establish what the communication actually was.  We can

          3   address the privilege issue in a second.

          4          THE COURT:  All right.

02:32     5          MR. ARNZEN:  But what the communication actually was,

          6   what we have now is a recording that Mr. Forster was involved

          7   with.  He captured the recording.

          8          THE COURT:  Right.

          9          MR. ARNZEN:  It is exceptionally clear that

02:33    10   Mr. Forster will come under vigorous attack throughout the

         11   trial, not only his credibility while on the stand but also any

         12   tapes that he made, what his motivations in making the tapes

         13   were, and how he was sneaky or tricky during the process of

         14   making those tapes.

02:33    15          So to corroborate evidence that comes from

         16   Mr. Forster's own mouth or the tapes that he made, the

         17   government would seek to put on Mr. Lee in corroboration of

         18   that as well.

         19          THE COURT:  All right.  Counsel, do you wish to be

02:33    20   heard with respect to Mr. Lee?  Who speaks for the defense?

         21   Okay.

         22          MS. CEDILLOS:  I am.  Michael Cedillos, Judge.

         23          THE COURT:  Okay.  Ms. Cedillos.

         24          MS. CEDILLOS:  Would your Court like me to address the

02:33    25   colloquy that we've been having here first?

1          THE COURT:  What is your position -- obviously the

2     jury -- under the -- your analysis, the jury is going to learn

3     -- will know that Mr. Lee and trial counsel are from the same

4     firm.

02:33    5          MS. CEDILLOS:  Well, under our analysis, Judge, the

6     tape shouldn't come in at all and it shouldn't be allowed to

7     come in at all.  That is the waiver issue that I think

8     Mr. Arnzen wanted to table, and I don't know that Your Honor

9     wants to get there first.

02:34   10          But where we are, this is a motion for inquiry; right?

11     It is a motion for inquiry for whether there is a conflict.  As

12     far as we're concerned, there is no conflict; right?

13          I talked to Mr. Giguiere.  I have talked to the people

14     at ESSI, and I talked with other attorneys at GT and I as the

02:34   15     person with the license who has pro hac'd in the other

16     attorneys in the case, I determined there is no conflict.

17          As we put in the papers, if there were a conflict, we

18     would take appropriate steps then.  It seems to me that the

19     government is simply trying to disqualify GT.

02:34   20          THE COURT:  I don't see it that way yet, and so -- I

21     am really just focused on Lee.  Address the comments with

22     respect to Lee.  Why isn't there a concern that Lee -- if he is

23     called to testify and the jury learns that he is from the same

24     firm as defense counsel, why that wouldn't be an issue?  You

02:34   25     would be -- in essence, you would have one lawyer

1    cross-examining of a lawyer of the same firm.

2         MS. CEDILLOS:  Well, Judge, again, we contend that it

3    shouldn't come in at all, but if it were --

4         THE COURT:  That Mr. Lee shouldn't be permitted to

02:35   5    testify?

6         MS. CEDILLOS:  Yes, Judge, that it is not necessary,

7    one, because of the privilege issue, which again we can deal

8    with later, but also we agreed to stipulate that the gist of

9    the conversation, if it were allowed to come in, is that which

02:35  10    is on the tape which they could still argue, hey, there are

11    things he didn't say; right?

12         We don't need to bring in Mr. Lee for that purpose.

13    But if it were allowed in, we would bring in conflicts counsel.

14    But it really strikes us, Your Honor, as generating a conflict

02:35  15    that does not exist.

16         To the extent they are now throwing out this idea

17    which was not in their papers that somehow the existence of

18    this tape will bolster Mr. Forster's credibility with respect

19    to his phone calls, they have got oodles of other tapes that

02:35  20    they can use with respect to things.  This is not -- it seems

21    to me, Judge, that this is a fishing expedition where they are

22    genuinely trying to create a conflict that does not exist.

23         The conversation with Mr. Lee was post-hac; right?

24    This was about certain conduct that was all over by the time

02:35  25    this conversation happened.  There can be no advice of counsel

1    defense, which is the first place that they kept going, and now

2    they just want to use some tenuous argument basically, well, he

3    lawyered up and so he must be guilty or that is consciousness

4    of guilt; oh, well, he didn't say these various things, he must

02:36    5    have consciousness of guilt.

6         Well, in the context of the advice that he was

7    receiving, again, I am not sure how much I can really say on

8    the record in front of everybody here, Judge, without waiving

9    privilege because we're in a very unique position having to

02:36    10   discuss whether or not substantive discussions have been waived

11   by reference to substantive discussions; right?

12        Judge, you can appreciate sort of the pickle that the

13   government has put us in here with the surreptitiously phone

14   call with people they have alleged are conspirators and now

02:36    15   they are trying to say that the privilege has been waived and,

16   therefore, Mr. Lee can be brought in, which does all circle

17   back all the waiver issue as well.

18        THE COURT:  Well, I guess to get back to the original

19   question, then, is it your view though, if it comes to the

02:36    20   point that Mr. Lee is called to testify that your -- that trial

21   counsel can cross-examine Mr. Lee even though he is a member of

22   the same firm?  Is that your bottom line legal position?

23        MS. CEDILLOS:  No, Judge, as we put in our papers and

24   the premotion correspondence to the Court, we have already said

02:37    25   that we would obtain conflicts counsel for that purpose if it

1    were to come to pass.

2         THE COURT:  And so how -- explain to me the mechanics

3    of how it would work.  Somebody else would come in to

4    cross-examine Mr. Lee?

02:37    5         MS. CEDILLOS:  Yes, Judge.  That person would be

6    present for that purpose.

7         THE COURT:  For the whole trial or just to

8    cross-examine Mr. Lee?

9         MS. CEDILLOS:  Whatever makes the Court more

02:37    10   comfortable.

11        THE COURT:  It is not really what would make me

12   comfortable.  What would your proposal be that -- so it is your

13   view that it is a problem for somebody from your firm to

14   cross-examine Mr. Lee -- for lawyers from the same firm to

02:37    15   cross-examine one another?

16        MS. CEDILLOS:  The conflicts counsel for this purpose

17   would be limited to Mr. Lee.  We understand the -- we

18   understand that the concern is that somehow, you know,

19   attorneys who are from the same firm should not be representing

02:38    20   as well.  Like, I get that, Judge, right, but there is numerous

21   reasons why it should be out, but the solution really is

22   conflict counsel, have another counsel deal with that.

23        The concern is supposedly reputation concerns and

24   those kind of things.  That can be dealt with by having

02:38    25   conflict counsel.  It can also be dealt with by having another

1   attorney step in, or frankly, we can talk about, if it gets

2   there, because we think that the tapes shouldn't come in or

3   testimony, but if we needed to, we could talk about dealing

4   with the name of the firm issue.

02:38   5          THE COURT:  Well, let's put that aside -- that issue

6   aside now.  Let's go to the ESSI officers and directors.  Does

7   your firm represent ESSI, the officers and directors?

8          MS. CEDILLOS:  Certain of them, yes.

9          THE COURT:  So how many of them?

02:38   10          MS. CEDILLOS:  Numerically, I think it is two or

11   three, Judge.  I'm sorry I am not recalling.

12          THE COURT:  Are they officers or directors?

13          MS. CEDILLOS:  Some of them are both, I think.

14          THE COURT:  Do you represent the company?

02:39   15          MS. CEDILLOS:  The firm does, yes.

16          THE COURT:  So the firm represents the company,

17   probably an officer -- at least one officer and one director

18   theoretically; is that right?

19          MS. CEDILLOS:  I think that is a fair assessment,

02:39   20   Judge.

21          THE COURT:  From the government, who -- when you talk

22   about that you might call them, is it the government's -- like,

23   under what theory is it -- the sense that ESSI officers and

24   directors, do they -- were they engaged in under the

02:39   25   government's theory criminal conduct or what would they be

1    called for?

2         MR. ARNZEN:  They would be called as fact witnesses,

3    Your Honor.  So ESSI went through a change in business focus.

4    It totally changed what it was doing and enhanced what it was

02:39    5    doing.  And the question is who was involved with that and in

6    what way?

7         It is our theory that Mr. Giguiere was heavily

8    involved with that in the context of a pump-and-dump scheme,

9    and so if the defendants come in -- I'm sorry -- if the ESSI

02:40    10    officers and directors come in, they can tell us how much of

11    that process they were involved with, vis-à-vis how much of the

12    process Mr. Giguiere was involved with.

13         THE COURT:  Well, it would be helpful if the

14    government could -- you are not required necessarily to call

02:40    15    the people, but to the extent you say that, you know, the ESSI

16    officers/directors could be witnesses, I mean, it is hard for

17    me to know whether that is an issue or not.  A lot of it would

18    depend on what they had to say.

19         If somebody just comes in authenticating some

02:40    20    documents, maybe it is not an issue, but depending on what you

21    think they might say, that could be a problem.

22         MR. ARNZEN:  Understood.  I would answer the question

23    more clearly, Your Honor, by an example.  We have recently

24    talked to management of KVMD, the other company that was

02:41    25    manipulated here.  We were going to reach out to the ESSI

         1    officers and directors to speak with them as well, but we

         2    didn't -- I mean, do we go through Greenberg Traurig for that?

         3         So we were going to wait for this process to develop.

         4    If I knew nothing else about the case, I would still say it is

02:41    5    a likelihood -- it is more than 50 percent that we would

         6    attempt to put them on the stand.

         7         THE COURT:  Is it the case that you haven't talked to

         8    them yet, so you don't know what they are going to say?

         9         MR. ARNZEN:  That is exactly right.  They were

02:41   10    approached July 5th, 2018, when the arrest took place, but they

        11    declined to make any substantive statements to law enforcement.

        12         THE COURT:  So do you have a sense that they have

        13    engaged in improper conduct or not?  You just don't know at

        14    this point.

02:41   15         MR. ARNZEN:  We don't know, and I don't think it is

        16    really central to the question about whether we put them on the

        17    stand, whether we put them on the stand either way.

        18         THE COURT:  That seems to me to be a big -- that is a

        19    bigger concern at this point is the ESSI people because, you

02:42   20    know, I understand Lee -- not to say that is not an issue.

        21         But it seems that it could be a significant problem if

        22    the government is calling, you know, former employees or

        23    officers and directors of ESSI and they are represented by the

        24    same lawyers that are represented by trial counsel.

02:42   25         I am not quite sure -- what the how -- the

15

1    cross-examination is going to go.  In fact, you would have

2    information from ESSI as a result of -- as a result of

3    representing them.  That seems to me to be a more

4    significant -- well, a significant issue.

02:42   5           MS. CEDILLOS:  Judge, if I may?

6           THE COURT:  Sure.

7           MS. CEDILLOS:  None of the officers and directors of

8    ESSI are criminal defendants in this case.  In the civil

9    litigation, we represent them.  In the civil litigation, the

02:42   10   defenses are basically the same; right?  I mean, we -- this --

11   there is no -- how to put it; right?  The fact pattern is all

12   the same.  The government wants to argue what it wants to argue

13   out of the fact pattern.

14          The civil litigants in ESSI want to argue what they

02:43   15   want to argue out of that fact pattern.  The truth is there is

16   one set of facts here, so all of the defenses are the same.

17   Again, we talked to all these people, and we determined there

18   are no conflict.  The interests are aligned.

19          In event that there were to be a conflict, we did in

02:43   20   fact take precautions and put in the joint representation

21   agreement, but we're not aware of any actual conflict.  There

22   is no scenario that we're aware of that which we would need to

23   tear apart an ESSI witness that the government decides to call.

24   Frankly, we expect their testimony to be favorable to Mr.

02:43   25   Giguiere.

1   THE COURT:  Well, I don't have -- I don't know what

2 the potential ESSI witnesses are going to say obviously because

3 the government's position is we don't really know but we think

4 we'll call them, and your position is that you think they may

02:44 5 help but that they are going to be -- they very well may be

6 witnesses, and so is your position -- your position is that the

7 government can call the witnesses, the officers and directors,

8 and you represent -- you continue to represent them as officers

9 and directors and the defendant?

02:44 10   MS. CEDILLOS:  Yes, Judge.

11   THE COURT:  Do you agree that there is certainly a

12 possible conflict?

13   MS. CEDILLOS:  No, Judge.  That is -- that is the

14 point of our response.  We don't agree that there is a possible

02:44 15 conflict on the basis of the understanding and the information

16 that we have, and we just -- we don't see that.

17   If -- theoretically under a completely different set

18 of facts or circumstances, I suppose; right?  But the cases

19 that we're talking about where these kinds of conflicts exist

02:44 20 are situations where an attorney needs to go against his own

21 client.  We don't see that.  That is not this scenario.

22   THE COURT:  Well, the cases all hold that -- in your

23 view does the Court have to wait until there is an actual

24 conflict before it did anything?

02:45 25   MS. CEDILLOS:  I suppose it depends what you mean by

17

1    "did anything."  We're certainly doing something now, Judge;

2    right?  There is --

3              THE COURT:  Disqualify counsel -- do you think that

4    the Court is required to wait as a matter of law until there is

02:45    5    an actual conflict before counsel could be disqualified?  Is

6    that your legal position?

7              MS. CEDILLOS:  Given Mr. Giguiere's Sixth Amendment

8    right, yes, Judge.

9              THE COURT:  I disagree.  I don't think that is the

02:45   10    law.  Do you think that is what Wheat says?

11             MS. CEDILLOS:  Yes, Judge, the -- that case was a dual

12    representation case; right?  What we're concerned about in this

13    case, they are -- it is an apples to oranges comparison.  I

14    understand why the Court is concerned.

02:45   15             It would be potentially a different scenario if the

16    ESSI people were already in this case.  Now, I will say I am

17    aware this happens a lot actually, where one law firm

18    represents officers and directors and a company in a criminal

19    matter.  It does happen, Judge, but that is not the same

02:45   20    scenario here.

21             Mr. Giguiere has a Sixth Amendment in this case to

22    counsel of his choosing.  The government has not demonstrated

23    that there has been any actual conflict.  We're here for a

24    motion to inquiry to determine --

02:46   25             THE COURT:  I agree there is no actual conflict yet.

18

1      I agree with that.

2              MS. CEDILLOS:  Thank you, Judge.

3              THE COURT:  But is it your point that the Court has to

4      wait until there is an actual conflict before it can disqualify

02:46  5      counsel?  Is that your legal position?

6              MS. CEDILLOS:  Certainly the government has not moved

7      to disqualify us, Judge.  They did only file the motion for

8      inquiry, so if the Court is inclined to inquire, we would --

9      that is what is before the Court at this time.

02:46  10             But certainly, you know, to proceed to disqualifying

11     us on a basis of a conflict that doesn't exist, I -- you are

12     looking at me, and maybe I am not understanding the inquiry --

13     but I don't think we need to be talking about disqualifying us

14     at this time.

02:46  15             THE COURT:  Well, I asked you a question whether or

16     not the Court has to wait.  As I understand your argument is

17     that right now there is no actual conflict and that everything

18     will work out; and so with Lee, we'll resolve that; and maybe

19     we can agree on some language of the firm; maybe he doesn't

02:47  20     have to testify, so that will be okay; don't worry about Lee;

21     Lee is fine; and with respect to the other witnesses, we

22     represent them too; and at the end of the day we think -- we

23     think that is going to be fine too because we think at the end

24     of the day they are probably going to say stuff that helps us

02:47  25     not hurt us; so we can represent some witnesses in the case and

1    we can represent the defendant.

2         And my question is -- I don't know what the ESSI

3    people are going to say.  I don't know if the government does

4    either.  And I don't know what Lee is going to say.  Although I

02:47    5    am not concerned about Lee as I am with the ESSI people, but I

6    understand sort of the tenor of your remarks to be, don't worry

7    about it, everything is going to be fine, and just -- it will

8    all come out in the trial, and so we've got it covered, and

9    there is no actual conflict now, and so everything will be

02:48   10    good.

11         And my concern is -- I guess two things.  One, I asked

12    do I have to wait until there is an actual conflict before the

13    Court can take action?  And that would be disqualify.  And I

14    understood your first answer to be, yes; is that right?

02:48   15         MS. CEDILLOS:  I think that would be the appropriate

16    course of action, Judge.

17         THE COURT:  And I don't think that I have to wait

18    until there is an actual conflict.

19         But putting that aside, I don't know that I am

02:48   20    comfortable at this point just sort of waiting to see that

21    everything will work out fine because if we get to the trial --

22    if we're in the trial and now the government calls the ESSI

23    people and they -- you know, they say things that are different

24    than what you think or maybe they are inconsistent with what

02:48   25    you think, and the issue then -- then it becomes there is more

1    of an apparent conflict or maybe an actual conflict, and at

2    that point it is almost too late because something should have

3    been done in advance.

4         And so I understand your position is, well, geez,

02:49  5    don't go to disqualifying; the government is not asking you to

6    do that yet; that is a little premature.  On the other hand I

7    see you saying wait; everything is going to be fine; wait until

8    the end; wait until the trial.  And I am not really comfortable

9    doing that yet either.

02:49  10        MS. CEDILLOS:  We have -- Judge, just to be clear, we

11   have taken an intermediate step in that everybody -- Mr.

12   Giguiere and the directors and officers of ESSI that we

13   represent have all entered into joint representation agreement

14   in the event there were to be such a problem.  We put that in

02:49  15   our papers, and we put that in our premotion correspondence

16   with the government as well.

17        So that intermediate step has been addressed.  I just

18   wanted to make sure that was clear.

19        THE COURT:  I understand.  Has there been a discussion

02:49  20   with respect to waivers with respect to Mr. Lee and the other

21   individuals and the ESSI people, and have they gotten

22   independent counsel with respect to the waivers?

23        MS. CEDILLOS:  The -- the advice with Mr. Lee relates

24   to KVMD not to ESSI.

02:49  25        THE COURT:  I understand.

1      MS. CEDILLOS:  I'm sorry.  I didn't follow.  Try me

2 again.

3      THE COURT:  There are two issues, issues with respect

4 to Mr. Lee and issues with respect to ESSI officers and

02:50    5 directors; is that right?

6      MS. CEDILLOS:  Yes.

7      THE COURT:  And so has there been any discussion

8 about -- I understand you are saying that you don't think there

9 is an actual conflict -- and I don't think that anybody is

02:50   10 saying there is an actual conflict yet, and maybe there never

11 will be -- but there is no actual conflict; and to the extent

12 that there is a conflict, your client is prepared to waive it;

13 is that right?

14      MS. CEDILLOS:  Yes, Judge.  That is the -- the

02:50   15 affidavit that Mr. Giguiere attached to our response papers --

16 I don't know if you saw it; it is brief -- but it basically

17 says, I am aware of what the government says they think is a

18 potential problem; I am aware that my counsel doesn't think

19 there is a problem; and to the extent that there is a problem,

02:50   20 I waive that.

21      And I would remind Your Honor that Mr. Giguiere was

22 represented by different counsel originally at the time that we

23 were decided to be brought on, so he did have the benefit of

24 counsel there, too.

02:50   25      THE COURT:  When he made the waiver?

1        MS. CEDILLOS:  Which waiver, the joint representation

2   agreement with respect to ESSI?

3        THE COURT:  The waiver that you are referring to that

4   he is waiving any potential conflicts.

02:51   5        MS. CEDILLOS:  That was, I believe, done through the

6   joint representation agreement.  I don't know the exact date on

7   which that was signed.  I don't know if Brown Rudnick was still

8   technically on the docket in this case.  I'm sorry.

9        MR. GIBBONS:  Your Honor, if I can just add a couple

02:51   10  things that I am familiar with.  So the government --

11       THE COURT:  Use the microphone.  Thank you.

12       MR. GIBBONS:  The government candidly has admitted

13  they haven't interviewed the ESSI officers and directors.  The

14  case has been around for 18 months.  That is a choice they

02:51   15  made.  We have interviewed them.  Some of them have their own

16  independent counsel.

17       What we're representing to the Court, as officers of

18  the court, is based on what we've been told, we don't see an

19  ethical conflict developing because we know what they are going

02:51   20  to say.

21       The government hasn't yet interviewed them.  That is

22  their choice, but to come here now and posit we might call them

23  as witnesses in the case despite the fact we don't know what

24  they are going to say and then gets the Court to start to

02:52   25  inquire on our side what they are going to say because we've

1 done our homework strikes me a little bit of getting out in

2 front on an issue that -- we have our own ethical

3 responsibilities.

4        If we were to see that conflict as you posited, an

02:52  5 officer or director saying something different, something that

6 is not favorable to the interest of Mr. Giguiere, we would have

7 to do something, and that something would be you've got to go

8 get your own independent counsel.

9        Some of them have their own independent counsel, and I

02:52  10 am suggesting that when the government gets around to

11 interviewing them, those counsel will appear.

12        THE COURT:  I think they said that they haven't --

13 they haven't interviewed them because -- I understood their

14 comments to be they haven't interviewed them because you

02:52  15 represent them and they haven't been given permission.

16        Whether or not you give permission is not at issue

17 here.

18        MR. GIBBONS:  Right.

19        THE COURT:  I take the government's comments to be --

02:53  20 the government has an ethical obligation to advise the Court if

21 they think there is an ethical issue before the Court, and so

22 that is what I interpret theirs to be.  I understand your

23 position is that you -- that you think that -- or you may think

24 that they are trying to get you disqualified or they don't want

02:53  25 you to be in the case.

1          I don't interpret it to be that way.  You are free to

2     take it the way you see it.  I think they have an obligation to

3     tell me if they think they have a conflict, and they have to

4     tell me as soon as they learn of it or at least they should.  I

02:53  5     think it is legitimate issue to inquire about.

6          As I have indicated, we have talked about Lee, and now

7     the ESSI people -- do you know how many people you represent

8     from ESSI?

9          MR. GIBBONS:  I think we have taken the position in

02:53  10    the civil case that represent all the officers and directors

11    until somebody says there is a conflict.  You just can't

12    theorize a conflict.  If there is somebody in that civil case

13    that says, hey, these all -- all these officers and directors

14    need independent counsel, we'll deal with that.

02:54  15         I mean, as much as the government has ethical

16    responsibilities to bring things to the Court, so do defense

17    lawyers.

18         THE COURT:  I agree.  And so you represent all the

19    officers and directors from ESSI, and your position is that

02:54  20    based on what you know today, you don't think there is a

21    conflict representing all the ESSI officers and directors, and

22    your client in the criminal case; is that right?

23         MR. GIBBONS:  Correct.

24         THE COURT:  And this is based on your investigation up

02:54  25    to today.

1           MR. GIBBONS:  Correct.

2           THE COURT:  All right.  Anything from the government?

3           MR. ARNZEN:  Only this, Your Honor, we do not intend

4    to get rid of competent counsel.

02:54  5           THE COURT:  Right.

6           MR. ARNZEN:  They have been zealous and professional

7    and civil and courteous throughout.

8           THE COURT:  All right.

9           MR. ARNZEN:  I would point out, though, and I think

02:54  10   this is what Your Honor is referring to, in Wheat itself, a US

11   Supreme Court case, it makes clear that Nathan conflicts can

12   give rise to inquiries such as this.  It is natural to try to

13   inquire about a conflict before they tee up because they may

14   tee up at trial, and no one wants that to happen.

02:55  15          THE COURT:  All right.  Well, at this point then, is

16   the government -- what specifically does the government -- does

17   the government have any additional requests or inquiry that it

18   wants me to make?

19          Why don't we do this, I'll give the government the

02:55  20   opportunity to respond in writing.  Is there anything else that

21   you want me to -- you heard what the defense has had to say,

22   and so is there any additional action at this point that you

23   want me to take?  So I'll give you -- why don't you take a

24   week, and you can file whatever additional inquiry you want me

02:55  25   to take.

1    MR. ARNZEN:  Thank you, Your Honor.

2    THE COURT:  And we'll just take it step by step, but I

3    understand your position is that you represent all the officers

4    and directors.  Based on all the information that you have now,

02:55    5    you believe there is no conflict between the ESSI officers and

6    directors and your current client; is that right?

7    MR. GIBBONS:  That's correct.

8    THE COURT:  And with respect to Mr. Lee, we can see

9    how that, I guess, unfolds as we get closer.  I mean, certainly

02:56    10    from the government, I don't -- at this point, I understand you

11    had an obligation to bring it to my attention, but do you

12    see -- I guess I don't really see yet a problem.

13    Even if Mr. Lee is called to testify and he says he

14    works for the same firm as trial counsel, and Mr. Lee says, you

02:56    15    know, I got these calls, I gave this advice, and you have the

16    tapes that say he wasn't told everything, isn't the only -- the

17    real relevance of his testimony that he wasn't told everything?

18    Is there anything else?

19    MR. ARNZEN:  Or in the alternative he could testify to

02:56    20    the contrary that he was told something, we would admit that or

21    seek to as an admission to Mr. Giguiere, assuming that the

22    recordings are correct and Mr. Lee says I wasn't told

23    something, basically it is to corroborate Mr. Forster, his

24    testimony, and the tapes that he made.

02:56    25    THE COURT:  So even if you did -- so if you wanted to

1    call Mr. Lee for that purpose, is there a real conflict with

2    Mr. Lee testifying?  And if he says -- testifies consistently

3    with what you said that you think he would say, is there any --

4    I mean, what is the conflict there?  Other than when you get

02:57   5    past the fact that the jury would learn this gentleman,

6    Mr. Lee, is at the same firm from, you know, the counsel that

7    they've heard through -- heard from throughout the case.

8           MR. ARNZEN:  Just looking at it through the lens of

9    separate appellate counsel or 2255 counsel, I think an argument

02:57   10   may be made that the cross-examination of Mr. Lee should have

11   included something that it did not.  And even if it is

12   something that they get separate counsel to do for purposes of

13   testimony, then they have to address Mr. Lee in the rest of

14   their case.  It has to be part of the opening and the closing.

02:57   15          And I think that Greenberg Traurig intends to do that,

16   and if I am appellate counsel -- separate appellate counsel, I

17   would argue that there would have -- should have and would have

18   been a point to argue more vigorously and have a different

19   tact.  So we're really in a protective stance.

02:58   20          THE COURT:  All right.  But if Mr. Lee is called to

21   testify, then your position is that conflict counsel would come

22   in to cross-examine Mr. Lee; is that right?

23          MR. GIBBONS:  Yes, Your Honor.

24          THE COURT:  All right.  If the government wants me to

02:58   25   take any additional inquiry, then -- after this conversation,

1   then you can file something in a week and let me know.

2          And obviously, counsel, if anything changes during the

3   representation, you'll have an obligation -- if the government

4   learns anything else that is in addition to what they filed,

02:58   5   they have an obligation to tell me.

6          And same thing for defense counsel.  You are well

7   aware if anything changes, you have an obligation to let me

8   know as soon as you learn of the information that changes the

9   representations that have already been made.

02:58   10          MS. CEDILLOS:  Of course, Your Honor.

11          THE COURT:  All right.  Now, let's go to the

12   discovery, and I've read, you know, the papers, and I am not

13   sure that there -- I am hesitant to say this -- but I am not

14   sure that I can tell exactly what the dispute is over.

02:59   15          Is it the case that the government's position is that,

16   look, all of the -- all of the information that we have that

17   has been requested by defense counsel, to the extent that we

18   have the information, the information is in the US Attorney's

19   Office, it is in with the San Diego FBI, information that we

02:59   20   were directly aware of, we have requested -- from those offices

21   that we're aware that they would have information, we've

22   requested it and we've given what we have, is that right, with

23   the exception of the Cleveland matter?

24          MR. ARNZEN:  If I may clarify?  We've requested it.

03:00   25   We, the US Attorney's Office, have requested it from FBI San

```
    1   Diego.

    2           THE COURT:  All right.

    3           MR. ARNZEN:  Yes, sir.  That is the case.

    4           THE COURT:  All right.  I guess, counsel, who speaks

    5   on this discovery issue?

    6           MR. GIBBONS:  I will, Your Honor.

    7           THE COURT:  All right.  What specifically is it that

    8   you are -- that you are requesting?

    9           MR. GIBBONS:  Yes.

   10           THE COURT:  I don't --

   11           MR. GIBBONS:  So obviously the words matter a lot

   12   here.  And if I understand the Court's questions and the

   13   government's responses, "requested from those offices" was the

   14   question posited.  What I think the answer is is what current

   15   counsel has done is just simply ask their current team here in

   16   San Diego -- they -- they know about other investigative files

   17   in other locations.

   18           And I think by their answer, they are telling the

   19   Court they have not gone to those other locations to ask them

   20   for those files.  This is not a situation we're asking them to,

   21   you know, query 96 other US Attorney's Offices or FBI offices.

   22   They know exactly the offices that investigated these specific

   23   examples.

   24           And we covered this in the last time we were here, and

   25   the Court said something to the effect of, you know, if the FBI
```

03:00  (line 5)
03:00  (line 10)
03:00  (line 15)
03:00  (line 20)
03:01  (line 25)

1    knows of three other matters in other places, the government

2    might have an obligation to go and get that and disclose that.

3           THE COURT:  Right.  And --

4           MR. GIBBONS:  That is exactly where we are at now.

03:01  5    THE COURT:  Excuse me for interrupting.  Why I said

6    the reason I said "might" was because I wasn't making a legal

7    ruling, and, you know -- so certainly -- you know, I think we

8    all understand that it is the government's obligation that they

9    have to -- they can't necessarily just rely on what is in San

03:01  10   Diego, and, you know, certainly the Bryan case, which I spoke

11   about the last time, I think makes it clear, but the Bryan case

12   also makes clear, my recollection, they don't have to go out

13   and scour every office.

14          So as I understand the position of the government is

03:02  15   that they are saying, look, we've given everything that we have

16   that we're aware of that emanates from San Diego, San Diego

17   FBI, that they are aware of the one particular case, the

18   Cleveland case.  I think they -- they state that they -- they

19   made inquiry sometime ago with respect to the Cleveland office,

03:02  20   and they've asked for information with respect to Forster.

21          Is there anything -- is the Cleveland case the only

22   case that the government has any inclination, if they do, that

23   there might be other things out there that relate to Forster

24   that they don't have?  Is that the only one?

03:03  25          MR. ARNZEN:  So the only -- so the Cleveland case is a

1    case where we know there are FBI and US Attorney office files

2    in another place.  We also know that with respect to one more

3    ticker.  We just learned of this, Your Honor, a ticker for

4    letters SCIO.

03:03    5            THE COURT:  Because there is a number of those -- and

6    you don't know if any cases were opened on those; is that

7    right?

8            MR. ARNZEN:  Absolutely.

9            THE COURT:  Now it is your understanding that there

03:03   10    was one opened with SCIO?

11            MR. ARNZEN:  Yes, Your Honor.

12            THE COURT:  And so is it the case then that you know

13    there was something opened with respect to SCIO; is that right?

14            MR. ARNZEN:  Yes, in another district.

03:03   15            THE COURT:  So you now learned of that.

16            MR. ARNZEN:  Minnesota, yes.

17            THE COURT:  So do you intend to make inquiry?

18            MR. ARNZEN:  We can make inquiry.  It is the same

19    situation as Cleveland, Your Honor.  We happen to have some

03:04   20    stuff that we gathered for our purposes a year ago.  Of course,

21    if the Court orders us to go out to Minnesota and ask them what

22    they have on Forster, we can do it.  That would fall under the

23    same category as Cleveland which is a huge file.  It went all

24    the way through trial.  Some of that we think may involve

03:04   25    Mr. Forster.  We have only bits and pieces that we collected

1    months and months ago.

2          THE COURT:  All right.  Well, it would seem to the

3    extent that there may be something in Cleveland with Forster

4    and there may be somebody in Minnesota with Forster, that it

03:04  5    would seem -- is the government's view that you would have no

6    obligation to acquire that?

7          MR. ARNZEN:  To request that from Cleveland and

8    Minnesota respectively?

9          THE COURT:  Yes.

03:04  10          MR. ARNZEN:  That is our position.

11          THE COURT:  Well, I -- what I'll do is give you an

12    opportunity to brief that, because now -- if your position is,

13    look, we think there may be some things in Cleveland that deal

14    with a cooperator, and we think there may be some things in

03:05  15    Minnesota that deal with a cooperator, but we don't think that

16    we have a legal obligation to go ask or to go get it, then I'll

17    give you an opportunity to brief that, and, you know, I can get

18    some case authority on it.

19          So you can tell me why you don't think you have an

03:05  20    obligation, and I will give the defense an opportunity to weigh

21    in as to why you do, and I can make a legal ruling.

22          MR. ARNZEN:  I am embarrassed that this is our best

23    effort that we have on paper to brief exactly that issue, Your

24    Honor.

03:05  25          THE COURT:  Well --

1    MR. ARNZEN:  If it is your position that we do, we'll

2  go out and do it.  It would be less work than doing this again,

3  and we understand it.  Our current position, it is not in our

4  possession, custody, or control, but you tell us, hey, you know

03:05    5  about it, go out and get all references to Forster and we'll do

6  it.

7    THE COURT:  Don't you think that is really what Bryan

8  was talking about though?  It is a case where -- isn't there --

9  there is a middle ground between if a prosecuting agency has a

03:05   10  case and they say, okay, this is all we have; now,

11  theoretically it is possible that some of the other 90-plus US

12  Attorney's Office opened a case, closed a case, we don't know

13  if they had a case or never had a case, so we're not going to

14  send out a request to every office to ask them if they have

03:06   15  something.

16    I agree.  I don't think that you have to do that, but

17  doesn't Bryan really stand for the proposition, all right,

18  look, just -- just because it is not in your district, if it is

19  someplace else and you have reason to believe it is someplace

03:06   20  else, then you have to go -- you have to go look.

21    MR. ARNZEN:  It is our position that -- and Bryan says

22  it depends on the extent --

23    THE COURT:  Right.

24    MR. ARNZEN:  -- of our knowledge and access to.  So

03:06   25  the extent of our access to what is in Cleveland and what is in

1    Minnesota depends largely -- mostly on what the agents and the

2    law enforcement officers in Minnesota and in Cleveland do.  It

3    is -- we have full -- the fullest extent of knowledge and

4    access to what is here in San Diego.  It is much less with

03:06    5    respect to materials that reside elsewhere.

6         THE COURT:  Here's -- if you want to brief it, I'll

7    give you an opportunity to brief it.  If you don't want to

8    brief it, then I'll say that you have an obligation -- or I am

9    going to say you have to go -- you have to check with Minnesota

03:07    10   and you have to check with Cleveland for materials that relate

11   to a cooperating witness which is Forster.

12        And if you don't want to do that, then you have to

13   file -- I'll give you an opportunity to file, but if you are

14   not going to file, I'll tell you now you have to go check.

03:07    15   Because I don't think that it is the case that you can take the

16   position that we think there may be something in Minnesota or

17   Cleveland, and it is likely -- in fact, it is beyond that -- it

18   is likely that there is something in those places, but we're

19   not going to ask them.  Is that your final position?

03:07    20        MR. ARNZEN:  Yes, sir.

21        THE COURT:  I don't -- if you want me to rely on what

22   you've given me so far to convince me that you don't have to

23   make inquiry, I am not persuaded.

24        MR. ARNZEN:  Okay.

03:07    25        THE COURT:  And so will address that.  So you are

1   going to inquire with Cleveland and Minnesota.  So those are

2   places where you know or have reason to believe that there is

3   information that relates to Forster that haven't done yet.

4        MR. ARNZEN:  That is the answer with respect to FBI

03:08   5   offices, Your Honor.  SEC falls into a different category.

6   We've worked with different SEC teams during the course of our

7   investigation.  Some members of those teams have gone off and

8   done other investigations that may touch upon Forster, too, so

9   the SEC has files involving Forster that we haven't requested

03:08   10   or gotten because we haven't been interested, frankly, enough

11   to do it.  We have plenty for Forster.

12        THE COURT:  Well, I think the defense is interested

13   though.

14        MR. ARNZEN:  Understood.

03:08   15        THE COURT:  All right.  So you have to get those as

16   well.

17        MR. ARNZEN:  Okay.

18        THE COURT:  And then -- I think that addresses most of

19   the issues.  I think we'll have to wait to see -- as we get

03:08   20   closer to trial, is it -- is it the government's view that

21   during the trial Forster could be working in other cases as a

22   cooperating witness and you wouldn't be required to disclose

23   more particulars?

24        MR. ARNZEN:  We would cut off his cooperation four to

03:09   25   six weeks before trial, Your Honor, so that we could give

1    defense summaries, like the ones that we provided in the

2    supplemental briefing that they could use to cross-examine

3    Forster.

4              THE COURT:  At some point -- I mean, at some point,

03:09  5    you know, it is all going to have to get disclosed; right?  You

6    know, to have Mr. Forster to testify, is it your thought that

7    he would -- he would be able to testify but not -- not have to

8    reveal whose he's working with or who he worked with most

9    recently before the trial?

03:09  10              MR. ARNZEN:  It is.  And under Giglio and Jencks --

11    actually Giglio, the defense is entitled to information, not

12    necessarily the form of the information.  We can summarize

13    information and give it to the defense.  It happens all the

14    time such that the defense can cross-examine the witness.

03:09  15              THE COURT:  All right.  We'll take it a step at a

16    time.  First we'll address the issue with respect to -- the

17    government is going to undertake to look into Minnesota, to

18    Cleveland, and to the extent that the SEC has files of which

19    they are aware of with respect to Forster, they'll look into --

03:10  20    they'll obtain that information.

21              MR. ARNZEN:  Your Honor, with respect to the SEC,

22    we're aware of certain SEC investigations into Forster or

23    companies that Forster had something to do with.  We can ask

24    those teams -- it is a much different thing to ask the SEC with

03:10  25    their thousand of employees and all of its regional offices and

1    entire enforcement program to do a search of Forster as well.

2          THE COURT:  I am not saying that you have to undertake

3    searches, but what I am saying at this point is if you -- with

4    respect to Minnesota and with respect to Cleveland, those

03:10  5    really aren't searches.  You know -- you have reason to believe

6    that there is information there, and you may not have all of

7    it.  Is that fair to say?

8          MR. ARNZEN:  That is fair to say.

9          THE COURT:  And so I think you have to then undertake

03:11  10    to say, all right, we need -- I know that there may be

11    something there; I am going to request that it be provided to

12    me.

13          To the extent that you know the -- that the SEC has a

14    case or had a case utilizing Mr. Forster and you don't have

03:11  15    that information and so you are not guessing -- you are not

16    asking -- you know, you are not trying to canvass the entire

17    SEC, but you know the SEC in this place has a case or had a

18    case that deals with Mr. Forster, then I think you have an

19    obligation to find those materials and produce them.

03:11  20          MR. ARNZEN:  Yes, sir.

21          THE COURT:  All right.  Now, does that resolve most of

22    the issues, putting aside to the extent of the government's

23    disclosure of Mr. Forster prior -- what he is working on now

24    and what he will have done prior to trial?

03:11  25          MR. GIBBONS:  I think it does, Your Honor.  I mean,

1    there are other examples that I think the government knows

2    where these documents lie.  I am thinking about your order that

3    the government is going to go there, too.  I don't think that

4    it is just limited to Cleveland and Minnesota.

03:12    5        I think the SEC is part of this, but I trust the

6    government.  And I think with that order that if they have --

7    if they have -- if they know about it or have reason to know

8    about it, they have to go get it.  I trust that they'll do it.

9    And they've been very candid to date about what they know and

03:12    10   what they don't know.

11       THE COURT:  All right.  Why don't we do this, we'll

12   give the government some opportunity -- and if the government

13   wants any additional inquiry at this point on the counsel

14   issue, the government will set forth in a pleading what they

03:12    15   are requesting for me to do by, say -- by the 29th, and the

16   defense could respond by the 6th.

17       Then with respect to the discovery issues, I can -- I

18   can have you come back, you know, in six, eight weeks, or I can

19   just leave it to you to put on calendar -- and you have a

03:13    20   number of other dates.  If you want to put it on calendar --

21   seems like you are working well -- working fairly well with

22   each other.

23       MR. GIBBONS:  Yeah, I think that is right.  I think

24   the big bugaboo that we haven't really talked about, how and

03:13    25   when we're going to address Forster's ongoing cooperation.  The

1    government has briefed it.  There are four or five ongoing

2    investigations.  Frankly, what it does is leave me a

3    cross-examination that goes something like, you are working

4    with the government in some unknown location with some unknown

03:13    5    people and unknown phone calls and unknown emails.  We don't

6    know what was said, and I can't cross like that.

7            THE COURT:  Right.  But at this point, I think --

8    let's wait to see -- I understand that you are dissatisfied at

9    this point with what the government's proposal is, but let's

03:13    10    let it play out a bit, and as we get closer to the trial, you

11    know, I'll hear you again on the sufficiency of that.

12            But at this point -- I mean, maybe his work is going

13    to wrap up sooner than the government thinks.  It could be a

14    whole host of things, so I don't want to get into what they

03:14    15    have to disclose now.  Shortly before the trial -- because

16    maybe some things are going to change, and then we can take a

17    harder look at the disclosure and, you know, whether or not it

18    is sufficient or not -- sufficient or not.

19            MR. GIBBONS:  Okay.  The only thing that I put out

03:14    20    there -- and again, we're dealing with August, I think, 20th or

21    21st trial date, it could be, depending on what the Court

22    orders in disclosures and what we get, I have to do some

23    investigating of those fact patterns.  There could be 8 to 10

24    fact patterns that as we stand here now I don't know about.

03:14    25            And I am not asking to move the trial date.  I am just

1   suggesting that you might have to hear from us on that in the

2   future.

3          THE COURT:  I understand.  We'll wait to see what the

4   volume is and what is in it, and I always take a reasonable

03:14   5   approach, so we'll just wait to see what is there, and, you

6   know, we'll have to wait to see the volume that you get.

7          MR. GIBBONS:  Understood.

8          THE COURT:  But I will certainly -- you know, no one

9   is precluded from making any motions of any kind, and I'll give

03:15   10   them due consideration.

11          MR. GIBBONS:  I appreciate it.

12          THE COURT:  Anything else from the government or

13   defense counsel?

14          MR. ARNZEN:  To exclude time until the next hearing,

03:15   15   Your Honor.  I have that as the motions in limine hearing.

16          THE COURT:  It probably is.  Although there are

17   substantive motions -- is there a substantive motions date?

18          MR. ARNZEN:  This was the substantive motions date,

19   Your Honor.

03:15   20          THE COURT:  Anything else?  Do you intend -- is the

21   next hearing date set for the motions in limine date?

22          THE CLERK:  Yes.

23          THE COURT:  And that date is?

24          THE CLERK:  August 19th.

03:15   25          THE COURT:  So theoretically you wouldn't be back here

```
 1   until August 19th.

 2           In light of -- Mr. Lipman.

 3           MR. LIPMAN:  Your Honor, I may be mistaken, but I

 4   thought sometime at the last hearing we basically said we'll

 5   move the motion -- the substantive motion date.

 6           THE COURT:  If we did, I don't -- it doesn't seem like

 7   we did in the record.  I'll give you another -- I'll give you a

 8   substantive motion date between now and then if you want one.

 9           MR. LIPMAN:  Yes, absolutely.

10           THE COURT:  All right.  I can give you -- how about

11   July 29th, at 2:00?  Does it work -- work for government

12   counsel as well?

13           MR. ARNZEN:  It does, Your Honor.

14           THE COURT:  How about this, defense will file

15   substantive motions by July 1st.  The government will respond

16   by the 15th.  The hearing is the 29th at 2:00.

17           MR. GIBBONS:  Your Honor I don't have a problem with

18   the briefing schedule.  I have a family wedding in

19   California -- California on July 29th.  That week actually I am

20   out.

21           THE COURT:  All right.

22           MR. GIBBONS:  I could do it the 22nd.

23           THE COURT:  How about the 5th?  Can you do it the 5th?

24           MR. LIPMAN:  August 5th?

25           THE COURT:  August 5th.
```

03:16  (line 5)
03:16  (line 10)
03:16  (line 15)
03:17  (line 20)
03:17  (line 25)

|         | 1  | MR. GIBBONS:  I will be in San Jose.  Yeah, I can come |
|---------|----|
|         | 2  | down. |
|         | 3  | THE COURT:  We'll say then -- we'll say -- defense |
|         | 4  | will file on the 8th of July.  The government will file by the |
| 03:17   | 5  | 22nd of July, and the hearing is August 5th at 2:00.  Those |
|         | 6  | dates work for everybody? |
|         | 7  | MR. LIPMAN:  Yes, Your Honor. |
|         | 8  | MR. GIBBONS:  Yes, Your Honor. |
|         | 9  | THE COURT:  And do you agree that time should be |
| 03:17   | 10 | excluded between now and the 5th, counsel? |
|         | 11 | MR. GIBBONS:  Yes, Your Honor. |
|         | 12 | THE COURT:  Anything else? |
|         | 13 | MR. LIPMAN:  Yes.  I am agreeing to excluding time. |
|         | 14 | THE COURT:  All right. |
| 03:17   | 15 | MR. ARNZEN:  Nothing else from the government. |
|         | 16 | THE COURT:  All right.  Thank you for your |
|         | 17 | appearances.  Your arguments are helpful as always. |
|         | 18 | MR. LIPMAN:  Thank you, Your Honor. |
|         | 19 | MS. CEDILLOS:  Thank you, Judge. |
|         | 20 | (Proceedings concluded at 3:17 p.m.) |
|         | 21 | ---000--- |
|         | 22 | |
|         | 23 | |
|         | 24 | |
|         | 25 | |

1                      C-E-R-T-I-F-I-C-A-T-I-O-N

2

3          I hereby certify that I am a duly appointed, qualified

4    and acting official Court Reporter for the United States

5    District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with the rules and requirements of the United States Judicial

10   Conference.

11          DATED:  April 29, 2019, at San Diego, California.

12
                                  /s/ Melinda S. Setterman
13                                _____
                                  Melinda S. Setterman,
14                                Registered Professional Reporter
                                  Certified Realtime Reporter
15

16

17

18

19

20

21

22

23

24

25