*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

Michael Cedillos (SBN 284794)
**GREENBERG TRAURIG, LLP**
77 West Wacker Drive, Suite 3100
Chicago, Illinois 60601
Tel.: (312) 456-8400
cedillosm@gtlaw.com

Miriam Bahcall (*pro hac vice*), IL ARDC #6191823, bahcallm@gtlaw.com
John F. Gibbons (*pro hac vice*), IL ARDC #6190493, gibbonsj@gtlaw.com
Attorneys for Defendant Gannon Giguiere

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America | CASE NO.  18-CR-3071 WQH |
| Plaintiff, | **DEFENDANT GANNON GIGUIERE'S SUBMISSION CONCERNING SENTENCING** |
| v. | |
| Gannon Giguiere (1), and Oliver Lindsay (2), | **Sentencing: January 10, 2022**<br>**Time: 9:00 a.m.** |
| Defendants. | **The Hon. William Q. Hayes** |

Defendant Gannon Giguere, by and through his counsel of record, respectfully submits the following Submission Concerning Sentencing.

## I.     INTRODUCTION

On July 19, 2019, Mr. Giguiere pled guilty to Count I of a superseding indictment, charging him and co-defendant Lindsey Oliver with participating in a scheme to manipulate the stock price of Kelvin Medical, Inc. ("KVMD") by matching trades with each other. Mr. Giguiere is scheduled to be sentenced January 10, 2022.

For nearly 50 years, Mr. Giguiere has led an exemplary life – both professionally and personally.  However, for reasons that are expounded on later in this submission, Mr. Giguiere made an uncharacteristic decision to involve himself in a series of trades that artificially inflated the share price of KVMD.  From the moment Mr. Giguiere agreed to match trades, he knew it was an illegal shortcut and has repeatedly acknowledged his

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

mistake and wrongdoing.  Critically, his sincere remorse has gone beyond mere words, as demonstrated by the timely and substantial cooperation he provided the government, beginning over two years ago, and on the very afternoon of his guilty plea.[1]  Indeed, the government has characterized Mr. Giguiere's assistance as valuable and will be filing a §5K1.1 departure motion detailing that cooperation.

Defense counsel and government counsel have had multiple candid conversations about how to "value" Mr. Giguiere's cooperation.   We expect the government to recommend a four-point reduction from the Total Offense Level agreed to by the parties in the Plea Agreement (18), resulting in a government-recommended Offense Level of 14.  We also expect the government to recommend Mr. Giguiere be sentenced at the low end of that advisory sentencing range, or 15 months incarceration.  We believe Mr. Giguiere earned more for his extensive cooperation, which we will expound on later in this submission.[2]  That, coupled with his timely guilty plea, sincere remorse, lifetime of good deeds including caring for an aged and sick mother, caring for three minor children during this pandemic, his post-offense volunteerism, that he is no danger to re-offend, and the exploding dangers associated with the Coronavirus and its variants (especially in a jail-like setting), supports our respectful request that the Court consider three sentencing options: (1) a Zone B sentence of probation where the Court orders home detention as the condition of probation, within a guideline range of 8-14 months, along with a substantial community service obligation; (2) a Zone C sentence where the Court orders 5 months imprisonment followed by 5 months home detention, per the dictates of §5C1.1(d), plus a substantial community service obligation; or (3) a year and a day sentence, along with a substantial community service obligation.

---

[1] Mr. Giguiere's guilty plea is Docket No. 133 in this matter.  Attached hereto as Exhibit R is Mr. Giguiere's Sentencing Summary Chart, which has also been contemporaneously filed.

[2] Though we disagree with the government on this point, we want to affirmatively note that AUSA Arnzen and his team are true professionals and were respectful of our arguments throughout the process, inviting us to bring this matter to the Court for its ultimate decision.

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

Pursuant to the dictates of 18 U.S.C. § 3553(a), each of those sentences would appropriately address the circumstances of Mr. Giguiere's offense, his background and characteristics, and the need to impose a sentence sufficient, *but not greater than that necessary*, to accomplish the sentencing and societal goals of punishment, deterrence, rehabilitation and productive citizenship.

## II.   3553 FACTORS: FACTOR ONE: CIRCUMSTANCES OF THE OFFENSE / CHARACTERISTICS OF THE DEFENDANT

### A. Personal Background

Mr. Giguiere is almost 50 years old, and but for this single instance of illegally matching trades, has led an exemplary and law-abiding life (business, personal, and philanthropic). Mr. Giguiere was born and raised in Clovis, California, where he learned early life lessons working on the family farm. As detailed in his letter to the Court, Mr. Giguiere grew up idolizing his father, who "taught me right from wrong without ever making a moral compromise." (*See* Exh. A). Mr. Giguiere's father served in Vietnam, and when Mr. Giguiere was 16 years old, ███████████████████████ ████████████████████████████████████. Tellingly, Mr. Gigiuere's letter explains that letting down his father by his actions in this case, even though no longer alive, has shamed Mr. Giguiere beyond words, and starkly taught Mr. Giguiere to never come close to breaking the law again. The undersigned counsel has rarely seen so many people volunteer personal testimonials echoing that same sentiment. Many of these people have known Mr. Giguiere for most of his adult life, know how uncharacteristic his misconduct was, and that it will never be repeated. For example, childhood friend Josh White stated:

> *Gannon is the type of guy who would always walk the straight line....I drove down to Orange County and picked up Gannon for lunch. I will never forget the look on his face of shame, sadness, and despair....What I've realized from speaking with Gannon has been a full and complete acceptance of responsibility for his actions.* (Exh B.)

The letters make abundantly clear that Mr. Giguiere has been selfless, honorable, honest, giving, forthright, and a dedicated son, father, spouse, friend, and valued member of the community, his entire life.

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

1 <u>Son</u>: As reflected in Mr. Giguiere's letter, his mother (█████)

2 ████████████████████████████████████████████

3 ████████████████████████████████████████████

4 ████████████████████████████████████████████

5 ████████████████████████████████████████. Lindsay

6 Giguiere puts it succinctly and honestly: "His mother needs him….I simply could not

7 handle her passing with him gone." (Exh. C).

8 <u>Father/Spouse</u>: Mr. Giguiere's first wife, Clare MacIntosh, wrote a moving letter to

9 the Court, detailing ████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████████████████████████████████

13 ████████████████████████████████████████████

14 ████████████████:

15
16
17
18
19
20

21 Longtime friend Vernon Edler recounts these events similarly:

22
23

24 *not the case with
Gannon as his dedication to family goes above and beyond.  I saw him in the
25 years that followed do everything in his power to make sure he helped the
mother of his children.   This included financial help and providing her
26 housing to keep her geographically in the same area.  He never denied her
access to the kids as he felt it was important the kids have their mom be a part
27 of their lives.  (Exh. E).*

28

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

<u>Friend/Community Member</u>: Not only has Mr. Giguiere shown his character to family, he has shown those same positive traits and commitment to friends over the last 30 years.  Josh White states:

> *I've known Gannon for over 30 years, and I don't think he's even had a traffic ticket.  He's a model citizen and person.  I have seen him use the resources he has to improve people's lives around him.  That is just what he does.  He wants everyone to succeed around him and will do whatever it takes to make that happen.*  (Ex. B).

Similarly, longtime college friend Vern Edler observes:

> *Being a busy and productive businessman, what many don't get to see is Gannon's compassionate side.  I have witnessed this compassion as I see the way Gannon has stepped up for my dad who has battled significant health issues over the past few years.  Gannon lost his dad a few years back and knows how that loss affected him and his family.  Knowing that my dad was struggling with his health, Gannon reached out to my father directly to offer words of encouragement and support.  Gannon continues to do things which make my life and the lives of my family better.*  (Exh. E).

One of the most telling letters comes from Gary Thompson, who invested "a significant amount of retirement money" with Mr. Giguiere, which was lost when the government seized Mr. Giguiere's assets.  Gary candidly states:

> *Even though the money I invested with Gannon is gone now and I have every reason not to trust Gannon, he and I continue to meet monthly, and I have no doubt who Gannon is as a man….When Gannon told me what happened, he was upfront and incredibly sorry for losing my money.  He gave his word that he would do everything in his power to repay me.  I believe it may take some time, but in the long run, I am confident Gannon will pay me and everyone back their lost money.  He is that kind of man.  Every time we are together, he expresses how much he is sorry for having lost the money I invested with him. I continue to have a friendship with Gannon, because I wholeheartedly believe he is a good and honest person.*  (Exh. F).

David Tarnoff similarly speaks to Mr. Giguiere's integrity (and if a golfer, you know exactly what he is talking about):

> *You can't spend five or six days a week with somebody and not get to know them well.  I really became part of the family and developed a strong friendship with Gannon.  When I think of honesty, Gannon embodies that trait.  I have never seen Gannon cheat in golf, move a ball, or not putt out.  He was always a man of integrity.*  (Exh. G).

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

Andrew Levitt sums it up in his own words:

> *While I am not familiar with the ins and outs of Gannon's case, I can say he's the kind of person that wouldn't do something intentionally harmful to other people. What I noticed is the way Gannon talks about this situation. He only refers to how it affects his family, friends, and the people around him, rather than how it was affecting him. He regrets having put his wife and children in this situation, as well as anyone who may have lost money because of what happened. If I could say anything, it would be that this crime is completely out of character for Gannon. It does not represent the person he is and the person I know.* (Exh. H).

Mr. Giguiere's decency, honesty, and integrity are not confined to his personal life. Professionally, those who have known Mr. Giguiere best over the years attest to his character and value system. Counsel knows that money/greed is often at the root of white-collar crimes, but that is not what got Mr. Giguiere in trouble here, as expounded on later in this Submission. Kelle Cohen, who has worked at two companies with Mr. Giguiere over the last 20+ years, drives home the point that money is <u>not</u> what drives Mr. Giguiere:

> *Gannon has a gift for not only building companies, but also building an exceptional culture and developing people's strengths. The company culture was one of the most amazing I have been a part of. When the housing market crashed in 2007-2008, we needed to sell the company. This was beyond heartbreaking for all of us but especially for Gannon. He felt responsible for every employee. Laying off all the employees was one of the toughest days. Gannon handled it with compassion and integrity. Gannon wanted to ensure each employee was able to land a new position and health insurance stayed active. Together, we spoke to every person individually and made sure everyone was taken care of with severance packages and insurance for months. Gannon stopped taking a salary to make sure people would be taken care of financially. There was never a time he wasn't thinking more of someone else's situation over his own.* (Exh. I).

Mr. Steve Cranston has known Mr. Giguiere for 25 years and shared three professional experiences with him, commented:

> *I have observed Gannon under pressure and recognized the true depth of character, talents, skills, and discipline Gannon had. This was never more apparent than when I worked with Gannon to do a reorganization of a publicly traded company called Homestore. When a reorganization happens, often you need to break down things before they can be rebuilt. For this reason, the early days of Homestore were challenging due to having to let go of almost 100 people. I learned from Gannon how to let people go with dignity. For him, this was just as important as how we were going to rebuild the team.* (Exh. J).

Maybe most insightful are the comments of Gerry Kuse, who knows the entire story of Mr. Giguiere's downfall, worked with him at a previous company, witnessed Mr.

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

Giguiere's interactions for years, and stated:

> *In terms of my own career, Gannon has had a huge impact on my career path, and I appreciate all he has done for me. There is no doubt in my mind that if Gannon gave me the opportunity to work with him again, I would trust him completely.* (Exh. K).

Charity and community outreach programs were and remain very important to Mr. Giguiere. Dino Katsiametis has known Mr. Giguiere since 2005. Mr. Giguiere helped Dino financially during the Great Recession (long before Mr. Giguiere got involved with penny stocks) and has supported Dino's podcast called "God's Men of Influence." Most telling is the faith Dino has in Mr. Giguiere's character, summed up this way:

> *If anything ever happened to me, I know I could call Gannon and count on him to take care of my family. That's the biggest compliment I could ever give anyone. I have that kind of faith and trust in him. He is that type of person, one who through living a highly honorable life deserves the benefit of the doubt in this instance.* (Exh. L).

Doug Weaver, having known Mr. Giguiere since college, similarly adds:

> *The amount of remorse Gannon has shown makes me realize he has turned a corner for the better. This is a new chapter in his life and with the volunteering he is currently doing, along with the education he is trying to provide others, Gannon has gone above and beyond to prove he is willing to use his experience to better others' lives. There are times in our lives where something happens to make us all look at things differently. While Gannon could have shut down on himself, his family, and others, he's taken the opposite approach by trying to give back and educate others, putting his mistakes in the open. I have every confidence that Gannon will never do anything like this again.* (Exh. M).

And, former development officer for the University of Southern California, Joseph Aguirre, echoes these similar sentiments:

> *Good people stumble and make mistakes. Gannon's work ethic and goodwill simply didn't seem to fit with the crime he has pleaded guilty to and is completely out of character for Gannon. What I saw in the time I have known him is a successful, generous family man. He believed in giving back to his community and using the money he had successfully earned to help make USC better.* (Exh. N).

There is no question that people who know Mr. Giguiere well have seen firsthand his willingness to own his mistakes, feel and demonstrate true remorse, and encourage that utilizing Mr. Giguiere's talents in the form of community service would better serve the

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

interests of society rather than a lengthy prison stay.  Timothy Lyons and Adam Geach collectively and eloquently sum this up:

Timothy Lyons:

*I still speak to Gannon nearly every day.  I am aware of the circumstances he is in right now.  Gannon came to me, within days of being arrested, and admitted his mistakes he had made.  He makes no excuses and, in my opinion, shows an incredible amount of integrity and honesty every day.  In any rehabilitation, the first step is admitting you've made a mistake.  Gannon has never played the victim and always owned up to his mistakes.  This says volumes to me personally about Gannon's character.  Gannon has strong values and knows the difference between right and wrong.  He made a mistake, and he is paying for it.  You see, Gannon will never hold another corporate officer position in a company.  This is somebody that went to USC and has been an entrepreneur his whole life.  Whether he is sentenced to two days or two months the real punishment is Gannon will never be able to hold another corporate leadership position….The loss of not being able to do what you trained your whole life to do is a warning to others not to cross that line. Gannon's story is well known in the tech industry already and is a large warning sign to anyone in the tech industry.  If you cross the line and you will lose everything you worked your whole life to build.  (Exh. O).*

Adam Geach:

*Shortly after his arrest, he and I sat down together and I remember that he was shaken in a way that I had not seen – he was nearly in tears.  I could feel his deep regret and it was clear that he knew that he had made a massive mistake.  He expressed his remorse and he gained a lot of respect from me after that sit down….Gannon never attempted to make any excuse for this betrayal and owned his part in the wrongdoing.  (Exh. P).*

Even today, fully recognizing that he might soon be imprisoned, Mr. Giguiere continues to use his intellect, skill set, energy, and story of failure to try and help others. Michael Santos, one of the founders of a non-profit, Prison Professors, explains:

*I received an unsolicited phone call from Gannon. He told me that he had been researching the criminal justice system in connection with a potential sentencing. Through that conversation, Gannon asked about the work that we're doing to improve outcomes for people in jail and prison. Gannon asked if he could volunteer to help. He asked what he could do, or how he could contribute….Gannon took the time to draft a complete curriculum. He then came to my house to work with me in creating a video version of the course, and an audio version of the course. Together, we worked to begin distribution. As a result of Gannon's hard work, more than 100,000 people in jails and prisons across America will have access to his course. (Exh.Q).*

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

### A. Background of the Offense

Mr. Giguiere is an entrepreneur at heart.  He graduated USC with a degree in business administration, participating in its entrepreneurship program while there.  In the late 1990s, Mr. Giguiere worked at AltaVista, a pioneering internet search engine company.  This was during the same time period Google was being developed, and these two companies were creating new ways to access information online.  This experience led Mr. Giguiere to Realtor.com, a leading online real estate search engine, which is still an industry leader today.  Over time, and after saving enough money, Mr. Giguiere opened his own company, true to his entrepreneurial instincts.  The company, GetLower.com, was a lead generation platform for real estate professionals, supporting the residential real estate market.  The company flourished until the real estate market collapsed on the eve of the Great Recession, causing Mr. Giguiere to sell the technology and close up the business.  Then, tragedy struck in his personal life, as described by Mr. Giguiere's ex-wife Clare.  This caused Mr. Giguiere to pause his professional life for four years to raise his two children.  In 2013, Mr. Giguiere re-entered the business world, creating Eventure Interactive.  Eventure was a social networking and local events application, employing about 20 workers at its height.  The company's promising technology attracted early-stage investors, and this is when trouble began.  Without getting into unnecessary details, Mr. Giguiere accepted convertible debenture financing from predatory lenders to help fund his company.  These predatory lenders used their positions to make a quick return, but left the company insolvent, forcing it out of business.

In the wake of this experience, Mr. Giguiere wanted to develop a financing platform to help microcap companies go public, without needing to rely on predatory lenders.  Enter ███████████.[3]  Unbeknownst to Mr. Giguiere at the time, █████ was a longtime crook, engaging in pump and dump schemes going back to at least 2012 (8/18/17 FBI 302 Report).

---

[3] This information is provided not to excuse Mr. Giguiere's subsequent criminal actions, but simply to put them into context, as Mr. Giguiere was relatively new to the microcap/financing world.

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

1   But when Mr. Giguiere first met him, █████ seemed honorably intent on helping Mr.

2   Giguiere develop a digital financial media platform that connected start-up companies with

3   willing investors.  The two became good friends, taking vacations together.  In fact, Mr.

4   Giguiere officiated at █████'s wedding.  Professionally, Mr. Giguiere knew that his

5   company, and its website, if used improperly, could be used to manipulate the market.  That

6   is the path █████ was heading, and Mr. Giguiere should have seen it sooner, stopped it,

7   and cut all ties with █████, but did not.[4]

8          At the end of 2017, █████ spoke to Mr. Giguiere about Kelvin Medical and ways

9   to help raise capital for the fledgling company.  Those conversations turned criminal when

10  Mr. Giguiere agreed to illegally match trades with co-defendant Oliver Lindsey, which

11  artificially raised the stock price of Kelvin.  That illegal trading was not reported in

12  promotional materials on Mr. Giguiere's company's website, and Mr. Giguiere has no one

13  but himself to blame for allowing that to occur.  Indeed, Mr. Giguiere's letter to the Court

14  (Exh. A) readily and fully acknowledges this fact.  Counsel simply recounts this history to

15  show that Mr. Giguiere did not purposely set out to organize a "pump and dump."  █████

16  opened that door, and Mr. Giguiere let down himself, his father, his family, and the

17  investing public by not having enough fortitude to say "no" and walk away.  Mr. Giguiere

18  knows and accepts that now. *See e.g. Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993)

19  (considering the defendant's motive for committing the offense is an important factor);

20  *United States v. Milne*, 384 F. Supp. 1309, 1310-11 (E. D. Wis. 2005) (granting variance

21  where "defendant did not take the bank's money out of greed or a desire to live a lavish

22  lifestyle…, [but in an effort] to keep a sinking business afloat.")

23                 B.  The Offense and its Aftermath

24          The conduct involved in this case is accurately reflected in the plea agreement.  This

25  offense is Mr. Giguiere's first and only experience with the criminal justice system.  As

26

27          [4] On August 16, 2017, the FBI confronted █████ and had a warrant for his arrest.
28  Instead of executing the warrant and arresting him, █████ agreed to cooperate with federal
    authorities, including the taping of subsequent meetings with Mr. Giguiere.

CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION

explained above, it was the product of a lapse in sound judgment, not recognizing that his (yes, indefensible) actions were hurting others and were no better than the toxic financiers he so despised.  Mr. Giguiere accepts that, knows his actions were wrong, and that he will be punished.

True to his character, Mr. Giguiere is not blaming anyone but himself for this, as recounted by friend Gerry Kuse:

> I know that over the past several years, he has had time to reflect and realize what he did was wrong and wants to do everything in his power to make it right again.  Gannon is an honest and decent man who made a mistake and learned from that mistake.  My hope is you will be able to discover that Gannon has learned his lesson and has certainly shown remorse.  I am confident Gannon will not re-offend and will do all he can to give back to those who were financially hurt.  He will continue to have my support in all he does.  (Exh. K).

Similarly, Mr. Giguiere has taken the last two years since his guilty plea to not only accept responsibility, but to continue to try and make amends for his actions.   Gary Thompson recounts:

> In the past year and a half, Gannon has taken the time to reach out to those of us who lost money and reassure us all he will make the wrongs right.  He has been working diligently to help his wife Lindsay start building a business so she will be able to support herself and the kids.  Did Gannon make mistakes?  Sure.  Does it change the man of integrity he is to me?  No.  (Exh. F).

Finally, Lindsay eloquently articulates that this will be a non-stop effort for Mr. Giguiere:

> It is also so very important to mention to you that although this has been a humiliating experience for Gannon and myself, we have not stopped our community service efforts.  Our commitment to each other through "thick or thin" is that we are never to lose sight of God, our family, and our community.  I wasn't sure how Gannon would react when this unfolded, but I am very proud that even though he often has to fight back tears when questioned by the organizations we donate our time and energy to, he continues to stay committed and fights to be a positive force.  I believe this has made a tremendous impact on the children as well, since they can see their father fighting through failure and in many instances, being shunned and having to own it.  He wants nothing more than to re-establish credibility in his charitable efforts and in doing so, be an example to his kids.  (Exh. C).

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

## III.   FACTOR TWO: PURPOSES OF SENTENCING

As the Court is well aware, the federal Sentencing Guidelines are not binding, but simply advisory.  Moreover, the advisory guidelines range is not presumed to be the "correct" sentence to be imposed; indeed it would be error for a sentencing court to presume the advisory range is the appropriate sentence.  *Nelson v. United States,* 129 S. Ct. 890 (2009); *Spears v. United States*, 129 S. Ct. 840 (2009).  Instead, the Court's sentencing decision is to be individualized and committed to its sound discretion, guided by the parameters of the statutory maximum and minimum sentence, the factors enumerated in 18 U.S.C. § 3553, and the directive to impose a sentence "sufficient but not greater than necessary "to comply with the purposes of sentencing set forth in *U.S. v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (*en banc*).  As is often mentioned, "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 128 S.Ct. at 588 (2007), quoting *Koon v. United States*, 518 U.S. 81, 113 (1996).  As aptly stated by another sentencing court:

> *[S]urely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."*

*United States v. Adelson,* 441 F. Supp. 2d 506, 513-514 (S.D.N.Y. 2006).

As set forth in the plea agreement, the parties agree regarding the initial Guideline calculations.  (Plea Agreement, Dkt. 133, p. 12).  The government has further acknowledged Mr. Giguiere's prompt, candid, and complete cooperation in its investigation and will be filing contemporaneous with this Sentencing Memorandum a §5K1.1 departure motion, lowering the Total Adjusted Offense Level to 14.  Since Mr. Giguiere has no criminal history, and the government is recommending a low-end

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

guideline sentence, that yields a government-recommended sentence of 15 months.  For the reasons set forth herein, including Mr. Giguiere's timely guilty plea, his cooperation with the government, his sincere remorse, that this was a highly unusual departure for a man of otherwise strong character, his lifetime of good deeds, the fact that he is caring for an aging and sick mother, caring for an ex-wife and three children, that he is not a danger to re-offend, his post-offense rehabilitation and volunteerism, and the increasing dangers associated with the Coronavirus and its variants, especially in a jail-like setting – Mr. Giguiere respectfully requests a sentence below the government's recommended sentence. We humbly ask the Court to consider three options, a sentence of probation where the Court orders home detention as the condition of that probation, within a guideline range of 8-14 months, along with a substantial community service obligation; or a sentence of 5 months imprisonment followed by 5 months home detention, per the dictates of §5C1.1(d) plus a substantial community service obligation; or a year and a day sentence, along with a substantial community service obligation.

Specifically, § 3553(a)(2) requires consideration of:

(2) the need for the sentence imposed—

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense [retribution];

> (B) to afford adequate deterrence to criminal conduct [general deterrence];

> (C) to protect the public from further crimes of the defendant [specific deterrence]; and

> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner [rehabilitation].

### A. <u>Retribution</u>

We acknowledge that Mr. Giguiere's conduct warrants punishment.  Each of our suggested sentences would be "sufficient, but not great than necessary" to satisfy this sentencing goal.  Moreover, as noted in Timothy Lyons's letter to the Court, Mr. Giguiere's story is well known in the high tech world, and he will never be able to secure work in that

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

arena again.  (Exh. O).  In this internet age, Mr. Giguiere's criminal conviction will be forever available, a punishment in and of itself.  *See United States v. Olis*, 2006 WL 2716048, at *13 (S. D. Tex. 9/22/06) (granting substantial variance in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct").

Moreover, the accompanying civil suits, SEC proceedings (where an officer and director bar will almost assuredly be imposed), the previously agreed to forfeitures totaling $2,036,140.60 from real property and cash, and the likely restitution/fine orders, will almost if not entirely wipe out Mr. Giguiere financially—a circumstance which he will have a hard time recovering from, whatever sentence is imposed.  In a very real sense, any of our recommended sentences will vindicate the law's rightful interest in retribution.

B. <u>General Deterrence</u>

A growing number of commentators, social science studies, and scholarly analyses have all concluded that the costs to society of separating otherwise productive individuals from society are enormous and frequently outweigh any supposed benefits by incarcerating nonviolent offenders.

> *Imposing the least amount of time practicable, as the statute requires, will ultimately best serve the interests of the defendant, his family, his community, and society at large.  The rapid growth of incarceration has had profoundly disruptive effects that radiate into other spheres of society, the persistent removal of persons from the community to prison and their eventual return has a destabilizing effect that has been demonstrated to fray family and community bonds, and contribute to an increase in recidivism and future criminality.*

Clear, T. Rose, "Coercive Mobility and Crime: A Preliminary Examination of Concentrated Incarceration and Social Disorganization," *Justice Quarterly*, Vol. 20 at 33-34 (2003) [quoted in *Incarceration and Crime: A Complex Relationship, Sentencing Project* (2005)].

Even individuals who were for years fierce advocates of longer sentences, such as former Attorney General Edwin Meese, Bill Bennett, Congressman Newt Gingrich, and

others, have all come to question the need and the propriety of long prison sentences or the need for incarceration at all – especially for nonviolent offenses. *The Conservative Case Against More Prisons*, Vikrant Reddy & Marc Levin (March 6, 2013) (available at www.theamericanconservative.com/articles):

> *There are other ways to hold offenders – particularly nonviolent ones – accountable. These alternatives when properly implemented can lead to greater public safety and increase the likelihood the victims of crime will receive restitution. The alternatives are also less costly….Unnecessary incarceration of nonviolent, low-level offenders also destroys families.*

*See also United States v. Adelson*, 441 F.Supp.2d 506, 513-514 (S.D.N.Y. 2006), *aff'd mem.*, 301 Fed. Appx. 93 (2d Cir. 2008) ("But as to [general deterrence], there is considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders) (*citing* Richard Frase, *Punishment Purposes*, 58 Stanford L. Rev. 67, 80 (2005); Elizabeth Szockyj, *Imprisoning White Collar Criminals?*, 23 S. Ill. U. L.J. 485, 492 (1998)). *Cf* United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* 56 (2004) (noting that the Sentencing Guidelines were written, in part, to "ensure a *short but definite* period of confinement for a larger proportion of these 'white collar' cases, both to ensure proportionate punishment and to achieve deterrence") (emphasis in original).

Similarly, many states over the recent years have enacted reforms, and the Sentencing Guideline amendments and congressional enactments in recent years have all recognized the need for alternatives to imprisonment, not simply as a cost containment policy, but because removing from society persons who are not dangers actually harms society and does not help it. As one noted observer said, "prisons ought to be prioritized for the people we're afraid of, [not] the ones we're mad at." *The Conservative Case Against More Prisons* (2013). "The best available evidence, …prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen, *et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science,* 91 Prison J. 48S, 50S-51S (2011).

As it relates to Mr. Giguiere, the letters attached hereto make clear the impact a lengthy incarceration will have on Mr. Giguiere's children (including his toddler), his sick

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

mother, his ex-wife, and current spouse.  Moreover, placing Mr. Giguiere on home confinement will allow him to continue to use his skills to advance Lindsay's company, greatly increasing the chances that all KVMD victims will be re-paid monies lost.  Finally, other white collar offenders would most certainly be deterred by the punishments already incurred by Mr. Giguiere and by the enforcement of the sentences suggested here.

### C. Specific Deterrence

The goal of specific deterrence is to protect the public from further crimes by the defendant.  18 U.S.C. § 3553(a)(2)(C).  Mr. Giguiere has no prior record and has no propensity to engage in criminal conduct.  Indeed, all the statements about Mr. Giguiere's character indicate the great unlikelihood of him ever engaging in criminal activity again.  Mr. Giguiere did not set out or intend to commit securities fraud, in the common sense understanding of that phrase.  Yet that is exactly what legally occurred when Mr. Giguiere and his co-defendant Mr. Lindsay agreed to trade KVMD.  Mr. Giguiere is painfully aware that it is irrelevant that he genuinely wanted to help KVMD reach a greater audience and increase its market value.  However, this was not Mr. Giguiere's mind-set five years ago, and his actions were not the product of criminal scheming, but almost the "no harm, no foul" mentality that sometimes clouds our judgment.  Indeed, since his arrest in July 2018 (over three years ago), Mr. Giguiere has never come close to committing an illegal act, he has complied with all terms of his pre-trial release, and he has worked hard in lawful business practices to provide for his wife and three children.  The attached letters written on his behalf almost uniformly state that Mr. Giguiere knows what he did was wrong, that it will never happen again, and that he will work the rest of his life to make amends.  From family, friends, and co-workers, all the letters plead with the Court not to deprive society, his community, or his family of his positive contributions for more than the times suggested by defense counsel.

### D. Rehabilitation

In all candor, the purpose of rehabilitation has little relevance in Mr. Giguiere's case, given his background and lack of any dependencies.  What Mr. Giguiere intends to do

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

moving forward is to use his intellect and determination to secure work to help support his family and repay whatever debt may be left to repay. Indeed, Mr. Giguiere has truly accepted responsibility for his actions and shown sincere remorse. The letters written on his behalf speak of his generous nature, his love for his family, his kindness, his intelligence, his helpfulness, his caring and nurturing personality, and his sense of social responsibility.  Together, these letters speak more eloquently about the character of Mr. Giguiere than the undersigned can capture here.  We know the Court will review them in the spirit they were tendered – not to mitigate the seriousness of the offense, but to put it into context and to confirm that there is no risk that Mr. Giguiere will commit this, or any other crime, in the future.

## IV.   FACTOR THREE: THE KINDS OF SENTENCES AVAILABLE

As stated above, the government will be filing a §5K1.1 motion, acknowledging that Mr. Giguiere has provided substantial assistance in its investigations and/or prosecution of others.  The government will be recommending a four-level reduction, to offense level 14.  Of course, and per §5K1.1, it is this Court who will decide the appropriate sentence, and we ask the Court to consider the following in making that determination.

First, Mr. Giguiere willingly accepted responsibility for his actions from the day the case was filed; indeed, he immediately made himself available for two full days of interviewing by the government upon entry of his guilty plea.  During those meetings, the government was professional and provided Mr. Giguiere with clear direction regarding the nature of the information the government was interested in.

To that end, Mr. Giguiere spent the following months delving into the requested information.  With outside counsel's assistance, Mr. Giguiere reviewed thousands of emails, analyzed them, and organized them by topic and target for the government, including a chronological memorandum in which each of those documents was put into the context of related events.  In addition, Mr. Giguiere paid to have his own phone forensically collected and processed, not previously done by the government, which resulted in the review and subsequent production of thousands of relevant text messages with various

CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION

targets.   In the end, three (3) five-inch (5") binders full of culled-down, organized documents and information were provided – along with an offer to follow up on any questions or requests the government might have.

Second, when it became known that Mr. Giguiere was cooperating with the government, co-defendant Oliver Lindsey promptly reached his own plea agreement, executing it three weeks after Mr. Giguiere announced his intention to change his plea. We believe the government will acknowledge this positively in its §5K1.1 motion.

Third, several months ago, the government requested Mr. Giguiere's assistance, asking for documents and information from a specific date and topic for use in the trial of a separate criminal defendant, involving someone who was not a target of prior requests. Mr. Giguiere again dug into his records, found the requested information, and provided it, with context.  The government won its case, resulting in a conviction.

The bottom line is that Mr. Giguiere was an open book, providing timely, truthful, and reliable information.  As the Court well knows, only the government has the power and authority to charge others.  While the undersigned can argue that it provided sufficient evidence to charge other identified targets, and thereby earn Mr. Giguiere additional departure levels in the eyes of the government, that did not happen here, and we do not criticize the government for exercising their rightful discretion.  With that said, we do contend that the assistance rendered supports the basis needed by the Court to impose the sentence recommended by counsel.

## V.  FACTORS FOUR AND FIVE: THE SENTENCING GUIDELINES AND POLICY STATEMENTS

**Covid 19 Concerns**:  A sentence of home confinement, as recommended above, seems increasingly appropriate in light of the exploding Covid-19 pandemic, especially its impact in U.S. prison facilities.  As of November 30, 2021, the data shows a rate of infection among the federal prison population to be 283.3 cases per 1,000 people.  See *https://covidprisonproject.com/data/national-overview* (last visited Dec. 20, 2021).  This is far higher than those outside of prison, especially since we recommend Mr. Giguiere be

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

confined to the home in Newport Coast.  *See https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/orange-county/* (14-day average positivity rate of 1.6 per 1,000 (16 per 10,000)) for Newport Beach as of Dec. 20, 2021).  Importantly, Covid-19 precautions are impacting inmates' ability to receive visits, as most everyone is anxious and worried, from family members to guards to fellow inmates, about the increasing threat of transmission.  Moreover, the U.S. Bureau of Prisons ("BOP") has released more than 36,000 to home confinement since Congress expanded the program at the start of the pandemic to help reduce the spread of the coronavirus in its jails. and just recently, the Justice Department ruled that the BOP is not required to reimprison thousands of federal inmates who were granted home confinement to limit the spread of the coronavirus — even after the federal health emergency ends. *Memorandum Opinion of the Attorney General, Discretion to Continue the Home-Confinement Placements of Federal Prisoners After the COVID-19 Emergency, available at https://www.justice.gov/olc/file/1457926/download (last visited Dec. 27, 2021)*.  We submit that the current conditions in prisons, coupled with the reasoning behind the recent Justice Department order, represent a factor which can properly be taken into account in deciding to sentence Mr. Giguiere to a term of home confinement.

**Children, the Pandemic and Mental Health:** There is no question the Pandemic's effect on young children is a current and unique condition that also militates towards a sentence of home confinement.  In late October, 2021, three prominent medical groups, the American Academy of Pediatrics, the American Academy of Child and Adolescent Psychiatry and the Children's Hospital Association, declared a national state of emergency in children's mental health, caused by the unique challenges brought on by the pandemic.  *https://chicago.suntimes.com/2021/12/3/22763902/childrens-mental-health-must-be-addressed-editorial*.  Young people's education and everyday activities have been tremendously disrupted, and with the recent spread of its variants, this will likely be the case for years to come.  The experts all agree that children across every social and economic class, and among all races and ethnic groups, are being affected. *Id.*  Soaring

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

rates of depression, anxiety, trauma, loneliness, and suicidal thoughts have been reported among children and teens nationwide, which parents need to watch and address, say the organizations cited above. *Id.* As recounted above, Mr. Giguiere is extremely close to his three children, ███ 17, ██ 15 and ████ 4, having been the older kids' sole parent for four years, and now spending most of his days with them since his arrest and virtual home detention. Lindsay Giguiere's letter speaks to this very issue, stating:

> *I humbly ask of you to take into consideration a sentencing that allows him to stay home with us, continue to lead the development of our children ….As a mother, I fear that if my children don't have a strong father figure in their life who actively participates in their wellbeing, catastrophic events can occur.* (Exh. C).

Mrs. Giguiere's fears are real, as borne out by the experts and their recent October 2021 joint report. Mr. Giguiere's roles in his children's lives, especially during this pandemic, have paid great dividends to date, and we humbly ask the Court to take this into consideration when imposing sentence.

**Victims and Loss:** Mr. Giguiere recognizes that his conduct caused loss to individual investors in this matter; he has acknowledged this by pleading guilty, and we do not dispute that fact here. However, because the Court must consider the applicable Sentencing Guideline range before imposing sentence (18 U.S.C. § 3553(a)(4)), we are compelled to address the number of victims and loss amounts at issue here.[5]

Specifically, Mr. Giguiere agreed in his plea agreement that the gain attributable to his role was $1,484,598.54 and that there were more than 10 victims (Plea Agreement, Dkt. 133, at pp. 8, 12). Mr. Giguiere is not contending otherwise, and we believe those figures should be considered by the Court as it contemplates the appropriate sentence. With that said, we note that only two victims have come forward to date in connection with this case,

---

[5] Counsel for the government and defendant will jointly move the Court to schedule a restitution hearing 75 days after sentencing, to allow the parties to jointly submit a restitution order. Per the terms of the Plea Agreement and the accompanying Restitution Addendum, the government must prepare a "full list of victims and corresponding amounts," which it is currently working on. That will allow all parties to more meaningfully address restitution.

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

William Mandel and Margaret Austin, and that the $266,703.37 already forfeited by Mr. Giguiere in connection with his KVMD plea agreement (Plea Agreement at Forfeiture Addendum § B) will likely exceed the losses incurred by Mr. Mandel and Ms. Austin.

There is a reason that so few victims have come forward, even though the parties stipulated that there were at least 10 victims in this case: While some individual investors did apparently trade in KVMD (the government is exploring those numbers now), it is undisputed that Mr. Giguiere and Mr. Lindsay's improper matched trading (using related investors) constituted the vast majority of all trading in KVMD during the relevant time period, and those related participants clearly were not "victims" of the KVMD matched trading, nor would they be eligible for compensation.[6]

## VI.   FACTOR SIX: DISPARITY WITH SIMILAR OFFENDERS

18 U.S.C. § 3553(a)(6) makes clear that a sentencing court should avoid unwarranted sentencing disparities among similarly situated offenders.  We appreciate that it is tricky to try and compare one defendant with another, particularly in this case, where co-defendant Mr. Lindsay has also pled guilty to the same charge but not yet been sentenced.   However, Mr. Giguiere has provided substantial cooperation to the government, as outlined above.  Moreover, unlike Mr. Lindsay, Mr. Giguiere has never been a registered broker and/or investment advisor and did not have any of that training.  As such, we humbly and respectfully contend that our recommended sentences would be a proportionate and just result under every factor of 3553(a), including this factor of avoiding unwarranted sentencing disparities.

## VII.   FACTOR SEVEN: RESTITUTION AND FINE

The parties have agreed to a fine of $10,000 (Plea Agreement p. 14). With respect to restitution, the parties will be moving jointly to schedule a restitution hearing 75 days from the date of sentencing, to see if the parties can reach agreement on a proposed

---

[6] The government and defense counsel both agree that the gain figure of $1,484,598 is the correct figure to be used in analyzing Mr. Giguiere's sentence, and not any gains/losses associated with dismissed counts involving Eco Science Solutions, Inc. (ESSI); Superseding Indictment Counts III and IV.

*CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION*

restitution order.  (*See* footnote 5 and accompanying text, *supra*.)

## VIII.  POST SENTENCING ISSUES

Mr. Giguiere respectfully requests that if the Court sentences him to a jail-like institution, that the Court recommend to the Bureau of Prisons that he be placed at FCI-Lompoc, California, at the satellite prison camp or at the lowest applicable security designation available at that facility.

## IX.    CONCLUSION

Mr. Giguiere made a terrible mistake over three years ago and has worked diligently to correct it ever since.  We respectfully request that the Court take all of that into consideration and sentence Mr. Giguiere to one of the sentences recommended above.


RESPECTFULLY SUBMITTED this 3rd day of January, 2022.

GREENBERG TRAURIG, LLP

By: */s/ John F. Gibbons*
     Michael Cedillos
     Miriam Bahcall*
     John F. Gibbons*
     *Pro Hac Vice
     Attorneys for Defendant Gannon Giguiere*

CONTAINS CONFIDENTIAL INFORMATION – REDACTED VERSION

**CERTIFICATE OF SERVICE**

I hereby certify that on January 3, 2022, I caused to be filed electronically this **DEFENDANT GANNON GIGUIERE'S SUBMISSION CONCERNING SENTENCING** with the Clerk of the Court using the Court's CM/ECF system which will send notification of such filing to the e-mail addresses denoted below:

| | |
|---|---|
| ROBERT S. BREWER, JR.<br>UNITED STATES ATTORNEY<br>AARON P. ARNZEN<br>ANDREW J. GALVIN<br>Assistant United States Attorneys<br>United States Attorney's Office<br>880 Front Street, Room 6293<br>San Diego, CA 92101-8893<br>Tel: 619-546-8384/9721<br>Emails: Aaron.Arnzen@usdoj.gov<br>Andrew.Galvin@usdoj.gov<br><br>*Attorneys for Plaintiff United States of America* | MICHAEL L. LIPMAN<br>KAREN LEHMANN ALEXANDER<br>DUANE MORRIS LLP<br>750 B Street, Suite 2900<br>San Diego, CA 92101-4681<br>Tel: 619.744.2200<br>Emails: mllipman@duanemorris.com<br>klalexander@duanemorris.com<br><br>*Attorneys for Defendant Oliver Lindsay* |

In addition, on January 3, 2022, I caused an electronic copy to be emailed to:

Aaron.Arnzen@usdoj.gov
Andrew.Galvin@usdoj.gov
efile_hayes@casd.uscourts.gov

By: ___*/s/ John F. Gibbons*_____
JOHN F. GIBBONS
Attorney for Defendant Gannon Giguiere
E-mail: gibbonsj@gtlaw.com

# EXHIBIT A

Gannon Giguiere
6 Ferrand
Newport Coast, CA  92657

January 3, 2022

Honorable William Q. Hayes
United States District Court
Southern District of California
United States Courthouse
333 West Broadway
San Diego, CA  92101

Dear Judge Hayes,

I submit this letter feeling embarrassed, heartbroken and apologetic to everyone I disappointed or hurt. After a long career in technology and several entrepreneurial ventures, I participated in a conspiracy to commit fraud in a microcap security, Kelvin Medical ("KVMD"). Specifically, I engaged in business transactions with a broker that included unlawful matched trades. What I did was wrong. I am responsible and I am sorry.

When market participants agree to buy and sell securities between each other at agreed upon prices, they create the impression that securities have a more active market than is actually the case. These trades result in the manipulation of the stock market. I should never have participated in such a conspiracy scheme. I know how to study, comprehend and follow the law. I am very sorry that I failed to do so in this case.

I would like to share how I arrived at this decision that devastated my family, my closest friends, my colleagues, and the investors in KVMD. But first, I want to express how ashamed I am for using such poor judgement. I was not raised to engage in unscrupulous activities. I stand before you a broken man, knowing that my choices caused harm to others.

When I first was exposed to the OTC marketplace, I witnessed the volatile, toxic nature of the microcap securities world. Instead of exiting this marketplace, I concluded that I could bring financing integrity and operational support to OTC microcap-sized companies. I developed and began executing a plan to help these small companies achieve their entrepreneurial vision.

Early on, I stayed true to my business model and realized some success. Entrepreneurs approached me to assist with financing and business development. Unwisely, in the case of KVMD, I deviated from my original business plan. I cut corners and lost my moral clarity. I participated in a matched trading conspiracy, thus violating laws that were written to protect the public.

I deeply regret my illegal actions. It was my duty to obey the law and I failed. I regret letting down the owners of KVMD, William and Margaret. I regret failing the very marketplace that I wanted to make better. I regret disappointing my wife and three children. My family saw me as a guiding light of honorable leadership until I broke the law in this case.

Your Honor, since my arrest, I've reflected on why I made the poor choice that got me here and what I've learned from this experience. I offer this letter to put my unlawful acts into the broader context of my whole life story. I hope that neither the prosecution, nor this court, will misconstrue anything I write as an effort to minimize my culpability in this offense. Rather, I offer this personal history in an effort to provide a more complete framework. I hope it assists your deliberations over the appropriate sentence to hand down in my case.

**Background**

I was born on ▮▮▮▮▮ 1972, in Clovis, California, as the oldest of two sons. My family lived on a five-acre ranch in Clovis which, at that time, had a population of approximately fifteen thousand. My father's primary income came from the development and sale of a crop management farming system. My mother's primary income came from being a secretary in the Clovis Unified School District. My extended family members lived nearby, including my grandparents, aunts, uncles, and cousins. I was surrounded by love in a safe home where all my material needs were met.

On Sundays, we attended services at Our Lady of Perpetual Help, where I also went to school until the eighth grade. I made friends at church and with the children of my dad's employees. I played various sports when I was a child. Although my father and mother worked long hours, they prided themselves on never missing my sporting and academic events.

My dad was a gentle giant who lived a peaceful life. He taught me right from wrong, without ever making a moral compromise. When I was sixteen years-old, . It was not his fear of death that caused the tears, it was how proud he was to have served his country.

My father's company went public and onto the Nasdaq in 1983. He employed 100+ workers, including me. I worked on field management projects like checking water levels, sweeping for pests, and measuring the height of the plants. I admired my father for his dedication, focus, and entrepreneurial drive. Also, I was proud of how he treated everyone with kindness and respect, no matter who they were.

With my family's help, I earned good grades in school. In addition to working with my dad's farming business, I took an early-shift job at a local gym. I opened the doors at 5am to work

out with the morning crew. While at Clovis High School, I served as captain of the baseball and football team, winning All-League and All-Valley honors and participating in the all-star game for both sports. Unfortunately, a shoulder injury, followed by several unsuccessful surgeries, ended my baseball career.

Your Honor, I was blessed with a stable, beautiful upbringing. My parents served as extraordinary examples of hard work and good values. My father built a successful company by delivering excellent services and making positive contributions to his community. My parents taught me to study hard, obey the law, and love my country. I feel ashamed at having let them down and besmirching our family name. I will spend the rest of my life working to become worthy of forgiveness.

**College and Early Work**

After my athletic career ended in injury, I attended the University of Southern California to pursue an undergraduate degree in business administration. At USC, I helped organize several fundraising events to support outreach activities for underprivileged children and people experiencing homelessness throughout the South-Central Los Angeles area. I earned good grades and participated in the undergraduate entrepreneurship program. I worked hard and learned the importance of collaborating with high-caliber talent.

In my last year at USC, I developed my first successful business plan as part of my degree program. Drawing upon my agricultural experience, I designed a project to bring Field Integrated Technical Services (FITS) to cotton farmers in China, with my father's help. This patented technology managed the cotton fields by measuring soil and analyzing data. Working through government officials in Sacramento, we brought this technology into the Xinjiang province of China, one of the largest cotton-producing regions in the world. Some of our systems still operate there today.

In 1997, I went to work for AltaVista, a pioneering internet search engine company where I joined the e-commerce product development team. My team created a way for merchants to submit inventory online, then allowed consumers to comparison shop for products. That team wrote the first-ever e-commerce mobile application for the PalmPilot VII.

Next, AltaVista promoted me to lead Global Search and I relocated to Palo Alto. Google developed their search tools around that same time. Collectively, we created a new way to access information online. It was a thrill to be at the epicenter of this profound transformation of human life.

I knew how to build teams, foster innovation, and solve big problems. I accomplished these things and obtained whatever successes and recognition I did through hard work. I learned this from my father. At the same time, I was still that country kid from Clovis. So, when the Wall Street Journal unexpectedly decided to interview me, I knew little about their readers or the world of high finance.

**Family and Career Changes**

In 2000, I moved back to Southern California to become a Senior Vice President at
Realtor.com, a leading online real estate search company. My division enjoyed success,
bringing in 70% of the company's revenue. I built a strong team by focusing on each member
as an individual human being. Sometimes, we hired team members who did not have any
experience on their resume. My goal was to develop talent and establish long-term bonds
with each worker.

Within three years, I had saved enough money to open my own company, bringing along
several key team members who still work with me today. The company we started was
GetLower.com, a lead-generation platform for residential real estate professionals including
realtors and mortgage brokers. Our biggest clients included Lending Tree, First American,
Ameriquest, Home 123, and First Magnus—all industry leaders heading into the mid-2000's
real estate boom. Then, as the real estate market collapsed prior to the Great Recession, we
were forced to sell. We worked hard to take care of all of our employees, and were able to
pay severance to our team members, as they transitioned to other jobs.

**Family Challenges**

My first wife, Clare, and I welcomed our daughter ███ on ███ 2004, followed by
█████ on █████, 2006. Sadly, █████



During that same period, my father's health failed. █████
█████. My father was my role model, my best teacher, and my best friend. I
remain grateful that he lived to see my early accomplishments and be part of my children's
lives. He finally succumbed to his illness and passed away in 2009.

I've thought a lot about my dad since this legal process began. I want to live up to his high
standards of honesty, humility, and honor. I pled guilty to a federal crime and will accept my
punishment with dignity. Then, I hope to put my story into service and help other people
avoid my mistakes. My father would have expected no less.

**Eventure and the OTC Market**

4

In 2013, I happily reassembled my team to create Eventure Interactive, a social networking and local events calendaring application. Eventure allowed users to arrange small invited gatherings then string party photos together like a memory collage. This concept pre-dated Instagram and was a precursor to Facebook's Timeline. We employed twenty workers in our Costa Mesa office.

Our promising technology attracted the attention of talent and early-stage investors. My college roommate then approached me about a group who offered to take Eventure public on the OTC marketplace. Then, as my roommate explained, another group would infuse working capital without the limitations typically associated with venture capital financing.

I was intrigued by this proposal and decided to pursue it with my business partner. Looking back, I see that I was naïve and made a very poor choice. My company was suddenly connected with unscrupulous financiers, who sought to provide convertible debenture financing to the company. I later learned this was also known as "death-spiral financing." I witnessed this predatory technique deployed to make a quick return to the detriment to the company and its retail investors. (I first met Michael Forster and Amy Munros during this time.)

In the wake of this toxic financing debacle, I wanted to develop a method, process, and financing platform to help microcap companies go public safely and ethically. I imagined a platform to connect retail investors with exciting new companies on the OTC Markets. I knew about team-building and product innovation, and was learning about finance and the equity markets.

███████████, from what I could ascertain, had the knowledge and experience that I lacked. Forster attached himself to my team to help develop a platform to serve up-and-coming entrepreneurs.

**Violating Federal Law**

At the end of 2017, ████████ spoke to me about KVMD and indicated that a trusted colleague was helping the owners raise capital.  Additionally, we involved a broker (co-defendant Oliver Lindsay) to assist in "developing the market" for KVMD. Rather than help KVMD in the right way, I unwisely participated in conversations resulting in an illegal matched trading conspiracy. I remember having a bad feeling in the moment. I worried that it might be unethical. I paused, then went with the flow, a decision I will regret for the rest of my life.

While I had the resources to confirm whether the trading plan was legal or not, I chose not to consult anyone and have no one to blame but myself. I did not give enough thought to the potential for harming investors and the company and its owners. Sadly, I broke the law and ended up hurting KVMD's chances of success.

5

Your Honor, my inexperience is no excuse for my unlawful conduct in this case. The laws I broke were written to protect the public from illegal market manipulation. I believe in these laws and am glad they are vigorously enforced. To everyone harmed by this fraudulent conspiracy, I am sorry.

**Reflections**

My wife, Lindsay, and I welcomed our son ████ on ████████ 2017. A few months later, I was arrested by federal agents and taken to the Metropolitan Detention Center in San Diego. This legal process, while at times shocking, has given me an important opportunity for self-examination and growth. Knowing that justice will be done in my case, I am focused on making amends and planning for the future.

I remain passionate about helping great ideas grow into great American companies. With my recent experiences, I feel I am now a more effective consultant and guide for budding entrepreneurs. I now talk about strict compliance from the very beginning. It is essential that entrepreneurs understand their absolute duty to obey the letter of the law at all times. Failure to do so can not only lead to legal jeopardy but also harm the development of their companies, their investors, and ultimately their families. The most insidious kinds of harm can stay in our blind spots by design.

In the years ahead, I will use my talent and energy to share what I have learned with others. I can turn my extraordinarily wide range of experiences into purposeful content. There is no reason for anyone to fall into the traps I did during my career. Currently, I am helping my wife launch Greenfield Groves, a telehealth and life sciences business. I am also working with her Researching Life Foundation to develop plant-based medicines for pain management, mental health, and cellular health.

Earlier this year, I explored the Department of Justice website. I wanted to learn more about what the system would expect from me. Through that research, I read what the Attorney General has written about the need for equal justice—and how he is striving to improve programs for disadvantaged people. That led me to learn more about people that experience the criminal justice system, and the challenges they face upon release.

That led to me to volunteering with Prison Professors Charitable Corporation to develop coursework for currently incarcerated individuals. I recorded courses on entrepreneurship and journaling that are now part of their program. My courses teach inmates/students about setting goals, persistence, hard work, service to others, and learning from failure. I hope the lessons also inspire inmates/students to sharpen their basic skills in communication, critical thinking, and math—all of which serve as building blocks to success.

In my course, I described my successes and my failures. Most importantly, I emphasized the importance of strict legal compliance at all times and not taking shortcuts. Along with other

business ethics speaking engagements I have participated in over the past few years, I hope to continue on a positive forward trajectory for the rest of my life.

Your Honor, thank you for taking time to review this letter. I assure you that I will serve my sentence with humility and never return to a courtroom as a criminal defendant. Please take these thoughts into consideration as you deliberate over the appropriate sanction in my case. I pray that his Honorable Court will balance justice with mercy.

Respectfully,

Gannon Giguiere

# EXHIBIT B

William "Josh" White
1422 Burgan Ave
Clovis, CA 93611

August 8, 2021

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

### Re:  United States vs Giguiere, et al

Dear Mr. Gibbons and Judge Hayes,

I have known Gannon Giguiere since we were 17 years old. I had an unstable home life growing up in a single parent household where drug and alcohol abuse was the norm for both my parents. For two years in high school, I was a fixture in the Giguiere household. Gannon's mom made me breakfast and his dad made me work and taught me countless life lessons. Gannon treated me like a brother.

After high school Gannon went off to college and I went off to work in the construction industry. We kept in touch with messages and phone calls here and there throughout the years. When Gannon's father, Burt, died in 2012, Gannon and I reconnected, and the frequency of our conversations increased.

When I heard about Gannon being arrested, I tried to contact him, and his phone number was disconnected.  I called his mother to check in on him, and she expressed how deeply concerned she was and how devastated Gannon and his family were with everything that had happened.. I was shocked.  Gannon is the type of guy who would always walk the straight line.

Within a week or so, I drove down to Orange County and picked up Gannon for lunch.  I will never forget the look on his face of shame, sadness, and despair.

We have spoken or seen each other almost daily since that meeting.  What I've realized from speaking with Gannon has been a full and complete acceptance of responsibility for his actions. He understands and deeply regrets the ramifications of his choices, both personally and financially. Most of all, he is devastated by what may be the short-term and perhaps long-term effect on his wife and children.

- 1 -

This case has put Gannon into financial ruin and drastically reduced his ability to work in his field forever.

Despite what he has gone through, Gannon still wakes up every day positive and productive. I've known Gannon for over 30 years, and I don't think he's even had a traffic ticket. He's a model citizen and person. I have seen him use the resources he has to improve people's lives around him. That is just what he does. He wants everyone to succeed around him and will do whatever it takes to make that happen.

Gannon has essentially been on house arrest since this all happened, and any prison sentence would be greatly unnecessary. I believe this man has more than paid for his debt to society. Gannon has shown deep regret and remorse for the situation he has put his family in. Please consider leniency as you sentence Gannon. This mistake should not cost his kids and wife their dad and husband.

Sincerely,

Josh White

# EXHIBIT C

Lindsay Giguiere
6 Ferrand
Newport Coast, CA  92657

Honorable William Q. Hayes
United States District Court
Southern District of California
United States Courthouse
333 West Broadway
San Diego, CA  92101

Dear Honorable Judge William Hayes,

I am writing this letter today to provide my perspective to you about my loving husband Gannon Giguiere, his character, his commitment to helping others first and his remorse for failing.  Gannon and I have been inseparable for over 10 years now, he is my partner, father to our three children; ███ 17, ███ 15 and ███ 4. I am horrified right now as to what may come because so many rely upon him in countless ways.

When Gannon and I met, he was a single dad raising ████ and ███, his children from a previous marriage. ████████████████████████████. I fell in love with his commitment to his children and his passion to establish a cohesive family life for them. His ability to succeed with a demanding technology career, while keeping a family-first focus was truly magical to me.

From day one, we worked hand-in-hand to develop a house based on honesty, trust, love and compassion. This foundation allowed for us to build what he and I have as a primary vow to each other, which is to make family the center of our "reason to be." This approach of ours, allowed for me to step into the lives of ████ and ██ and become a needed mother for them, ████████



Your Honor, our life at home makes sense, life is what it is supposed to be – the family we've created is driven by happiness, warmth, and giving to all around us. Then one fateful day I was phoned by the authorities to learn that Gannon was indicted over dealings in the financial markets. After I pulled myself from the floor and realized what was happening, I knew immediately who was behind it and was absolutely devastated as I had warned Gannon of my intuition in terms who he engages with in his venture investing business. Which leads me to point out, one of Gannon's greatest attributes is how open, giving and trusting he is, but that very strength can be used against him in negative ways and it was. So, while I blame the person who got Gannon into this, Gannon has told me that he should have known better and I must blame him not others. It has been so emotionally difficult for me to watch him battle the overwhelming guilt he has over the past three and a half years. Not a single day goes by that he does not speak to me about his failure for not being able to simply say "no." Even though he is not classically trained as an investor, he absolutely should have taken his technical mind and business experience to better learn of the murky waters he waded into. It breaks my heart, what used to define him, were his <u>giving and trusting attributes</u>.

Now, those attributes are demons he battles with. I can see why, a man defines himself, for as long has his memory can reach back, as someone that is to be relied upon because of his giving and trusting nature. Because of this nature, he allowed his moral compass to wander and ultimately failed those around him. From my perspective, where he failed was not in his giving and trusting ways, but rather through **blindingly** giving and trusting.

This brings me to want to explain how we are dealing with this and working to pick up the pieces as a family.   For me, during this past three plus years, his implosion has meant I have had to step up. . I have started my own business, grew into revenue generation, launched a regulation A+ offering, as well as form a non-profit foundation to give back to the communities we serve. I have not been able to grow the foundation yet, as my primary business needs to still reach profitability to compensate me and in-turn fund the foundation, but it is in place and ready. Never in my life did I think I would be capable of completing all of that, but because of Gannon's transition into a teaching mode I have been able to evolve my skills and begin to make my dream a reality. What I have concluded because of this, is he really is a powerful mentor, teacher and he has found his true calling, which is to help entrepreneurs realize their vision by educating in business matters and  more importantly, matters of integrity.

As for  . As for . Gannon was also a student athlete, served as a wonderful coach to  through his athletic development. It's amazing for me to see Gannon volunteer as a coach and mentor for and young athletes. Gannon has always talked about how impactful his coaches were in his life so he wanted to be that same inspiration for  in his athletics. . Our youngest , has just turned four. He is his Dad's shadow and the two are inseparable. I find it so amazing how little ones are "sponges" and how nature coupled with a stable nurturing environment drives confidence, development and intelligence. It is extremely important to me that  continues to be driven by his father's direction and I see how Gannon spends time discussing right and wrong more often than I would imagined before this took place.

It is also so very important to mention to you that although this has been a humiliating experience for Gannon and myself, we have not stopped our community service efforts. Our commitment to each other through "thick or thin" is that we are never to lose sight of God, our family, and our community. I wasn't sure how Gannon would react when this unfolded, but I am very proud that even though he often has to fight back tears when questioned by the organizations we donate our time and energy to, he continues to stay committed and fights to be a positive force. I believe this has made a tremendous impact on the children as well, since they can see their father fighting through failure and in many instances, being shunned and having to own it. He wants nothing more than to re-establish credibility in his charitable efforts and in doing so, be an example to his kids.

As we near his sentencing, many emotions and practical realities encompass our day. Even though Gannon has battled with his guilt, he has been extremely successful communicating, educating and openly working this through with the children, our large extended family, business colleagues, friends and the local community at large. He has not hidden from this, he has been transparent and

genuine in his acceptance of his failings. My love for him has even grown deeper as I have watched him accept the humiliation and commit himself to turning this moment of life into an educational opportunity that he feels he can educate on the life-concepts that his failure has brought out. I have even grown to better appreciate the idea of "character." I now see how character is something you aren't born with but it develops over the course of life and dependent on how you manage through both success and failure, with the handling of failure probably more important.

I do realize that he has plead guilty and with that comes ramifications.  I know that Gannon also understands this as it is an ongoing discussion between us. I can tell you not one single day has gone by that he does not wake in the morning, look me in the face and apologize for failing me. I have forgiven him. We discuss how critical it is that we don't let this define us, but also that we can never stop working to correct the mistake. While Gannon's activities during this short period in November and December 2017, were a serious lapse in judgment, it is not who Gannon is as a person. He often quotes a quote from an inspirational figure of his, Warren Buffet that you can "destroy a lifetime of building your reputation in 20 minutes" which is truly what he has done. His actions do not represent the character of the man I love, the father of my children and the leader of my family. I know he will never cross boundaries like he did again, I know he will educate and inspire others to avoid making a mistake like he did.

I humbly ask of you to take into consideration a sentencing that allows him to stay home with us, continue to lead the development of our children and positively impact my start up business. which So many people have come to depend on him, including his mother who ███████████████ ███████████████. I'm hopeful you can empathize with how the toll of him being pulled away from us will be detrimental to our family. I need him … to assist me to financially support the family. His mother needs him … I simply could not handle her passing with him gone. As a mother, I fear that if my children don't have a strong father figure in their life who actively participates in their wellbeing, catastrophic events can occur. I've read studies that have shown there is a negative impact on children who don't have a father in the home. For example, behavioral problems, promiscuity and teenage pregnancy, drug and alcohol abuse, homelessness, mental health disorders, and many more. Your Honor, with your compassion, we can prevent my children from becoming one of these statistics. Many not just in our immediate but also in our extended family rely on him for a list of things that would simply run on and on. OK, I will stop here and would like to simply thank you for taking the time to read this letter and being open to learning more about a real person, who made a terrible decision, and not just a number on a paper.

Warmest Regards,

*Lindsay*

# EXHIBIT D



To the Honorable Judge William Hayes,

I am writing this letter in support and on behalf of Gannon Giguiere's character. Gannon is my ex-husband and we share 2 children together. We first met in high school where he became my first true love. Having had a father that died at a young age and a mother who was emotionally absent, what drew me to Gannon (even at the young age of 14) was his steadfast stability and the strong bond he shared with is family. Gannon has always been beyond his years in maturity, focus, drive and above all else, love and support of family.

We eventually got married after college and had our 2 children, ▮▮▮ and ▮▮▮▮▮▮.



We both feel that the most important thing in life is to raise our 2 children with as much stability and emotional support as possible.

I realize that he has plead guilty with his case and is awaiting sentencing. I know that Gannon has not spent one single day unremorseful and has not let one minute pass not working to correct his mistakes. What he did is NOT who he is, it does not define the man and father I know. I know he acknowledges that he needs to face the consequences of his actions, but there is no doubt in my mind that he will never do anything to jeopardize his or any of our futures again.

I implore you to take into consideration a judgement that allows him to be home and continue to work and support the so many people who have come to depend on him, the most significant being our children. As you can imagine, the emotional toll on our children could be critical if their father was sent away. He has been their one true constant.  By the grace of God, we have been able to work together to get our children in a wonderful place in their lives. They are both amazing children with drive, self-confidence and emotional stability. Although this is true, they are at critical phases in their lives where one big event could vastly change the trajectory of their futures.

Thank you so very much for taking the time to read this letter and being open to seeing the whole of the man, and not just the charge.

Regards,

Clare MacIntosh

949.500.7365

# EXHIBIT E

John Gibbous, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr., Suite 3100
Chicago, IL 60601

60601-4904275

SANTA ANA CA 926

14 AUG 2021 PM 2 L

RECEIVED
AUG 18 2021



USA FIRST-CLASS FOREVER

Vernon Edler
10 Bryant Ct.
Ladera Ranch, CA 92694

**Vernon Edler**
**10 Bryant Ct**
**Ladera Ranch, CA 92694**

August 12, 2021

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

**Re:  United States vs Giguiere, et al**

Your Honor,

I first met Gannon at the University of Southern California where we were fraternity brothers and friends.  Gannon was a groomsman in my wedding, and I was a groomsman and best man in his weddings.  My wife and I are also Godparents to all his children.  Having known Gannon and been close to him most of his adult life, I can speak to the character of Gannon and believe the mistakes made do not define who he is.

I currently serve in senior leadership with an investment firm and am familiar with the reasons Gannon is where he is right now. Gannon has always been an upfront and honest man with me.  In all our years, I cannot recall a time he has ever lied to me.  Knowing what I know about Gannon, and being in the securities and finance business myself, I can tell you he has owned his mistakes and understands what he did was wrong.  His commitment to making reparations to those who were impacted throughout this process has been admirable. For me, his mistake does not change who Gannon is to me or my family and I will continue to support Gannon and his family in any way possible.

Despite all that Gannon is going through, he continues to make time for the people he cares about. Being a busy and productive businessman, what many don't get to see is Gannon's compassionate side. I have witnessed this compassion as I see the way Gannon has stepped up for my dad who has battled significant health issues over the past few years.  Gannon lost his dad a few years back and knows how that loss affected him and his family.  Knowing that my dad was struggling with his health, Gannon reached out to my father directly to offer words of encouragement

and support. Gannon continues to do things which make my life and the lives of my family better.

When it comes to friends and family, Gannon is fiercely loyal.  He always has the best interests of his family at heart.  ████████████████████████████████
████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████  While many men would have turned their backs on an ex-wife, that was not the case with Gannon as his dedication to family goes above and beyond.  I saw him in the years that followed do everything in his power to make sure he helped the mother of his children.  This included financial help and providing her housing to keep her geographically in the same area.  He never denied her access to the kids as he felt it was important the kids have their mom be a part of their lives. The impact on this family should Gannon be sent away somewhere will be devastating.

Gannon has owned and accepted responsibility for his part in this crime. In addition, he wants to make it right and move forward.  What Gannon has done in terms of creating businesses, creating jobs, and creating wealth for employees has been unbelievable.  I would like to see him be able to get back to doing that as soon as possible.  In my world, if you can be honest and upfront, we can move forward.  Gannon has done this and then some. My hope, your honor, is you can see past this mistake to see the person Gannon is.  As you consider his sentence, I would ask you show leniency for this honest man who has completely owned his mistakes.

Sincerely,

Vernon Edler

Vernon Edler

# EXHIBIT F

Gary Thompson
29 Via Falerno
Aliso Vallejo, CA 92656

August 8, 2021

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

**Re: United States vs Giguiere, et al**

Your honor,

I had the good fortune of meeting Gannon Giguiere about 4 years ago where we were both members at Mission Viejo Country Club. We were introduced through a mutual friend, Shawn Hofkes. Shawn let me know that Gannon was a hedge fund manager who would be willing to take me on as a client. I found Gannon to be very trustworthy, straightforward, and honest. I decided to invest a significant amount of my retirement money in this investment opportunity. When I found out that Gannon was in trouble and the government had seized all his assets, of course I was shocked. I didn't believe that he had done this. Even though the money I invested with Gannon is gone now and I have every reason not to trust Gannon, he and I continue to meet monthly, and I have no doubt about who Gannon is as a man.

I saw Gannon do things for other people and myself that were out of the ordinary. I can remember a time where I was looking for a battery-operated pushcart and Gannon had one. I asked him to borrow it, so I could try it out to see if I liked it. Gannon said to me, "If you like it just keep it." I told him I would borrow it for three weeks to see how it goes and would give it back to him. When I went to return the cart to him, and I told him I was going to purchase one, he insisted I take it. I was blown away by his graciousness.

Gannon was always gracious to anyone he knew. There was a young man at our golf club who was trying to make it on the PGA tour. Gannon gave him enough money to live on while he was trying to get his PGA Card. The money Gannon provided had no strings attached and allowed the young man to just focus on golfing without worrying about living expenses. Gannon didn't ask this young man to sign a contract, only made a verbal agreement with him. He told the young man that he could pay Gannon back when he made it on the tour. I can't think of any other person other than Gannon, that would do something like that without expecting anything in return.

When Gannon told me what happened, he was upfront and incredibly sorry for losing my money. He gave me his word that he would do everything in his power to repay me. I believe it may take some time, but in the long run, I am confident Gannon will pay me and everyone back their lost money. He is that kind of man. Every time we are together, he expresses how much he is sorry for having lost the money I invested with him. I continue to have a friendship with Gannon, because I wholeheartedly believe he is a good and honest person. Gannon continues to update me frequently on where things are and is very committed to moving forward with his life and repaying those of us who lost money due to his mistake.

Gannon is a very intelligent man. He made a mistake in trusting someone who had been his business partner and friend for several years. He fully admits that the deal he made was wrong. He was pressured multiple times to come in and be a part of this deal from a person he really trusted. In the end he knows there is nobody but himself to blame because he was the one that agreed to be a part of the deal.

If I were to ask anything, it would be to please have some mercy on Gannon. He is a very active dad to all three of his children including their 3-year-old Brock. Family is what drives Gannon to be a better man and having to spend time away from his family will be devastating to everyone. In the past year and a half, Gannon has taken the time to reach out to those of us who lost money and reassure us all he will make the wrongs right. He has been working diligently to help his wife Lindsay start building a business so she will be able to support herself and the kids. Did Gannon make mistakes? Sure. Does it change the man of integrity he is to me? No. I implore you to consider leniency for Gannon and consider the time he has spent awaiting sentencing as time served.

Sincerely,

Gary Thompson

# EXHIBIT G

David Tarnoff
9206 Pina
Irvine, CA 92614

SANTA ANA CA  926

26 AUG 2021 · PM 7  L

RECEIVED

SEP 0 7 2021

By:

John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Ste. 3100
Chicago, IL 60601

60601-160499

David Tarnoff
9206 Dana
Irvine, CA 92618


August 16, 2021

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

### Re:  United States vs Giguiere, et al


Dear Judge Hayes,

I am a golf instructor and met Gannon while working a couple days a week at the PGA Superstore. Gannon Giguiere is the most unbelievably giving, caring person I've ever met.  Gannon came into the PGA Superstore to get prizes for those attending a special golf tournament he was hosting prior to his wedding with Lindsay.  While he was there, I had him hit a few balls and could see the natural athletic talent Gannon was gifted with.  A few months later he came back in to purchase new clubs and asked if I would give his son Jonathan lessons.  When Lindsay and Gannon decided they wanted lessons as well, Gannon hired me full time in the afternoons to instruct them all. Gannon and I spent five days a week together, seven hours a day helping Gannon and his family become golfers.

You can't spend five or six days a week with somebody and not get to know them well. I really became part of the family and developed a strong friendship with Gannon. When I think of honesty, Gannon embodies that trait.  I have never seen Gannon cheat in golf, move a ball, or not putt out.  He was always a man of integrity.

The ways he gives to those around him could go on and on, but I will highlight a few of the things I saw as extraordinary. Gannon was always looking for ways to better the lives around him.  I saw Gannon give a young golf professional enough money to be able to live on for a year so he could go on the Canadian Tour and work at becoming a golf pro. He barely knew this young man but recognized the talent he had and wanted to make his life better.

Another instance I observed during this time had to do with his connection to the University of Southern California. Gannon felt it was important to give back to the college he went to as he was grateful for the education and experiences he had at USC and wanted to better the school for those who came after him. Gannon made a significant donation to the University of Southern California in order to help the school who helped him.

I have seen him go above and beyond for his family and he never asks for anything in return. He made sure the mother of his two oldest children could be close to them by paying for an apartment near his home with Lindsay. In my opinion, Gannon is an amazing human being who would give anything to help those he cares for.

Your honor, I hope you can see that Gannon has already served a significant amount of time as he has been unable to go anywhere and has remained in his house while the pandemic has delayed his sentencing. Gannon has absolutely shown remorse and hates that his actions have impacted so many lives outside of his own. He is a man of integrity who keeps his word. I have no doubt Gannon will do what it takes to right the wrongs in this case. I ask for your leniency as you consider Gannon's sentence.

Respectfully,

David Tarnoff

# EXHIBIT H

Levitt
25 Waltham Rd
Ladera Ranch, CA 92694

SANTA ANA CA 926

13 AUG 2021 PM 1 L

Judge William Hayes
c/o John G. Gibbons, Esq.
Greenberg Traurig, LLP
77 W Wacker Dr., Ste. 3100
Chicago, IL 60601

60601-490475

AUG 16 2021



Andrew Levitt
25 Waltham
Ladera Ranch, CA 92694

August 12, 2021

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

**Re: United States vs Giguiere, et al**

Your Honor,

I am an avid golfer who grew up playing golf at Mission Viejo Country Club and played collegiately at the University of Southern California. Growing up, my dad was a member of the golf club and would bring me out to learn the game of golf and help me pursue my passion. About 4 years ago I was introduced to Gannon Giguiere, who was also a member at the Mission Viejo Country Club. At the time I had just graduated from college and was pursuing professional golf. In between tournaments I would play at the club and would be paired with various members. Gannon and I started playing together more often, bonding over the fact that we had both played professional sports and attended USC.

Over the course of that year, we played many rounds of golf together. I thought of Gannon as a good friend and mentor. Gannon had a huge impact on me and to this day I don't think I will ever be able to repay his kindness. At one point I had qualified and gotten my Canadian Tour card but didn't have a job and was still living with my parents. To pursue a professional career would mean tons of expenses. Some of those include hotels, entry fees, flights, swing coaching, management, food, caddy fees, etc. When I shared this with Gannon, he came up with the idea of reaching out to members of the golf club to see if I could come up with a pool of money to take the burden off. The thought of asking for money from anybody at the club was uncomfortable for me. While my parents were not well off, they had enough money to help me out a little. But professional golf is incredibly expensive, and I most likely was going to take out a loan.

Gannon approached me several days later and said he wanted to personally help me. He wrote me a check for $10,000 to cover the cost of the first four tournaments. I was blown away, and objected, knowing I may never be able to pay that amount of money back. Gannon said, "You make the PGA tour, you make it to the majors, you can pay me 1% of your earnings, until you pay me back." There were no other strings attached. It didn't seem real. Being able to play golf at that level without the burden of debt was such an amazing opportunity. I didn't earn my PGA Tour card, and Gannon has never

asked for anything in return. Gannon is without a doubt one of the most generous and kind guys I have encountered.

Having been around the golf club my entire life, I saw so many people who joined to take advantage of others who had money. Their goal was to use the membership for their own personal gain. Gannon separated his business from the country club. He never talked finances or business. For him, it was the pure joy of playing and learning the game that brought him to the golf club. Gannon always had a smile on his face and was the type of person anyone would want to play golf with.

When I found out that Gannon was going through all of this, it was a huge shock to me. But giving my support to Gannon is easy. He has always gone out on a limb for me, and I am happy to reciprocate. While I am not familiar with the ins and outs of Gannon's case, I can say he's the kind of person that wouldn't do something intentionally harmful to other people. What I noticed is the way Gannon talks about this situation. He only refers to how it affects his family, friends, and the people around him, rather than how it was affecting him. He regrets having put his wife and children in this situation, as well as anyone who may have lost money because of what happened.

If I could say anything, it would be that this crime is completely out of character for Gannon. It does not represent the person he is and the person I know. He took a chance on me and my dreams, and I only hope you can offer some leniency in Gannon's sentence. In my experience, even after all of this has happened, I have not heard one single bad thing about Gannon. I know he will continue to help better those around him if allowed to continue doing so.

Respectfully,


Andrew Levitt

- 2 -

# EXHIBIT I

Kelle Cohen
23411 Summerfield #22F
Aliso Vallejo, CA 92656

August 8, 2021

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

### Re: United States vs Giguiere, et al

I met Gannon about 20+ years ago, when he was hired by Homestore to come structure the sales organization and increase revenue. At the time, I supported Gannon's team as a recruiter. Currently I am a Senior Technical Recruiter for Facebook. I would not be where I am today professionally or personally without Gannon. Gannon gave me an opportunity that allowed me to grow and develop professionally which allowed me to provide a beautiful life for my family. Gannon recruited me and moved my family to Orange County, CA. If my family had stayed in Ventura County my children would not be as wonderful & successful as they are today.

As a recruiter an extension of Human Resources, I interact with all types of people and see the best and worst. Gannon is one of the good ones. He's not perfect, he's flawed like the rest of us, but his heart and his intentions are always in the right place. Gannon wants to take care of people. Gannon has always prided himself with wanting to provide for his family and employees. When I got divorced, I found myself supporting my two kids and stressed financially. Gannon was always there and extremely supportive, making sure the kids and I were alright. Gannon is like this with all those he cares about.

At Homestore, I watched Gannon come in and restructure the company with a very innovative recruitment strategy and hiring process that had never been done before. The goal was to create a high-volume sales team and train them. We spent many late nights holding open house recruitment events and building teams. As a leader Gannon created a vision that his team members were excited about. Gannon had an open door policy and would often walk the sales floor to see how he could help or just chat with people. This is uncommon at the executive level and made a significant impact. We hired 1000+ people in 18 months. What he built changed the lives of so many people; many who still reach out to us today to thank him for the opportunity and share their achievements. Witnessing these young adults transform into successful business professionals was inspiring. Many of them went on to work for big tech or start companies of their own.

After Homestore, Gannon left and started his own company called Get Lower which provided mortgage leads for large mortgage companies. When Gannon reached out to me to see if I would consider spearheading Recruiting and HR, it was without hesitation I accepted. I picked up my young family and moved.. The company started with four people, and we built it to almost 200. Gannon has a gift for not only building companies, but also building an exceptional culture and developing people's strengths. The company culture was one of the most amazing I have been a part of. When the housing market crashed in 2007-2008, we needed to sell the company. This was beyond heartbreaking for all of us but especially for Gannon. He felt responsible for every employee. Laying off all of the employees was one of the toughest days.

Gannon handled it with compassion and integrity. Gannon wanted to ensure each employee was able to land a new position and health insurance stayed active. Together, we spoke to every person individually and made sure everyone was taken care of with severance packages and insurance for months. Gannon stopped taking a salary to make sure people could be taken care of financially. There was never a time he wasn't thinking more of someone else's situation over his own.

Family is Gannon's top priority and what drives him. There was a period in his life where he was a single dad just taking care of his two older kids by himself. Raising kids in a two-parent household is hard enough, but for almost seven years, Gannon was a single dad. His two older children are amazing, and he has always put this family first and worked hard to provide the best life possible for them.

I am aware of Gannon's legal situation and what he has done wrong. For me, it was surprising when this whole thing happened because this is not who Gannon is. When I think of the good man, Gannon is who I would picture. He is forever the optimist and always brings out the best in everyone around him, encouraging and pushing them to do better. He's one of the smartest people I've ever met. He has a big heart and genuinely wants to take care of people. Gannon did not go into hiding when all of this happened. Instead, he showed integrity by coming forward and sharing with me what had happened.

Your honor, Gannon has taken the steps necessary to take accountability for his actions. He unknowingly made a mistake and got caught up in something that was probably just too good to be true. This mistake has cost him respect from friends and family and has forever changed him as a man, husband, dad, and entrepreneur. I hope you see that this mistake was just that, a mistake. Gannon's children are 17, 15 and 3; they need him. Having a father who is present daily is critical and would be detrimental if he was sentenced to jail time. I'm asking you to please consider house arrest and time served over the past year and a half. I am confident if Gannon is given the opportunity to use his talents to help others, he will do so wholeheartedly.

Sincerely,

Kelle Cohen

# EXHIBIT J

Steve Cranston
Wuchterlova 16
Prague CZ 16000

August 18, 2021

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

### Re: United States vs Giguiere, et al

Your honor,

I can't think of anyone I would be more willing to write a letter like this than for Gannon Giguiere. Gannon and I have known each other for 25 years. In that time, we had at least three working experiences together, including working for startups and publicly traded companies. The purpose of this letter is to provide a character reference for Gannon, who I know as both a friend and business associate. I am fully aware of the charges Gannon has pleaded guilty to and ask you to consider this mistake as something that deserves a second chance.

I have known Gannon to be a man of integrity, devoted to his family and work, and someone who has shown a great deal of remorse. I know the way Gannon treats people, and I hope he is treated with the same understanding and opportunity for a second chance I know he gives others, me included.

I have observed Gannon under pressure and recognized the true depth of character, talents, skills, and discipline Gannon had. This was never more apparent than when I worked with Gannon to do a reorganization of a publicly traded company called Homestore. When a reorganization happens, often you need to break down things before they can be rebuilt. For this reason, the early days of Homestore were challenging due to having to let go of almost 100 people. I learned from Gannon how to let people go with dignity. For him, this was just as important as how we were going to rebuild the team.

In the years we have worked together, Gannon helped me understand not only business strategies, but also how to work with product professionals to achieve sales revenue goals. His belief in setting the standard high for people to allow them to reach more than they think they can, led to a phenomenal company culture.

- 1 -

Leadership by example is one of the greatest qualities that a leader can have, and Gannon practices leadership by example like no-one I have ever met. He was always first in, last out, demonstrating a high degree of professionalism and setting expectations for himself that others could follow. He was always transparent and treated people with fairness in terms of things that might impact their growth and happiness.

As Gannon has gone through this season of his life, I've seen so much more of the positive. Gannon understands the impact this has had on his family and their futures. As a father, he goes above and beyond to care for his kids and knowing he may have let his kids down is a scar he will bear for the rest of his life.

I recognize Gannon broke the law. I do not believe he should go unpunished. But I believe he deserves any leniency you are willing to give him as he moves forward from this. In speaking to Gannon, I understand he is working diligently to make amends, going above and beyond what is required. There is no chance Gannon will re-offend or make a mistake like this again. If given the opportunity to serve his time in a way where he is given a second chance, I know he will serve it well. As you consider Gannon's future, please know that so many of us believe he can come out of this and be an even better member of the community.

Thank you,

Steve Cranston

# EXHIBIT K

KUSE
107 S. Waterwheel Way
Orange, CA 92869

SANTA ANA CA 926

20 AUG 2021 PM 5 L

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

60601-490475

AUG 23 2021



Gerry Kuse
107 S Waterwheel Way
Orange, CA 92869

August 17, 2021

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

## Re:  United States vs Giguiere, et al

Your Honor,

I volunteered to write a letter on behalf of Gannon Giguiere that I hope will
help you understand who Gannon is as you make decisions on his sentencing.
I knew Gannon had gotten into small cap trading and was doing well.  When
Gannon told me the whole story of his conviction from beginning to end, I was
surprised to hear what happened.  What I do know is Gannon was forthright
and forthcoming as he shared his story and was incredibly remorseful.

I have known Gannon since 2006, when I was hired to be his head of finance
and accounting for Gannon's company, Get Lower. Unfortunately, Get Lower
was a mortgage lead generator, and the mortgage industry was on its way to
financial collapse.  Mortgage banks stopped buying mortgage leads, and
within a few months of me starting, we were having to lay off everyone.  As
the company's leader, I saw how Gannon stepped up in the face of adversity.
He tried everything in his power to make things work, but ultimately could do
nothing about it. I saw the way he maintained the dignity of all employees

even though he had to lay them off. Gannon was crushed but did everything in his power to make things right for all the employees.

Gannon is a person who believes in people. Instead of seeing the glass half full or half empty, he sees the glass as always overflowing with opportunity. Over the years, he and I have worked together on several startups. I believe he also sees people as overflowing with opportunity. Certainly, Gannon is someone I have always trusted and enjoyed being around. In terms of my own career, Gannon has had a huge impact on my career path, and I appreciate all he has done for me. There is no doubt in my mind that if Gannon gave me the opportunity to work with him again, I would trust him completely.

I know that over the past several years, he has had time to reflect and realize what he did was wrong and wants to do everything in his power to make it right again. Gannon is an honest and decent man who made a mistake and learned from that mistake. My hope is you will be able to discover that Gannon has learned his lesson and has certainly shown remorse. I am confident Gannon will not re-offend and will do all he can to give back to those who were financially hurt. He will continue to have my support in all he does.

Sincerely,

Gerry Kuse

# EXHIBIT L

California Coastal Loans
28381 Crown Valley Pkwy #230
Mission Viejo, CA 92691

60601-490475

SANTA ANA CA 926

16 AUG 2021PM 3 L

RECEIVED
AUG 19 2021
BY

$0.510
US POSTAGE
FIRST-CLASS
062S0005644450
FROM 92691

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig LLP
77 W. Wacker Dr. Ste 3100
Chicago, IL

**Dino Katsiametis**
**26381 Crown Valley Parkway**
**Suite 230**
**Mission Viejo, CA 92691**

August 10, 2021

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

**Re:  United States vs Giguiere, et al**

Dear Judge Hayes:

I first met Gannon in 2005. I owned a mortgage company called California Coastal
Loans in Newport Beach and a real estate agent referred Gannon as a potential
client. We became fast friends as a result of that business encounter.

That friendship was tested after the onset of the Great Recession. It can be easy to be
a good friend during good times, but the testament of a friendship becomes more
tangible during trying times. I struggled as a result of the economic turmoil, as did
Gannon who lost everything. He fought back and got on his feet while I still battled
back. I desperately needed a loan and Gannon graciously provided one on friendly
terms much below the going rates, assuming I could have gotten a loan at the time
(which I couldn't). Without Gannon's gracious gesture, it would have taken me
considerably longer to get back on my feet.

I would best describe Gannon as loyal and honest, full of integrity, and the last
person I would ever imagine to commit a crime. I understand he has in this instance
but this act is a total aberration from the person whom I have come to greatly
appreciate and admire.

Several years ago I started a Podcast called God's Men of Influence. I mentioned it to
Gannon, unsure of his position on faith, it just never came up. We engaged in a deep
conversation on the matter and found another source of connection to strengthen our
bond. We also discussed the humbling experience of the Great Recession and how it
brought more meaning into our lives. He gave a generous donation toward
supporting my podcast, as I know he has done for other charitable ventures.

Gannon and I have always served as mentors of sorts, offering counsel and advice
whenever we need it. He is a great, open-minded person who is easy to talk to. We
both inspire each other with wisdom and insight in making challenging decisions.

I know Gannon readily accepts responsibility for his actions and readily faces the consequences for his crime. However, your Honor, I respectfully request that you sentence him leniently. If anything ever happened to me, I know I could call Gannon and count on him to take care of my family. That's the biggest compliment I could ever give anyone. I have that kind of faith and trust in him. He is that type of person, one who through living a highly honorable life deserves the benefit of the doubt in this instance.

Sincerely,

Dino Katsiametis

# EXHIBIT M

O. Weaver
5261 Fanwood Dr,
Huntington Beach, CA 92649

SANTA ANA CA  926

18 AUG 2021  PM 7  FOREVER
US

Barn Swallow

AUG 2 3 2021

To
Greenberg Travrig, LLP
77 W. Wacker Dr., Ste 3100
Chicago, IL 60601
Attn: John Gibbons, Esq.

60601-490475

Doug Weaver
5261 Fanwood Dr
Huntington Beach, CA 92649


August 14, 2021

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601


**Re:  United States vs Giguiere, et al**


To: The Honorable Judge Hayes

Gannon Giguiere and I have known each other since college where we were a part of
the same fraternity at the University of Southern California. I was also the best man in
Gannon's first wedding. I understand how serious things are and am writing the court in
hopes that you will show some leniency in his sentencing.

When I found Gannon was arrested, I reached out to him. Gannon was open and
honest about his part in all of this.  He expressed both remorse and a strong desire to
use this experience as an opportunity to learn from but also to teach others business
acumen and things to avoid. Gannon has learned his lesson and is using his experience
to turn a corner and assist others that may be in a similar circumstance.  He is not
hiding out or retreating but using the experience as a tool to help others and move
forward in his own life.

Gannon has always been a strong leader.  In college, he was the president of our
fraternity one year.  He has always been a natural at bringing people together and
shows an enormous amount of confidence when put into a leadership position.  This is
something I have always admired about Gannon.  In a difficult situation, Gannon
delegates and brings people together to accomplish goals. I saw this when he was
leading the fraternity as well as when he was helping out in his dad's business.

After speaking to Gannon, it was clear this mistake is something that really hit home.
The amount of remorse Gannon has shown makes me realize he has turned a corner
for the better. This is a new chapter in his life and with the volunteering he is currently
doing, along with the education he is trying to provide others, Gannon has gone above

and beyond to prove he is willing to use his experience to better others' lives. There are times in our lives where something happens to make us all look at things differently. While Gannon could have shut down on himself, his family, and others, he's taken the opposite approach by trying to give back and educate others, putting his mistakes in the open. I have every confidence that Gannon will never do anything like this again.

Gannon has shown a steadfast and resolute demeanor in moving past this mistake in a constructive manner. It is my hope this letter will act as a positive and contributing factor as you decide the terms of Gannon's sentence. If given the opportunity Gannon will give back 100% to others with the skills he has. Thank you for your consideration in this manner.

Sincerely,

Doug Weaver

# EXHIBIT N

Joseph Aguirre
3807 Eagle St
Los Angeles, CA 90063

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601





Joseph Aguirre
3507 Eagle St
Los Angeles, CA 90063

August 18, 2021

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Truurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

Re: United States vs Giguiere, et al

To: The Honorable Judge Hayes,

My name is Joseph Aguirre and I have known Gannon in a professional capacity, having worked for the University of Southern California (USC) for almost 5 years. Originally, I met Gannon when I asked if he would be willing to make a monetary donation to USC. Gannon was a former USC alum and proud of his background and education. I consider Gannon to be a straightforward and upfront individual. Over the years, I have gotten to know Gannon and his family through some of USC's alumni events. I would characterize Gannon as an intent and responsive donor. I consider Gannon someone I hold in high confidence. For this reason, I am happy to help him by writing this letter of support. I understand the seriousness of this matter, but I hope there will be leniency shown.

When Gannon first told me what had happened, I was taken aback. However, Gannon was open and transparent with me. Good people stumble and make mistakes. Gannon's work ethic and goodwill simply didn't seem to fit with the crime he has pleaded guilty to and is completely out of character for Gannon. What I saw in the time I have known him is a successful, generous family man. He believed in giving back to his community and using the money he had successfully earned to help make USC better.

Gannon cares a great deal about his family, giving back to the community, his alma mater USC, and all the people he develops relationships with. I am an example of the ways Gannon cares. When I changed jobs from USC to the non-profit I work for now, Gannon took an interest when he didn't have to. He asked if he could write a letter of recommendation on my behalf. I appreciated his willingness to not only write the letter, but also to take an interest in what my next steps would be in my career.

It is unfortunate that Gannon's mistakes have resulted in being in your court. I am positive after speaking with Gannon that he is ready to accept all responsibility for his part. He continues to express complete remorse for his part and is willing to pay off his debt to those affected. I have no doubt about the sincerity of his intentions. Gannon is a man of his word and will make every effort to do so. As Gannon works on moving forward and putting his life back together, I hope you can have some leniency. As Bruce Lee said, "Mistakes are always forgivable, if one has the courage to admit them." In this case, Gannon has admitted his mistakes and should be forgiven.

Respectfully,

Joseph Aguirre

# EXHIBIT O

Timothy J Lyons
3193 Spectrum
Irvine, CA 92618

SANTA ANA CA 92

21 AUG 2021 PM

FLAN

SANCOCHO

RECEIVED
AUG 2 5 2021
By

Judge William Hayes
C/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 6060

Timothy J Lyons
3193 Spectrum
Irvine, CA 92618


August 18, 2021

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

### Re:  United States vs Giguiere, et al

Judge Hayes,

Gannon and I met about 22 years ago when we both worked for AltaVista
Shopping in Irvine, California. He was a product manager, and I was a director of
engineering, and just clicked. Gannon was the product marketing visionary, my
teams and I were engineering departments that made his product vision reality
by writing code, creating and inventing new products. Over the years we have
developed a close personal friendship and a professional bond.

Several years later we started a company together called Get Lower Inc. which
generated leads for major lending corporations like Wells Fargo, Chase, Bank of
America, and Greenlight Funding. Gannon was the CEO, and I was the CTO. It
was 2007 and Get Lower Inc. was doing great. Then the housing bubble hit, and
the loan market dried up because no loans were being made.  Gannon went
above and beyond to help all his employees find and get jobs when we knew we
would have to close the doors at Get Lower Inc.  He could have closed the doors
and done nothing, but Gannon is a stand-up guy and made sure not only every
employee received severance pay, but ensured they had follow-on employment.

I still speak to Gannon nearly every day.  I am aware of the circumstances he is in right now.  Gannon came to me, within days of being arrested, and admitted his mistakes he had made. He makes no excuses and, in my opinion, shows an incredible amount of integrity and honesty every day. In any rehabilitation, the first step is admitting you've made a mistake. Gannon has never played the victim and always owned up to his mistakes. This says volumes to me personally about Gannon's character.

Gannon has strong values and knows the difference between right and wrong. He made a mistake, and he is paying for it. You see, Gannon will never hold another corporate officer position in a company. This is somebody that went to USC and has been an entrepreneur his whole life. Whether he is sentenced to two days or two months the real punishment is Gannon will never be able to hold another corporate leadership position.

I hope you will find a way to show some leniency as you sentence Gannon.  In my opinion Gannon losing his voting rights, his 2nd Amendment rights, and additionally not being able to hold a company office position are life time punishments.  With regard to deterrence the tech industry might seem big to the outside world, but after 30 years in the high tech industry it is quite really a small world. The loss of not being able to do what you trained your whole life to do is a warning to others not to cross that line.  Gannon's story is well known in the tech industry already and is a large warning sign to anyone in the tech industry. If you cross the line and you will lose everything you worked your whole life to build.

Further additional punishments in my opinion will not further the broader deterrence warning to others, nor help in Gannon rehabilitation as a member of society.

I also wanted to tell you my background.  I grew up in a large family in South Dakota.  My first professional career was in the Military with the 2nd Ranger Battalion to earn money to go to college. I was deployed multiple times and served with some of the finest leaders I have ever known. Unfortunately it was the early 1980's with 20 plus percent inflation and the VA GI Bill benefits were

reduced after the Vietnam War.  Inflation consumed my savings and I applied for a 3 year scholarship which required four more years of Military service. I served the last 4 plus years with the 7th Infantry Division deploying Panama on Operation Urgent Fury.  After 12 years of active, reserve, and then active service I was able to start my engineering career.

I have spent the last 30 years in the High Tech Industry from a first level engineering manager to Chief Technical Officer. I have worked for companies like Amdahl, Space Systems Loral, Compaq Computer, Altavista, Gateway Computers, Get Lower, Cisco Systems, and Greenwave Systems. I am 60 years old now and life has shown me that good people can and will make mistakes.  What they do after that mistake is character.  Gannon has owned his mistake two days after his arrest by coming to me and telling me his mistake.  He has experience and will continue to experience the outcome of his mistake for the rest of his life, in the loss of his life's work, his voting rights, and his 2nd Amendment rights.

I would ask you to consider showing some leniency as you sentence Gannon.


Sincerely,


Timothy Lyons

# EXHIBIT P

Nun key
856 W. Natal Ave
Mesa, AZ-8520

RECEIVED
AUG 2 6 2021
By_____

6060134504

Judge William Hayes
c/o John Gibbons, Esq
Greenberg Taurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

RENO NV 895

20 AUG 2021 PM 2 L



FOREVER USA

Adam Geach
2000 Corporate Dr #1409
Ladera Ranch, CA 92694

August 10, 2021

Judge William Hayes
c/o John Gibbons, Esq.
Greenberg Traurig, LLP
77 W. Wacker Dr. Suite 3100
Chicago, IL 60601

### Re:  United States vs Giguiere, et al

Judge Hayes,

I've had the pleasure of knowing Gannon since he met my sister, Lindsay, back in
2013 and begin to bring my family into his. As an older brother, I wanted to get to
know Gannon and make sure he was a good match not only for her but my entire
family, as we are very close. I could quickly recognize how much Gannon cared for
and loved my sister in an unselfish way. I could also see how dedicated he was to
building a grounded family. This not only included those under his roof, but
everyone in my family, including our parents. As I learned more about Gannon, I
greatly admired his intelligence, determination and most importantly his interest
in helping others succeed with their specific passions. He enjoys interacting with
people and is eager to help in any way that he can. As long as I have known
Gannon, he has proven to be extremely giving even when no one is asking.

Gannon is an entrepreneur at heart. He has an incredible ability to take an idea,
build a platform for a business opportunity and market that idea into something
real. This skill could actually be a detriment to him, as money is never a driving
factor but rather the idea of creating opportunity is. When I heard that Gannon
had been arrested in July of 2018, I was shocked, sad and very angry. I was angry
because of the turmoil that he created for my sister and I questioned his morale
compass. Shortly after his arrest, he and I sat down together and I remember that
he was shaken in a way that I had not seen—he was nearly in tears. I could feel
his deep regret and it was clear that he knew that he had made a massive
mistake. He expressed his remorse and he gained a lot of respect from me after

1

that sit down. He showed vulnerability and this is something that I had not seen from him before. He opened up, exposed a weakness and admitted that he was wrong in his association with certain people, as well as in his compromise of business integrity. While this situation may have been catalyzed by someone he trusted that was close to him, Gannon never attempted to make any excuse for this betrayal and owned his part in the wrongdoing.

After this initial shock to the family, what happened next was truly remarkable. I have seen Lindsay and Gannon become stronger as a couple. When pushed to the limit, Lindsay is resilient and she understood how regretful Gannon was and fully supported him as she knows the real person. Lindsay became a "rock" for Gannon to stand on and together they have been committed to making the wrong, right. I have watched him continue on with his charitable activities with local educational programs, his weekly coaching of his son Jon in youth sports, his untiring support for his daughter El in her athletic/academic efforts and his time spent with his youngest, Brock. Being the uncle to each of these wonderful children, I have been impressed with Gannon's open discussion to the entire family of how to simply own a mistake and remain focused on making amends with all that have been hurt.

Through my eyes, this whole experience has made Gannon a more complete person, a more diverse husband, a great father and someone who has truly developed into a friend of mine. While many would have folded, he has committed himself to his family—his kids are flourishing, and his family continues to be the most important thing in his life. I see how humble and thankful he is for what he has in his life. I think that he understands how quickly things can be taken from him even his most important possession, which is his family.

I am most sincere with my comments that Gannon deserves leniency as he has spent the past three and a half years continuing his local volunteering and finding unique ways to give back from what he has learned through this experience. I was very impressed to have learned that he has been speaking to universities and professional organizations on the topic of business ethics—something he has kept quiet but most recently discussed with me at a family dinner. My sister and the kids will be devastated if Gannon must leave them because of the loss of stability that he provides. With one working overtime to get into a reputable college, one dealing with the pressures of freshman year of high school and a little one that requires so much attention—breaking apart this family just does not make sense to me. I ask that you consider keeping Gannon at home where he can continue to

keep the family intact, teach the consequences of poor ethical decisions and support my sister and the three children for a future beyond this situation that he caused. I know that he is devastated for disappointing the people closest to him, shamed for his decision making and wants to ensure that his family learns from this and becomes better than him. Being a father myself, that is something that has really connected with me—making your children better than you is something that every father should be committed to.

With Appreciation,

Adam Geach

# EXHIBIT Q



December 21, 2021

The Honorable William Q. Hayes
United States District Court Judge
Southern District of California
333 West Broadway
San Diego, CA 92101
      Re:    *United States v. Gannon Giguiere*

Dear Judge Hayes:

Please accept this character reference letter that I offer on behalf of Gannon Giguiere.

I am the director of the Prison Professors Charitable Corporation, a 501(c)(3) organization. Since 2009, we've worked to create programs to teach and inspire people in prison and at-risk youth, as well as assisting people who were formerly incarcerated that want to find employment. Prison Professors is focused on the goal of making communities safer by enriching the lives and education of people in prison. Through this effort, we strive to ease people's transition to the community and to improve their chances of living successful, productive, and law-abiding lives.

One of our most important programs is creating self-directed digital courses for inmates in jails and prisons.  Our courses are now distributed to inmates in every state prison in California, as well as federal prisons including the United States Penitentiary Atwater, Federal Correctional Institution Victorville, United States Penitentiary Florence, and the Federal Holding Center, located at the Mecklenburg County Jail. Our courses are also loaded onto Edovo Tablets, which are made available to inmates in many federal and state prisons and jails across the country. Prison Professors has received many testimonials from administrators and law enforcement for the impact our programs have on educating people in custody and reducing recidivism.

**How I Met Gannon Giguiere:**
I received an unsolicited phone call from Gannon. He told me that he had been researching the criminal justice system in connection with a potential sentencing. Through that conversation, Gannon asked about the work that we're doing to improve outcomes for people in jail and prison. Gannon asked if he could volunteer to help. He asked what he could do, or how he could contribute.

Through that conversation, I learned of Gannon's extensive career as an entrepreneur. When he told me that he had built many businesses from scratch, I asked if he could help me create a course. Many people in jail and prison would face an unfriendly job market upon release, I explained. I asked if he would be willing to work with me to teach a course.

When we were preparing the course, Gannon wanted to talk about his challenges with the criminal justice system. He also wanted to express his remorse for the bad decisions that he made. I explained our audience to him. Speaking about his crime, or his remorse, would not add value to the course. In the course, we would show people the value of developing:

- Developing strong verbal communication skills,
- Developing strong writing skills,
- Developing strong critical-thinking skills, and
- Developing a self-directed work ethic

Gannon took the time to draft a complete curriculum. He then came to my house to work with me in creating the course. Together, we worked to begin distribution. As a result of Gannon's hard work, more than 100,000 people in jails and prisons across America will have access to his course.

We hope to create additional courses with Gannon.  If this Honorable Court deems community service a component of Gannon's sentence, Prison Professors would be willing, ready, and able to supervise and continue working with him. We value Mr. Gannon's ability to prepare courses for inmates, developing relationships with more institutions, and opening more job opportunities for formerly incarcerated people.

During the COVID era, people in prison are more in need than ever of the self-directed digital content we provide. The following agencies use our digital learning programs:

- » Every state prison in the state of California
- » United States Penitentiary, Atwater, CA
- » Federal Correctional Institution, Victorville, CA
- » United States Penitentiary, Florence, CO
- » Federal Holding Center, Mecklenburg County Jail
- » Edovo Tablets

The following links will show testimonials we've received from law enforcement officers, or people that administer programs in jails and prison. Those PDF links show how we're working to improve outcomes of America's prison system. We could not make this impact on society without your contributions:

- » [Federal Bureau of Prisons](#)
- » [California Department of Corrections](#)
- » [Washington State Department of Corrections](#)
- » [Edovo Tablets that Publish our Content](#)



**Prison Professors Charitable Corporation / 501c3 / IRS #: 85-2603315**
**32565 Golden Lantern Street, B-1026 / Dana Point, CA 92629**

We are desperately in need of leadership like Gannon can provide. We need guidance to scale our program, and we're hopeful that he will be able to continue volunteering with us.

Thank you for considering this testimonial.  If you have any questions or would like to discuss the volunteer opportunities for Gannon to fulfill any community service requirement, please do not hesitate to contact me.

Respectfully,

*Michael Santos*

Michael Santos
Michael@PrisonProfessors.com / 415-419-1728

# EXHIBIT R

# SENTENCING SUMMARY CHART

|  | USPO | _____ |
|---|---|---|
|  | AUSA | _____ |
|  | DEF | _____ |

| Defendant's Name: | Gannon Giguiere | Docket No. | 18-CR-3071 |
|---|---|---|---|
| Attorney's Name: | John Gibbons | Phone No.: | 312-476-5017 |
| Guideline Manual Used: | 2018 and 2021 Annotated Manual | Agree with USPO Calc.: | No. Objection filed. |

| Base Offense Level: (Drug Quantity, If Applicable:) | 2B1.1 | +7 |
|---|---|---|

Special Offense Characteristics:

| Gain > $550,000 (2B1.1(b)(1)(H)) | +14 |
|---|---|
| More than 10 Victims ( 2B1.1(b)(2)(A)) | +2 |
|  |  |

| Victim Related Adjustment: | 0 |
|---|---|
| Adjustment for Role in the Offense: | 0 |
| Adjustment for Obstruction of Justice: | 0 |
| Adjustment for Reckless Endangerment During Flight: | 0 |

Adjusted Offense Level:

☐ Combined (Mult. Counts)   ☐ Career Off.   ☐ Armed Career Crim.

| Adjustment for Acceptance of Responsibility: | -3 |
|---|---|
| Total Offense Level: | 20 |
| Criminal History Score: | 0 |
| Criminal History Category: | 1 |

☐ Career Offender   ☐ Armed Career Criminal

| Guideline Range: | from | N/A months |
|---|---|---|
| (Range limited by: ☐ minimum mandatory ☐ statutory maximum) | to | _____ months |

Departures:

| Departure/Variance (5K2.0 / 3553(a)) (Plea Agreement, p. 12-13) | -2 |
|---|---|
| Government 5K1.1, Substantial Assistance Motion | -4 |

| Resulting Guideline Range: Adjusted Offense Level : 14 | from | 15 months |
|---|---|---|
|  | to | 21 months |

**RECOMMENDATION:**   See Defendant's Sentencing Memo